Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone:   415.512.3000
Facsimile:   415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS MANER,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF STANISLAUS, BIRGIT FLADAGER, and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.:  1:14-CV-01014-MCE-MJS<br><br>**DEFENDANTS' APPENDIX OF EVIDENTIARY SUPPORT IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>*[Filed concurrently with Notice of Motion, Memorandum of Points and Authorities, Statement of Undisputed Facts, Joint Statement of Undisputed Facts, Request for Judicial Notice, Proposed Order, Proposed Judgment]*<br><br>Date:       April 21, 2016<br>Time:       2:00 PM<br>Courtroom:7, 14th Floor<br>Judge:      Morrison C. England, Jr.<br><br>Trial Date:     October 24, 2016 |

TO THE COURT, AND TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Defendants County of Stanislaus ("County"), and

Birgit Fladager ("Fladager"), hereby respectfully submit this Appendix of Evidence in

Support of their respective Motions for Summary Judgment or in the Alternative, Partial

Summary Judgment ("Motions") against Plaintiff Douglas Maner ("Plaintiff").  Defendants'

respectfully request that the Court consider the following evidence referenced in their

6685904.2 ST236-025

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Separate Statements of Undisputed Facts in support of their Motions, filed concurrently

herewith:

The following declarations are attached to the Appendix of Evidence:

| Exhibit Letter | Description of Evidence |
| --- | --- |
| Exhibit A: | **Declaration of David Harris** |
| Exhibit B: | **Declaration of John Goold** |
| Exhibit C: | **Declaration of Cari Griffin** |
| Exhibit D: | **Declaration of Brenda Suarez** |
| Exhibit E: | **Declaration of Adam Christianson** |
| Exhibit F: | **Declaration of Alex Loya** |
| Exhibit G: | **Declaration of Birgit Fladager** |
| Exhibit H: | **Declaration of Carol Shipley** |
| Exhibit I: | **Declaration of Gerard Begen** |
| Exhibit J: | **Declaration of Morin I. Jacob** |

## EXHIBITS

| Exhibit Number | Description of Evidence |
| --- | --- |
| Exhibit 1: | **Email from Birgit Fladager, dated February 14, 2012**<br>[Authenticated in Declaration of David Harris ("Harris") ¶ 8] |
| Exhibit 2: | **Email Chain between Doug Maner and Dave Harris, dated April 16 and 17, 2012** |

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

[Authenticated in Declaration of Harris ¶ 11]

Exhibit 3: **Email Chain between Carol Shipley *et al.*, dated April 19, 2012**

[Authenticated in Declaration of Harris ¶ 12]

Exhibit 4: **Email from Mary Ann Ybarra, dated April 23, 2012**

[Authenticated in Declaration of Harris ¶ 13]

Exhibit 5: **Memorandum from Dave Harris, 2012**

[Authenticated in Declaration of Harris ¶ 15]

Exhibit 6: **Memorandum from Ramon Bawanan, dated October 17, 2012**

[Authenticated in Declaration of Harris ¶ 16]

Exhibit 7: **Collateral Support Assignment**

[Authenticated in Declaration of Harris ¶ 21]

Exhibit 8: **Email Chain between Dave Harris *et al.*, dated September and October 2013**

[Authenticated in Declaration of Harris ¶ 23]

Exhibit 9: **Memorandum from Dave Harris, dated October 7, 2013**

[Authenticated in Declaration of Harris ¶ 27]

Exhibit 10: **Memorandum from Ramon Bawanan, dated March 12, 2012**

[Authenticated in Declaration of Harris ¶ 28]

Exhibit 11: **Performance Evaluation for the Period September 1, 2003 – September 1, 2004**

[Authenticated in Declaration of John Goold ("Goold") ¶ 6]

Exhibit 12: **Memorandum from Kathy Matt, dated January 20, 2004**

[Authenticated in Declaration of Goold ¶ 7]

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Exhibit 13:   **Letter of Reprimand, dated April 6, 2004**

[Authenticated in Declaration of Goold ¶ 8]

Exhibit 14:   **Email from John Goold, dated October 3, 2006**

[Authenticated in Declaration of Goold ¶ 10]

Exhibit 15:   **Email from Doug Maner, dated January 24, 2007**

[Authenticated in Declaration of Goold ¶ 11]

Exhibit 16:   **Stanislaus County Personnel Manual**

[Authenticated in Declaration of Cari Griffin ("Griffin") ¶ 3]

Exhibit 17:   **Employee Conduct/Behavior Expectations Policy Acknowledgment**

[Authenticated in Declaration of Griffin ¶ 4]

Exhibit 18:   **Letter of Resignation**

[Authenticated in Declaration of Griffin ¶ 8]

Exhibit 19:   **Letter from Cari Griffin, dated October 08, 2013**

[Authenticated in Declaration of Griffin ¶ 9]

Exhibit 20:   **Letter from Brenda Suarez, dated November 04, 2013**

[Authenticated in Declaration of Brenda Suarez ("Suarez") ¶ 5]

Exhibit 21:   **Stanislaus County Chief Executive Office Investigation Report**

[Authenticated in Declaration of Suarez ¶ 7]

Exhibit 22:   **Memorandum from Adam Christianson, dated August 18, 2013**

[Authenticated in Declaration of Adam Christianson ("Christianson") ¶ 9]

Exhibit 23:   **Letter and Order of Suspension, dated August 23, 2013**

[Authenticated in Declaration of Christianson ¶ 10]

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Exhibit 24:    **Letter and Last Chance Agreement, dated March 24, 2008**

[Authenticated in Declaration of Birgit Fladager ("Fladager") ¶ 16]

Exhibit 25:    **Order of Suspension, dated August 11, 2008**

[Authenticated in Declaration of Fladager ¶ 19]

Exhibit 26:    **Letter of Reprimand, dated March 2, 2009**

[Authenticated in Declaration of Fladager ¶ 21]

Exhibit 27:    **Email Chain between Birgit Fladager, *et al.*, dated December 21, 2012**

[Authenticated in Declaration of Fladager ¶ 29]

Exhibit 28:    **Letter from Judge Nan Jacobs, dated December 26, 2012**

[Authenticated in Declaration of Fladager ¶ 30]

Exhibit 29:    **Email from Judge Nan Jacobs, dated February 25, 2013**

[Authenticated in Declaration of Fladager ¶ 32]

Exhibit 30:    **Memorandum from Dan Inderbitzen, dated July 15, 2013**

[Authenticated in Declaration of Fladager ¶ 38]

Exhibit 31:    **Amended Notice of Intended Discharge, dated July 19, 2013**

[Authenticated in Declaration of Fladager ¶ 40]

Exhibit 32:    **Letter from Paul Coble, dated September 16, 2013**

[Authenticated in Declaration of Fladager ¶ 44]

Exhibit 33:    **Attorney V - Deputy District Attorney Job Description**

[Authenticated in Declaration of Carol Shipley ("Shipley") ¶ 5]

Exhibit 34:    **District Attorney's Office Personnel Policies**

[Authenticated in Declaration of Shipley ¶ 10]

Exhibit 35:    **Memorandum of Understanding**

[Authenticated in Declaration of Shipley ¶ 11]

Exhibit 36:    **Stanislaus County Code Chapter 3.28**

[Authenticated in Declaration of Shipley ¶ 16]

Exhibit 37:    **Performance Evaluation for the period September 1, 1995, to September 1, 1999**

[Authenticated in Declaration of Shipley ¶ 19]

Exhibit 38:    **Performance Evaluation for the period July 1, 1991 to July 1, 1992**

[Authenticated in Declaration of Shipley ¶ 21]

Exhibit 39:    **Performance Evaluation for the period July 1, 1992 to July 1, 1993**

[Authenticated in Declaration of Shipley ¶ 22]

Exhibit 40:    **Performance Evaluation for the period July 1, 1993 to December 1, 1994**

[Authenticated in Declaration of Shipley ¶ 23]

Exhibit 41:    **Memorandum from Matt, dated December 7, 2005**

[Authenticated in Declaration of Shipley ¶ 25]

Exhibit 42:    **Memorandum from Casey, dated December 15, 2005**

[Authenticated in Declaration of Shipley ¶ 26]

Exhibit 43:    **Email from Casey, dated May 10, 2006**

[Authenticated in Declaration of Shipley ¶ 27]

Exhibit 44:    **Performance Evaluation for the period September 1, 2005 to September 1, 2006**

[Authenticated in Declaration of Shipley ¶ 28]

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Exhibit 45:     **Memorandum from Inderbitzen, dated May 6, 2013**

[Authenticated in Declaration of Shipley ¶ 46]

Exhibit 46:     **Notice of Intended Discharge, dated June 14, 2013**

[Authenticated in Declaration of Shipley ¶ 48]

Exhibit 47:     **Unsigned Order for Discharge**

[Authenticated in Declaration of Shipley ¶ 49]

Exhibit 48:     **Letter from Eggener, dated August 29, 2013**

[Authenticated in Declaration of Shipley ¶ 54]

Exhibit 49:     **Letter from Eggener, dated September 5, 2013**

[Authenticated in Declaration of Shipley ¶ 54]

Exhibit 50:     **Letter from Nelson, dated September 26, 2013**

[Authenticated in Declaration of Shipley ¶ 56]

Exhibit 51:     **Performance Evaluation for the period of September 1, 1994 to September 1, 1995**

[Authenticated in Declaration of Gerard Begen ("Begen") ¶ 5]

Exhibit 52:     **Performance Evaluation for the period of September 1, 1999 to September 1, 2000**

[Authenticated in Declaration of Begen ¶ 6]

Exhibit 53:     **Performance Evaluation for the period of September 1, 2000 to September 1, 2001**

[Authenticated in Declaration of Begen ¶ 7]

Exhibit 54:     **Memorandum from Matt, dated March 5, 2001**

[Authenticated in Declaration of Begen ¶ 8]

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

DEFENDANTS' APPENDIX OF EVIDENTIARY SUPPORT

Exhibit 55: **Performance Evaluation for the period of September 1, 2001 to September 1, 2002**

Authenticated in Declaration of Begen ¶ 10]

Exhibit 56: **Performance Evaluation for the period of September 1, 2002 to September 1, 2003**

[Authenticated in Declaration of Begen ¶ 11]

Exhibit 57: **Email Chain between Begen and Goold, dated October 3, 2006**

[Authenticated in Declaration of Begen ¶ 14]

Exhibit 58: **Email Chain between Sundy, *et al.*, dated February, 2007 to March 2007**

[Authenticated in Declaration of Begen ¶ 15]

Exhibit 59: **Investigation Summary and 10-Day Suspension Recommendation, 2007**

[Authenticated in Declaration of Begen ¶ 18]

Exhibit 60: **Notice of Intended Disciplinary Suspension, dated July 26, 2007**

[Authenticated in Declaration of Begen ¶ 19]

Exhibit 61: **Performance Evaluation for the period of September 1, 2007 to September 1, 2008**

[Authenticated in Declaration of Begen ¶ 23]

Exhibit 62: **Memorandum from Begen, dated March 28, 2008**

[Authenticated in Declaration of Begen ¶ 24]

Exhibit 63: **Email Chain between Begen, *et al.*, dated September 2008**

[Authenticated in Declaration of Begen ¶ 25]

Exhibit 64: **Performance Evaluation for the period of September 1, 2008 to August 31, 2009**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

8

[Authenticated in Declaration of Begen ¶ 26]

Exhibit 65: **Performance Evaluation for the period of September 1, 2009 to August 31, 2010**

[Authenticated in Declaration of Begen ¶ 27]

Exhibit 66: **Performance Evaluation for the period of September 1, 2010 to August 31, 2011**

[Authenticated in Declaration of Begen ¶ 28]

Exhibit 67: **Email Chain between Miller, *et al.*, dated March 2011**

[Authenticated in Declaration of Begen ¶ 29]

Exhibit 68: **Email Chain between Smith, *et al.*, dated April 14, 2011**

[ Authenticated in Declaration of Begen ¶ 30]

Exhibit 69: **Memorandum from Bawanan, dated September 29, 2011**

[Authenticated in Declaration of Begen ¶ 33]

Exhibit 70: **Memorandum from Inderbitzen, dated June 16, 2011**

[Authenticated in Declaration of Begen ¶ 34]

Exhibit 71: **Letter of Reprimand, dated October 11, 2011**

[Authenticated in Declaration of Begen ¶ 35]

Exhibit 72: **Email Chain between Maner, *et al.*, dated November 2011**

[Authenticated in Declaration of Begen ¶ 36]

Exhibit 73: **Complaint, filed April 10, 2014**

[Authenticated in Declaration of  Morin I. Jacob ("Jacob") ¶ 2]

Exhibit 74: **Transcript of the August 28, 2007, Skelly Conference**

[Authenticated in Declaration of Jacob ¶ 3]

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Exhibit 75: **Relevant excerpts from deposition of Douglas Maner taken on August 21, 2015**

[Authenticated in Declaration of Jacob ¶ 4]

Exhibit 76: **Relevant excerpts from deposition of Gerard Begen taken on September 23, 2015**

[Authenticated in Declaration of Jacob ¶ 5]

Exhibit 77: **Relevant excerpts from deposition of Wallace McKenzie taken on November 6, 2015**

[Authenticated in Declaration of Jacob ¶ 6]

Exhibit 78: **Stanislaus County Code Chapter 2.08**

[Identified in Request for Judicial Notice]

Exhibit 79: **Stanislaus County Code Chapter 3.04**

[Identified in Request for Judicial Notice]

Exhibit 80: **Stanislaus County Code Chapter 3.28**

[Identified in Request for Judicial Notice]

Dated: February 24, 2016

LIEBERT CASSIDY WHITMORE

By: */s/ Morin I. Jacob*
Morin I. Jacob
Lisa S. Charbonneau
Attorneys for Defendants
COUNTY OF STANISLAUS,
BIRGIT FLADAGER

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Exhibit A

1  Morin I. Jacob, Bar No. 204598
   mjacob@lcwlegal.com
2  Lisa S. Charbonneau, Bar No. 245906
   lcharbonneau@lcwlegal.com
3  LIEBERT CASSIDY WHITMORE
   A Professional Law Corporation
4  135 Main Street, 7th Floor
   San Francisco, California 94105
5  Telephone:   415.512.3000
   Facsimile:    415.856.0306
6
7  Attorneys for Defendants
   COUNTY OF STANISLAUS and
8  BIRGIT FLADAGER

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS MANER,<br><br>                    Plaintiff,<br><br>        v.<br><br>COUNTY OF STANISLAUS, BIRGIT FLADAGER, and DOES 1 through 20, inclusive,<br><br>                    Defendants. | Case No.:  1:14-CV-01014-MCE-MJS<br><br>**DECLARATION OF DAVID HARRIS IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        April 21, 2016<br>Time:        2:00 PM<br>Courtroom:7, 14th Floor<br>Judge:       Morrison C. England, Jr.<br><br>Trial Date: October 24, 2016 |

I, David Harris, hereby declare and state as follows:

1.      I am currently the Assistant District Attorney in the County of Stanislaus's Office of the District Attorney ("ODA").  If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2.      I was hired at the ODA as a Deputy District Attorney ("DDA") in 1991.  In approximately 2005/2006, I was promoted to Chief DDA.  In about December 2015 I became the Assistant District Attorney.

3.      As a Chief DDA, my job duties include supervising DDAs, overseeing certain departments or divisions in which DDAs are assigned to work, and helping to

**2**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1    manage the ODA. As a Chief DDA while DDA Maner was at the ODA, my direct

2    supervisor was either District Attorney James Brazelton or Assistant District Attorney

3    ("ADA") Carol Shipley.

4         4.    Around January 2012, I became DDA Douglas Maner's supervisor. I took

5    over these supervisory duties from Chief DDA Gerard Begen. I was DDA Maner's

6    supervisor from around January 2012 until DDA Maner quit his job in October 2013.

7         5.    When I first began supervising DDA Maner, he was one of two calendar

8    deputies assigned to Department 6. As the Department 6 calendar deputy, DDA Maner

9    split the non-vertical caseload with the other department DDA. As used here, "vertical"

10   means a specialized case, such as a gang or special fraud case. As the Department 6

11   calendar deputy, DDA Maner was responsible for the prosecution of his assigned

12   criminal caseload from assignment to completion. Within the bounds of the law and the

13   ODA policies he would be allowed to settle cases or take them to trial. DDA Maner was

14   also required to perform other duties based on the needs of the ODA. Department 6

15   started later than any other court and I observed DDA Maner with a lot of downtime.

16   Because we were short staffed at the time, I asked him to assist with our backlog of

17   misdemeanor complaints to review for issuance purposes. Other calendar DDAs were

18   asked to do the same thing. However, DDA Maner reviewed and issued fewer

19   complaints that most other DDAs. Moreover, when he issued complaints, he failed to

20   follow some of the ODA's standard procedures, such as using a name stamp as directed

21   by ADA Shipley. This was frustrating for our clerical staff, which required additional

22   supervision from me and the supervisor at issuance, Chief DDA Begen, who contacted

23   me on multiple occasions about problems with DDA Maner's issuance work. Both of

24   these issues required me to take more time to supervise DDA Maner as compared to

25   other employees I supervised. DDA Maner's failure to follow instructions was time

26   consuming for me and other staff members.

27        6.    Also in early 2012, DDA Maner was the attorney on a murder case, which

28   the ODA referred to as the "Solario case." The victim's next of kin, Mary Ann Ybarra,

**3**

DECLARATION OF DAVID HARRIS

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

regularly appeared in court on behalf of the deceased victim. Around February 14, 2012, I received notice that Ms. Ybarra was complaining about DDA Maner's conduct as the attorney on the case. The information I received was that DDA Maner had ignored her, had refused to put her in touch with the Victim's Advocate with whom she wanted to work, and was not helping her understand what was going on in the case.

7. As a Chief DDA, I have responsibilities for ensuring that DDAs are complying with their legal and ethical obligations, including Marsy's law. Based on my knowledge, training and experience as a prosecutor and a Chief DDA in Stanislaus County, I am familiar with Marsy's law and how it is applied at the ODA. At the ODA, we strive to be sensitive and responsive to the needs of victims of crime and their families. It is bad enough to be a victim; victims should not be victimized by the system. In addition to the ODA's own internal standards regarding our victims, victims of crime and their families have articulated rights set forth in the California Constitution at Article I, Section 28, also known as "Marsy's law." Marsy's law was enacted by California voters in 2008 and gives victims of crime and their families such rights as the right to be treated with fairness and respect, the right to notice of proceedings , the right to confer with a prosecutor, the right to be heard, and the right to a speedy trial. I and the ODA take Marsy's law very seriously. All DDAs at the ODA are required to comply with Marsy's law, including DDA Maner.

8. On February 14, 2012, I received an email from DA Fladager that directed Chief DDA Begen, DDA Maner, and me, to convene a meeting with Ms. Ybarra to address her concerns about DDA Maner. A true and correct copy of the February 14, 2012, email from DA Fladager is attached to the Appendix of Evidentiary Support as **Exhibit 1.**

9. After hearing from DA Fladager, I convened a meeting with DDA Maner, DDA Maner's former supervisor Chief DDA Begen, Ms. Ybarra, and Ms. Ybarra's family member, Tina Cantu. Also present was Alex Loya, Ms. Ybarra's advocate from the ODA's Victim Services Unit. The purpose of the meeting was to give Ms. Ybarra the

**4**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   opportunity to voice her concerns, to address her concerns with DDA Maner, and

2   hopefully resolve the matter and move forward. The meeting was held on February 16,

3   2012. During the meeting, I listened to Ms. Ybarra describe dissatisfaction with DDA

4   Maner – that she had been ignored by him, that he had not kept her informed of what

5   was going on in the case, that she did not understand what was happening in the case,

6   and that DDA Maner had excluded Mr. Loya from a conversation against her wishes. At

7   the meeting, DDA Maner appeared disinterested. At the end of the meeting, I directed

8   DDA Maner to keep Ms. Ybarra informed of everything that happened in the case going

9   forward, as legally required by Marsy's law, and I also directed him not to exclude Mr.

10  Loya from any discussions DDA Maner had with Ms. Ybarra. I then asked if DDA Maner

11  understood what he had been directed to do. DDA Maner told me he understood.

12      10.     My expectation after this meeting was that DDA Maner would conduct

13  himself in accordance with Marsy's law and treat Ms. Ybarra with the sensitivity and

14  respect required so that Ms. Ybarra and Mr. Loya would have no further complaints

15  about DDA Maner's conduct.

16      11.     On April 16, 2012, which I believe was the next court appearance for the

17  Solario case, Mr. Loya contacted me about what had occurred that day. Mr. Loya told

18  me that he and Ms. Ybarra were in the courtroom for the hearing but DDA Maner did not

19  confer with them or speak to them at all. Mr. Loya also told me that DDA Maner met with

20  the Judge and opposing counsel in the Judge's chambers, came out and continued the

21  trial on the record, and then immediately left the courtroom through a side door. Based

22  on this information, I sent DDA Maner an email asking for an update on the case and

23  whether DDA Maner had made contact with Mr. Loya or Ms. Ybarra. DDA Maner told

24  me he failed to contact them. I then had to direct him to contact both Mr. Loya and Ms.

25  Ybarra to apprise them of what had happened. Attached to the Appendix of Evidentiary

26  Support as **Exhibit 2** is a true and correct copy of emails sent between myself and DDA

27  Maner on April 16 and 17, 2012, regarding Ms. Ybarra and the April 16, 2012, hearing.

28  \\

**5**

12.     On April 19, 2012, I received an email from ADA Shipley that forwarded an email from Ms. Ybarra that again complained about DDA Maner's conduct at the April 16, 2012, hearing. I reviewed the email in my capacity as DDA Maner's supervisor. In the email, Ms. Ybarra said that she felt the defense attorney was treating her better than DDA Maner. She also asked for a new DDA to be assigned to the case. Attached to the Appendix of Evidentiary Support as **Exhibit 3** is a true and correct copy of the email from ADA Shipley to me, Chief DDA Begen, and DA Fladager, with Ms. Ybarra's most recent complaint.

13.     On April 23, 2012, Ms. Ybarra told me via email that DDA Maner was rude to her when he called her on April 17, 2012, and that she did not deserve to be treated in the way DDA Maner was treating her. Ms. Ybarra also asked for DDA Maner to give her at least a few minutes at court hearings to let her know what was going on. She also told me that this was how DDA Maner had conducted himself with her years ago, and she was unhappy learning that DDA Maner was again on the case. Attached to the Appendix of Evidentiary Support as **Exhibit 4** is a true and correct copy of the email sent to me by Ms. Ybarra.

14.     Upon receiving Ms. Ybarra's April 23, 2012, email, I believed DDA Maner had not only again failed to keep Ms. Ybarra informed about the case in violation of Marsy's law, but he also disobeyed my direct supervisory order to do so. Also, I questioned his explanation for why he ignored Ms. Ybarra and Mr. Loya; although DDA Maner said he left without speaking to Ms. Ybarra because he had to hurry to another Department due to his caseload. I examined ODA records that showed his caseload on that day and did not see a heavy caseload. DDA Maner had about eight cases assigned to him that day, in addition to the Solario matter, and none of the cases appeared to be complex or serious. Because DDA Maner had failed to follow Marsy's law and my direct instruction to work with Ms. Ybarra and keep her informed about the case, without any justification, I believed DDA Maner's conduct warranted an investigation by the ODA HR Manager, Ramon Bawanan, to determine whether he violated any ODA and/or County

**6**

policies.

15.     Attached to the Appendix of Evidentiary Support as **Exhibit 5** is a true and correct copy of an April 23, 2012, memorandum I wrote and emailed to the ODA's HR Manager at the time, Ramon Bawanan, which memorializes what transpired between Ms. Ybarra and DDA Maner and how DDA Maner violated Marsy's law. I sent this memorandum and supporting documentation to Mr. Bawanan so he could undertake a fact-finding investigation and recommend a penalty, if appropriate, based on his investigation.

16.     On October 17, 2012, I received a memorandum from Mr. Bawanan that summarized his administrative investigation into DDA Maner's 2012 conduct toward Ms. Ybarra and Mr. Loya, his failure to follow my February 16, 2012, instructions to keep Ms. Ybarra apprised of goings-on in the Solario case, and failure to strictly comply with Marsy's law. A true and correct copy of the memorandum from Mr. Bawanan is attached to the Appendix of Evidentiary Support as **Exhibit 6**.

17.     I received Mr. Bawanan's memorandum in my capacity as DDA Maner's supervisor and reviewed it. In Mr. Bawanan's summary, he recommended a five-day suspension for DDA Maner. I disagreed with this recommendation and believed a more serious penalty was warranted due to the severity of DDA Maner's misconduct, which according to Mr. Bawanan was the conclusion that DDA Maner had lied in his interview about the direction I gave him in the February 16, 2012 meeting.

18.     Prior to Ms. Ybarra's complaint about DDA Maner, I had not received a complaint from a victim or victim's next of kin like that about DDA Maner. DDAs at the County of Stanislaus are subject to a system of rotating assignments and handle a variety of cases and tasks while employed at the ODA. The decision to rotate or transfer DDAs between assignments is made by the ADA in consultation with the Chief DDAs. All experienced DDAs are expected to work any assignment, and all DDAs are expected to rotate based on the needs of the ODA at a given time.

19.     The Chief DDAs at the ODA meet with the ADA and ODA's non-attorney

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

7

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

managers on a weekly basis to discuss management issues such as DDA assignments, workflow, staffing issues, and personnel decisions. These meetings are referred to as "Chiefs Meetings."

20. On or about March 22, 2012, I attended a Chiefs Meeting during which we discussed DDA Maner. At this meeting, we discussed his history of misconduct, including the complaints from judges, clerical staff, peace officers, members of the public, other Chief DDAs, and now a victim's next of kin and her Advocate. As a group we decided to transfer DDA Maner to Juvenile Court where he would be less likely to have such interactions and would work on less high-profile cases. DDAs at the County of Stanislaus are subject to a system of rotating assignments and handle a variety of cases and tasks while employed at the ODA. DDA Maner's transfer to Juvenile Court was not punitive. DDA Maner was transferred to the Juvenile assignment because I thought he could be successful there and receive fewer complaints.

21. I was not motivated to transfer DDA Maner to Juvenile Court due to DDA Maner's political speech in 2006, his association with any political candidate or another protected classification, and not out of retaliation. DDA Maner was transferred to Juvenile Court because his conduct and behavior caused numerous complaints over the years from various members of our staff, criminal justice partners and the public. In early 2013, at the direction of ADA Shipley, I drafted a list of collateral duties performed by Chief DDAs that we needed a high-level DDA or Chief-level DDA to take on due to staffing shortages at the Chief DDA-level. These duties would come to comprise a new assignment in the ODA called the Collateral Support Assignment. Attached to the Appendix of Evidentiary Support as **Exhibit 7** is a true and correct copy of the document I drafted and submitted to ADA Shipley for review.

22. The Chief DDAs and ADA Shipley originally wanted Doug Fontan, a former Chief DDA, to perform the Collateral Support Assignment ("CSA"). However, Doug Fontan retired and was unable to come back to perform the position. After we found out that Doug Fontan would not be performing the position, the Chief DDAs and ADA

**8**

DECLARATION OF DAVID HARRIS

Shipley decided to transfer DDA Maner into the CSA upon his return to the ODA after his suspension. As an experienced DDA, he was only one of a few attorneys at the ODA with the experience needed to perform these essential, high-level Chief DDA functions.

23. During the time when DDA Maner was serving his suspension, he emailed me on September 23, 2013, inquiring about his next assignment. In response, on October 4, 2013, I emailed him a description of the CSA. I planned to discuss the assignment with him on his first day back, October 7, 2013. Attached to the Appendix of Evidentiary Support as **Exhibit 8** is at true and correct copy of the September 23, 2013, email I received from DDA Maner and my October 4, 2013, response sent via email.

24. DDA Maner's transfer to the CSA was not punitive. DDA Maner was transferred to the CSA because he was one of the few senior attorneys with the required experience to perform these essential, Chief-level duties. In addition, I, the other Chief DDAs, and ADA Shipley believed that Maner would receive fewer complaints if he worked in the CSA because its functions were primarily within the ODA. Still, the CSA required court appearances from time to time. Because we hoped that DDA Maner's conduct would improve upon return from his suspension, we believed he would be competent to perform those courtroom duties.

25. DDA Maner's political activity, political opinions, political viewpoints, and/or associations with political candidates or other protected classifications, were not factors in our decision to assign DDA Maner to the CSA. Nor was I motivated to assign him to the CSA assignment out of retaliation.

26. After DDA Maner quit on October 7, 2013, former Chief DDA Goold had to be brought in to perform many of the duties of the CSA.

27. Before DDA Maner's resignation on October 7, 2013, I had been working with Cari Griffin, the new ODA HR Manager, about DDA Maner's return to work. Our plan was to meet with him on his first day back, October 7, 2013, present him with a performance improvement plan, and talk with him about performance expectations. Attached to the Appendix of Evidentiary Support as **Exhibit 9** is a true and correct copy

**9**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

of the performance improvement plan we planned to present to DDA Maner on October 7, 2013.

28.     At various times during the period during which I supervised DDA Maner, he requested pre-approval for vacation he had yet to accrue.  This is not typical since most employees – especially senior employees – have sufficient levels of accrued vacation at the time of their request to cover the requested vacation.  Also, DDA Maner represented to me that he had already planned his travel prior to receiving approval from the ODA regarding his chosen vacation dates.  For this reason, in March 2012, I asked Mr. Bawanan, the ODA's HR Manager, to prepare a summary of applicable policy with regard to such requests.  Attached to the Appendix of Evidentiary Support as **Exhibit 10** is a true and correct copy of the memorandum I received from Mr. Bawanan on this subject.  After receiving the memorandum, I shared it with DDA Maner via email on March 12, 2012.   I did not know that Douglas Maner wrote a Letter to the Editor of the Modesto Bee in 2006 until after Mr. Maner filed this lawsuit in April 2014.

29.     Sometime after DDA Maner's August 5, 2013, *Skelly* conference, I recall learning at a Chiefs Meeting that he voiced a concern that DDA Fladager was biased against him for his 2006 support of Cummins in the DA election that year.  This was the first I recall ever hearing of any alleged political affiliation on the part of DDA Maner.

30.     At no time was Douglas Maner's speech, association with any political candidate or any other protected classification, or retaliation, a factor in any personnel decision I made regarding DDA Maner.

31.     At no time did Douglas Maner tell me he supported Michael Cummins in the 2006 election for DA.  At no time did Douglas Maner complain to me that he believed he was being retaliated against for his political viewpoint, opinion, association, or expression.  At no time did Douglas Maner tell me he felt harassed or that he was a victim of a hostile work environment.

32.     I did not discuss DDA Maner's political opinions, views, or support for any particular DA candidate with DA Fladager, ADA Shipley, or any Chief DDA while DDA

**10**

DECLARATION OF DAVID HARRIS

1    Maner worked at the ODA.

2      I declare under the penalty of perjury under the laws of the United States that the

3 foregoing is true and correct.

4      Executed this 17th day of February, 2016, in Modesto, California.

_____
DAVID HARRIS

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

**11**

**12**

Exhibit B

Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone:   415.512.3000
Facsimile:    415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS MANER,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>COUNTY OF STANISLAUS, BIRGIT FLADAGER, and DOES 1 through 20, inclusive,<br><br>　　　　　　Defendants. | Case No.: 1:14-CV-01014-MCE-MJS<br><br>**DECLARATION OF JOHN J. GOOLD IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:　　　April 21, 2016<br>Time:　　　2:00 PM<br>Courtroom:7, 14th Floor<br>Judge:　　Morrison C. England, Jr.<br><br>Trial Date: October 24, 2016 |

I, JOHN GOOLD, hereby declare and state as follows:

1.　I worked as an attorney for the County of Stanislaus' Office of the District Attorney ("ODA") from March 1, 1993 until my resignation in December 2007, when I went to work for the Napa County District Attorney as a Chief Deputy I returned to part time employment with the Stanislaus County ODA in September 2013.  If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2.　From 1993 to 1999, I was a Deputy District Attorney ("DDA").  I was promoted to Chief DDA in October 1999.  I remained a Chief DDA until my resignation in

**13**

1

DECLARATION OF JOHN J. GOOLD

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

December 2007.

3. As Chief DDA, my job duties included supervising DDAs, overseeing various departments or divisions as assigned, and assisting in the management of the ODA. The duties of DDAs and Chief DDAs rotated throughout our careers. From at least 2005 to my resignation, all the Chief DDAs and ADA Shipley met on a weekly basis to conduct management meetings in what was referred to as the "Chiefs Meeting." From at least 2005 to my retirement, my direct supervisor was Carol Shipley, Assistant District Attorney ("ADA"). ADA Shipley was the Acting District Attorney from 2005 through 2006.

4. From mid-2003 to some date in November 2005, I served as DDA Douglas Maner's direct supervisor. As DDA Maner's supervisor, it was my responsibility to generally oversee his work assignments, perform annual performance evaluations and otherwise work with DDA Maner on any performance or misconduct issues he may have been having.

5. In July 2003, DDA Maner was overheard being condescending and arrogant toward another clerical staff. I counseled DDA Maner about this incident and told him to improve the way in which he communicated with our clerical staff.

6. As DDA Maner's supervisor, I was responsible for performing his annual evaluation for the period during which I supervised him. In November 2004, I issued him a performance evaluation for the period of September 1, 2003, through September 1, 2004. A true and correct copy of my 2003/2004 performance evaluation for DDA Maner is attached to the Appendix of Evidentiary Support as **Exhibit 11**. In the performance evaluation, I rated him as needing improvement in the area of his relationships with paralegals. During this evaluation period, I observed that DDA Maner was sometimes unprofessional in the way that he handled his personal contacts with clerical and other non-attorney staff at the ODA. Specifically, in January 2004, a paralegal, Dolores Nemanic, complained that DDA Maner had spoken to her in a loud, angry, and demeaning demeanor, which reduced her to tears.

\\

**14**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

7.      Due to Ms. Nemanic's complaint, I asked the ODA's Human Resources Manager, Kathy Matt, to conduct an investigation into DDA Maner's conduct toward Ms. Nemanic.  On January 20, 2004, I received a memorandum from Ms. Matt that detailed her investigatory findings.  Attached to the Appendix of Evidentiary Support as **Exhibit 12** is a true and correct copy of Ms. Matt's 2004 memorandum, which I reviewed in my capacity as DDA Maner's supervisor.

8.      After reviewing Ms. Matt's investigatory report and findings, I issued DDA Maner a Letter of Reprimand in April 2004 for his discourteous and inappropriate treatment of the paralegal.  Attached to the Appendix of Evidentiary Support as **Exhibit 13** is a true and correct copy of the Letter of Reprimand I issued to DDA Maner due to his conduct toward Ms. Nemanic.  DDA Maner's previous, similar conduct toward another staff member in July 2003 supported my conclusion that a Letter of Reprimand was warranted.

9.      After I presented DDA Maner with his performance evaluation in November 2004, he refused to sign the evaluation because he was upset that I referenced the April 2004 Letter of Reprimand in the performance evaluation.  Since DDA Maner had engaged in the misconduct that warranted the Letter of Reprimand during the evaluation period, I believed including that information was appropriate.

10.     In October 2006, my wife was painting a wall mural in the fourth floor restroom of our building.  All ODA employees had been informed via email that she would be working in the bathroom on October 3, 2006.  On October 3, 2006, DDA Maner entered the restroom and even though my wife was in the restroom painting, he proceeded to use a urinal within feet of her.  She immediately reported to me that she was offended by his actions.  That day, I complained to Chief DDA Gerard Begen, DDA Maner's then-supervisor, and the ODA's Human Resources Manager, Ramon, Bawanan, about this rude and unprofessional conduct.  Attached to the Appendix of Evidentiary Support as **Exhibit 14** is a true and correct copy of the complaint I emailed to Mr. Bawanan on October 3, 2006, about the bathroom incident.  I described in that

**15**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

email that DDA Maner's reputation for being rude and abusive to women at the ODA was legion. This was yet another example of his inappropriate conduct.

11. In January 2007 I received an email from DDA Maner that documented communications between DDA Maner and his personal auto repair person, Mr. Kruse. Attached to the Appendix of Evidentiary Support as **Exhibit 15** is a true and correct copy of DDA Maner's email to me dated January 24, 2007, in which he admits to reading DDA Baker's case notes to Mr. Kruse. It states that Mr. Kruse was unhappy with the handling of a case by DDA John Baker, who I supervised at the time. When DDA Maner returned to the office, he obtained the file and read DDA Baker's confidential handwritten work product notes over the telephone to Mr. Kruse without talking to his supervisor or DDA Baker. Maner emailed me that Mr. Kruse was still unhappy and that I should talk to DDA Baker and/or the repairman. I raised the issue of the inappropriateness of DDA Maner's actions with Maner's supervisor at the time, Chief DDA Gerard Begen. DDA Maner came in contact with Mr. Kruse because Mr. Kruse serviced DDA Maner's vehicle. I found DDA Maner's conduct inappropriate. That DDA Maner would read another attorney's confidential work product case notes to a member of the public displayed poor judgment and was a violation of policy.

12. I do not recall that Douglas Maner wrote a Letter to the Editor of the Modesto Bee in May 2006.

13. I had, and still have, no personal knowledge of Douglas Maner's 2006 political opinions or association with Michael Cummins.

14. At no time did Douglas Maner tell me he supported Michael Cummins in the 2006 election for DA. At no time did Douglas Maner complain to me that he believed he was being retaliated against for his political viewpoint, opinion, association, or expression. At no time did Douglas Maner tell me he felt harassed or that he was a victim of a hostile work environment.

15. At no time was Douglas Maner's speech, association with any political

**16**

candidate or any other protected classification, or retaliation, a factor in any personnel decision I made regarding DDA Maner.

16. At no time was Douglas Maner's speech, association with any political candidate or any other protected classification, or potential retaliation against him for such association, discussed in my presence during any Chief's meetings or individual meetings with other ODA managers.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of February, 2016, in Modesto, California.

JOHN J. GOOLD

**17**

**18**

Exhibit C

Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone: 415.512.3000
Facsimile: 415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS MANER,<br><br>                    Plaintiff,<br><br>         v.<br><br>COUNTY OF STANISLAUS, BIRGIT FLADAGER, and DOES 1 through 20, inclusive,<br><br>                    Defendants. | Case No.: 1:14-CV-01014-MCE-MJS<br><br>**DECLARATION OF CARI GRIFFIN IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:        April 21, 2016<br>Time:        2:00 PM<br>Courtroom:7, 14th Floor<br>Judge:       Morrison C. England, Jr.<br><br>Trial Date: October 24, 2016 |

I, CARI GRIFFIN, hereby declare and state as follows:

1. I am an employee of the County of Stanislaus ("County"). If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2. I began working for the County in December 2012. I currently work as a management consultant for the Human Resources ("HR") Division of the County's Chief Executive Office. I have been in this position since approximately October 2013. In my management consultant position, I act as the HR liaison to various County agencies,

**19**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

including the Probation Department, the Office of the District Attorney ("ODA"), the Sheriff's Department, and the Office of the County Counsel. Part of my job responsibilities include overseeing discipline and implementing the terms of each labor (or bargaining) unit's negotiated labor agreement, also known as a collective bargaining agreement or memorandum of understanding ("MOU"). My direct supervisors during the time Douglas Maner was employed by the County and I was serving in my dual role at the ODA and CEO's office were Nancy Bronstein, one of the County's Deputy Executive Officers, and Assistant District Attorney Carol Shipley.

3. The Stanislaus County Personnel Manual governs the terms and conditions of employment of most County employees, including deputy district attorneys. While employed by the County, Deputy District Attorney ("DDA") Douglas Maner was subject to the rules set forth in the County Personnel Manual. A true and correct copy of the County Personnel Manual is attached to the Index of Evidentiary Support as **Exhibit 16.**

4. As a Management Consultant at the County, I am familiar with, and have access to, the County's personnel files, records, and all other documentation the County maintains on employees. I have reviewed and am familiar with employee Douglas Maner's personnel file. Attached to the Appendix of Evidentiary Support as **Exhibit 17** is a true and correct copy of DDA Maner's signed Acknowledgment Form contained in his personnel file and dated January 4, 2005, acknowledging that he read, understood, and agreed to follow the policies set forth in the County Personnel Manual.

5. From approximately December 2012through October 2013, I served a dual function in that I was the HR Manager for the ODA and also worked as a Management Consultant at the County's Chief Executive Office. During this period, I spent approximately sixty percent of my time in the HR Manager position at the ODA. As the HR Manager at the ODA, I was responsible for most HR functions in the ODA, including administering and interpreting applicable MOUs, assisting with the disciplinary process, assisting with personnel investigations, and recruitment. My supervisor in the ODA's

**20**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

office was Assistant District Attorney ("ADA") Carol Shipley.

6.   As the ODA's HR Manager, I assisted with the investigation and discipline of DDA Maner.  Because I was so new to the position, my role was limited to facilitating and coordinating the efforts that were underway.  I did not personally conduct personnel investigations into DDA Maner's conduct, nor make recommendations as to what level of discipline to impose on DDA Maner.  My role  encompassed tasks such as scheduling witness interviews for the ODA's investigator, Chief Investigator Dan Inderbitzen, sending notices of interviews to the interview subjects, and creating and/or distributing templates for various correspondence, notices, or other documents as needed.

7.   I accompanied ADA Shipley when she served the notice of intent to discharge DDA Maner in June 2013.  After serving him the notice of intent, DDA Maner packed up his office.  I found that odd and did not expect him to do that since he was merely being served with a notice of intended discipline, and it was not final.

8.   On October 7, 2013, DDA Maner came to my office and presented me with a resignation letter.  A true and correct copy of the resignation letter I received from DDA Maner is attached to the Appendix of Evidentiary Support as **Exhibit 18.**

9.   After I received Maner's resignation letter, I notified my supervisor, Nancy Bronstein.  We discussed how to respond to the letter.  Following the direction of Nancy Bronstein, I contacted Douglas Maner the next day, on October 8, 2013, to follow up with him regarding what he claimed was a hostile work environment, that he was singled out for punishment, that he experienced harassment, retaliation, and abuse of the disciplinary process, and that he was forced to quit.  A true and correct copy of the letter I sent Douglas Maner on October 8, 2013, is attached to the Appendix of Evidentiary Support as **Exhibit 19**.  I never received a response from Douglas Maner.

10. Even though Maner never responded to my letter, Nancy Bronstein and I decided to open an investigation into the allegations set forth in his resignation letter, including whether Maner had experienced a hostile work environment, harassment, differential treatment, or an abuse of the disciplinary process, and/or whether Maner was

**21**

DECLARATION OF CARI GRIFFIN

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1  forced to quit. We referred the investigation to the Chief Executive Office's investigator,

2  Brenda Suarez for handling.

3      11. Prior to DDA Maner's scheduled return date, I spoke with Chief DDA Harris

4  about DDA Maner's transfer into the Collateral Support Assignment, which was

5  supposed to take place during the week of October 7, 2013. Rotating DDA Maner to the

6  Collateral Support Assignment would have had no effect on DDA Maner's salary or

7  benefits.

8      12. As a Management Consultant at the County, I am familiar with, and have

9  access to, the County's personnel files, records, and all other documentation the County

10  maintains on employees. Between August 2007 and February 2011, no new

11  proposed/intended disciplinary action against Maner was initiated by the County or

12  anyone in the ODA's office. Between May 2007 and March 2011, no new administrative

13  investigations into Maner's conduct were initiated by the County or anyone in the ODA's

14  office.

15      13. Prior to receiving Maner's October 7, 2013, letter of resignation, neither

16  Human Resources at the DA's Office nor the County's Chief Executive Office received a

17  complaint from DDA Maner about retaliation, harassment, hostile work environment, or

18  any other allegations of adverse action against DDA Maner due to his 2006 political

19  speech, his association with any political candidate or other protected classification.

20      I declare under the penalty of perjury under the laws of the United States that the

21  foregoing is true and correct.

22      Executed this __23__ day of February, 2016, in Modesto, California.

23

24

25

26                                    CARI GRIFFIN

27

28                                                              **22**

Exhibit D

Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone: 415.512.3000
Facsimile: 415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS MANER,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF STANISLAUS, BIRGIT FLADAGER, and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.: 1:14-CV-01014-MCE-MJS<br><br>**DECLARATION OF BRENDA SUAREZ IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: April 21, 2016<br>Time: 2:00 PM<br>Courtroom:7, 14th Floor<br>Judge: Morrison C. England, Jr.<br><br>Trial Date: October 24, 2016 |

I, BRENDA SUAREZ, hereby declare and state as follows:

1. I am an employee of the County of Stanislaus ("County"). If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2. I began working for the County in 1986. I am currently employed as a Management Consultant. In October 2013, my title was Management Consultant for the County's Chief Executive Office. In that position, my job included conducting investigations into complaints of hostile work environment, harassment, discrimination, and retaliation claims County-wide.

24

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

3.  On October 8, 2013, I was contacted by Nancy Bronstein,  in her capacity as the Equal Rights Officer for the County of Stanislaus , , to perform a fact-finding investigation into whether Douglas Maner was subjected to a hostile work environment, harassment, disparate and improper treatment, retaliation, and abuse of disciplinary process.

4.  I conducted my investigation in November 2013.  As part of my investigation, I reviewed Mr. Maner's resignation letter dated October 7, 2013 (which included his complaint), and interviewed District Attorney ("DA") Birgit Fladager, Assistant District Attorney Carol Shipley, Retired Chief Deputy District Attorney Jerry Begen, and Chief Deputy District Attorney Dave Harris.

5.  On November 4, 2013, I tried to make contact with Douglas Maner via letter to speak with him about the allegations of retaliation and a hostile work environment contained in his letter.  I also invited him to bring up any other issues he wanted to discuss.  I received no response from Mr. Maner.  Attached to the Appendix of Evidentiary Support as Exhibit 20 is a true and correct copy of the November 4, 2013, letter I authored and sent to Mr. Maner.

6.  Based on my investigation, I concluded that Mr. Maner was not discriminated against, harassed, or retaliated against due to his support of DA Fladager's opponent in the 2006 election for DA, nor was Mr. Maner subjected to a hostile work environment.

7.  As part of my investigation, I prepared a written report.  Attached to the Appendix of Evidentiary Support as Exhibit 21 is a true and correct copy of the investigatory report I wrote in or about December, 2013.

8.  At the bottom of page four in the "Conclusion" section of my report, I refer to Mr. Maner's support of Ms. Fladager's opponent in "2007."  This was a typographical error. Maner supported Ms. Fladager's opponent, Michael Cummins, in 2006.  June 2006 was the month and year in which the County held an election for DA; not 2007.

///

///

**25**

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 17th day of February, 2016, in Modesto, California.

BRENDA SUAREZ

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

**26**

Exhibit E

Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone:    415.512.3000
Facsimile:    415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DOUGLAS MANER,

               Plaintiff,

     v.

COUNTY OF STANISLAUS, BIRGIT
FLADAGER, and DOES 1 through
20, inclusive,

               Defendants.

Case No.:  1:14-CV-01014-MCE-MJS

**DECLARATION OF ADAM CHRISTIANSON IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

Date:      April 21, 2016
Time:     2:00 PM
Courtroom:7, 14th Floor
Judge:    Morrison C. England, Jr.

Trial Date: October 24, 2016

I, ADAM CHRISTIANSON, hereby declare and state as follows:

1.  I am the elected Sheriff-Coroner of Stanislaus County.  If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2.  I joined the Stanislaus County Sheriff's Department in 1996.  After working in various assignments, promoting to Sergeant and then Lieutenant, I was elected Sheriff-Coroner in 2006.  I was re-elected in 2010 and was re-elected to a third term in 2014.

\\\

**28**

3.  In July 2013, District Attorney ("DA") Birgit Fladager asked me to serve as the *Skelly* officer at an upcoming *Skelly* conference for Deputy District Attorney ("DDA") Douglas Maner.  Because part of my job as Sheriff-Coroner involves serving as the *Skelly* officer for discipline matters involving Sheriff's Department personnel, I was and am familiar with the *Skelly* pre-disciplinary process and the role of the *Skelly* officer.

4.  I have served as a *Skelly* officer on approximately thirty occasions in the last ten years.  Based on my knowledge, training and experience, a *Skelly* conference is the employee's opportunity to respond to proposed/intended discipline.  It is not an evidentiary hearing.   As the *Skelly* officer, my role is to hear the employee's response to the allegations set forth in the Notice of Intended Discipline, to ask clarifying questions, if needed, and render a decision to uphold or reduce the proposed/intended discipline.  Prior to DA Fladager's request that I serve as DDA Maner's *Skelly* officer, I had not heard about any of the details of the investigation or proposed discipline until I received the Amended Notice of Intended Discipline and attachments just before the *Skelly* conference, which I reviewed to prepare to serve as the *Skelly* officer.  DA Fladager did not inform me why she wanted me to serve as the *Skelly* officer in this particular matter except to say that she wanted an unbiased third party with no prior knowledge of the matter to serve as the *Skelly* officer.  I did not find her request of me to serve as the *Skelly* officer as unusual.

5.  Prior to the *Skelly* conference for DDA Maner, I was presented with an Amended Notice of Intended Discharge authored by DA Fladager, and all the documents listed in the Amended Notice as attachments, which included the ODA's investigatory findings and other performance and discipline documents.   I also received an audio recording of the initial *Skelly* conference, which was held on June 28, 2013.

6.  Prior to DDA Maner's August *Skelly* conference, I thoroughly reviewed the Amended Notice and all attached documents.

7.  My *Skelly* conference with DDA Maner was held on August 5, 2013.  Those present included me, Undersheriff Mick Hardenbrook, DDA Maner, and two of DDA

**29**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

DECLARATION OF ADAM CHRISTIANSON

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1    Maner's union representatives, Michael Eggener and Derek Seymour.  Sergeant Keith

2    Rakoncza from the County Sheriff's Department was also present to operate the

3    recording device.  During the conference, which was approximately forty-five minutes

4    long, DDA Maner and Mr. Eggener presented Maner's side of the story to me.  After the

5    conference, I reviewed all the evidence before me, including the investigatory findings,

6    the Amended Notice of Intended Discharge, DDA Maner's performance history, DDA

7    Maner's disciplinary history, and the response DDA Maner and Mr. Eggener provided

8    during the *Skelly* conference, prior to making my decision as to whether the proposed

9    termination should be upheld or reduced.

10          8.  After the August 5, 2013, *Skelly* conference, and a thorough review of the

11   documents presented to me along with the Amended Notice of Intended Discharge, I

12   decided a 30-day suspension was warranted, along with behavioral counseling a written

13   reprimand, and to be placed on a performance improvement plan.  I believed the initial

14   recommendation of termination was excessive.  I did, however, conclude that DDA

15   Maner had disobeyed his supervisor's directive with regard to working with Ms. Ybarra,

16   that he was unprofessional in court, that he was late to court and treated a judge with

17   disrespect, that he made inexcusable, disparaging comments about a judge to members

18   of law enforcement, and that he made an unprofessional comment about a courtroom

19   clerk.  In addition, I found him defiant, insolent, and showing little remorse.  I also

20   concluded that he had a demonstrated inability to work with co-workers, judges, victims,

21   and many others, which inhibited his ability to perform his job.  Taken together with his

22   history of misconduct and previous discipline, I determined that his conduct warranted a

23   thirty-day suspension, a letter of reprimand, and a performance improvement plan.

24          9.  Attached to the Appendix of Evidentiary Support as Exhibit 22 is a true and

25   correct copy of the August 18, 2013, memorandum I wrote to DA Fladager, which

26   accurately summarizes and reflects my findings and conclusions after the *Skelly*

27   conference, including the basis for my decision to impose a reduced level of discipline,

28   i.e. a thirty day suspension without pay instead of a termination.

**30**

10.    Attached to the Appendix of Evidentiary Support as Exhibit 23 is a true and correct copy of the letter I wrote DDA Maner regarding my decision and the Order For Suspension – both of which were served on DDA Maner on or about August 23, 2013. I also ordered DDA Maner to attend behavioral counseling, receive a written reprimand, and to be placed on a performance improvement plan, also referred to as a corrective action plan.

11. I ordered DDA Maner suspended for thirty days taken together with the instances of misconduct set forth in the Amended Notice of Discipline, because DDA Maner had been previously disciplined for the same conduct and behavior, and took no responsibility for his actions in the *Skelly* hearing. Thus a longer suspension than had previously been proposed was warranted.

12. My decision to suspend DDA Maner for thirty days was not based on his political affiliations, his support of Michael Cummins in the 2006 DA election, his political speech, complaint of retaliation, or any other protected activity.

13. After DA Fladager's initial request that I serve as the *Skelly* officer for DDA Maner's *Skelly* conference on August 5, 2013, I had no communication with her about the matter until after I made my decision to reduce the proposed discipline from a termination to a 30 day suspension. I did not consult DA Fladager prior to making my decision as to the appropriate level of discipline; I informed DA Fladager of my decision after I had made it.

14. Neither prior to, nor during, nor after the August 5, 2013 *Skelly* conference did the issue of DDA Maner's political support in the 2006 DA election come up as a topic in any conversation that I was involved in.

15. I have no personal knowledge as to who DDA Maner supported in the 2006 election for District Attorney in Stanislaus County. I was embroiled in my own election for Sheriff in 2006 and did not have any time at all to focus on the DA's race, including which DDAs supported which DA candidate.

I declare under the penalty of perjury under the laws of the United States that the

**31**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

DECLARATION OF ADAM CHRISTIANSON

foregoing is true and correct.

Executed this 17th day of February, 2016, in Modesto, California.

ADAM CHRISTIANSON

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

**32**

DECLARATION OF ADAM CHRISTIANSON

Exhibit F

Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone:   415.512.3000
Facsimile:   415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| DOUGLAS MANER, | Case No.: 1:14-CV-01014-MCE-MJS |
|---|---|
| Plaintiff, | |
| v. | **DECLARATION OF ALEX LOYA IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT** |
| COUNTY OF STANISLAUS, BIRGIT FLADAGER, and DOES 1 through 20, inclusive, | |
| Defendants. | Date:      April 21, 2016<br>Time:      2:00 PM<br>Courtroom:7, 14th Floor<br>Judge:      Morrison C. England, Jr. |
| | Trial Date: October 24, 2016 |

I, Alex Loya, hereby declare and state as follows:

1.  I work as a Victim Advocate in the Office of the District Attorney ("ODA") for the County of Stanislaus. If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2.  I have worked in the Victims Services Unit ("VSU") of the ODA since 1995. In 2012, I worked as an Interviewer II and Victim Advocate. In 2013, my position was reclassified to Advocate II. Cheryl Titus, who reported to ADA Carol Shipley, was my direct supervisor.

3.  The ODA takes the needs of victims of crime and their families very

**34**

*Liebert Cassidy Whitmore*
*A Professional Law Corporation*
*135 Main Street, 7th Floor*
*San Francisco, California 94105*

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1  seriously. Our primary objective in the Victim Services Unit is to minimize the trauma

2  victims endure. We do this, by, among other things, providing crisis intervention to

3  victims, escorting them to court proceedings, explaining the criminal justice system in lay

4  terms and serving as a liaison between victims and law enforcement as well as

5  prosecutors in the ODA. In addition, the ODA requires that we work to abide by "Marsy's

6  law," which gives victims of crime and their families the right to be treated with fairness

7  and respect, the right to notice of proceedings, the right to confer with a prosecutor, the

8  right to be heard, the right to a speedy trial, and other rights.

9        4.      When Doug Maner was a DDA, he was hostile to me and I tried to avoid

10  him as much as possible. My first interaction with him was sometime shortly after I was

11  first hired. I remember that he brought a stack of papers to me and directed me to punch

12  holes in them. I mentioned it to Steve Parodi, one of my supervisors at the time and he

13  informed me that punching holes in papers for DDAs was not part of my job description.

14  Steve Parodi took the stack of papers from me, returned them to DDA Maner, and asked

15  him to punch holes in papers himself.

16        5.      I met Mary Ann Ybarra in 1999 when I was the one of the two on-call

17  Victim Advocates on a murder case where her brother was the victim. The case is

18  referred to as "the Solorio case" after the suspect, Solorio. I escorted Ms. Ybarra and

19  her family to the court proceedings and eventual trial and sentencing hearings for

20  Solorio's co-defendants while Solorio himself remained at large.

21        6.      In 2004, I learned that Ms. Ybarra's mother had been murdered by her

22  brother. Because I had worked with Ms. Ybarra in the past, I immediately went to Ms.

23  Ybarra's house to check-in with her. Understandably, Ms. Ybarra was very upset. While

24  at her house that day, Ms. Ybarra told me that she repeatedly asked DDA Maner, who

25  was the deputy district attorney at the murder scene to please call me so I could be there

26  for her and her family. DDA Maner ignored her pleas to have me respond to the murder

27  scene. Ms. Ybarra told me she was very upset that she was not allowed to have me

28  there to provide support and crisis intervention to her and her family. When I mentioned

**35**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   this to DDA Maner, he laughed and said words to the effect of: "some people think they

2   can pick and choose their advocates." I thought this was insensitive on the part of DDA

3   Maner and also inaccurate. It is common for victims or their next of kin to ask to work

4   with particular Victim Advocates they have worked with in the past. As a matter of

5   practice in the VSU, we are assigned new cases for victims we have worked with in the

6   past so as to minimize their trauma by not having to deal with an advocate who is a

7   stranger to them.

8        7.    In early 2012, the suspect in the 1999 homicide of Ms. Ybarra's next of kin

9   was finally captured. DDA Maner was assigned as the lead attorney on the case.

10  Because I had been assigned to the case in 1999, I again served as Ms. Ybarra's Victim

11  Advocate after Solorio's capture.

12       8.    In my capacity as Ms. Ybarra's Victim Advocate in the Solorio case, I

13  escorted her and her family to court proceedings.   Ms. Ybarra had recently lost her

14  mother and brother and brother in a murder/suicide and did not want to attend the

15  painful court proceedings without me. Generally, Ms. Ybarra and I would sit in the front

16  of the courtroom for proceedings. DDA Maner ignored us and rarely spoke to us. At one

17  hearing, DDA Maner took Ms. Ybarra aside and would not allow me to participate in the

18  meeting. After their conversation, Ms. Ybarra was crying and told me she was upset that

19  I had been excluded. She told me she needed me to be a part of the conversation

20  between her and DDA Maner; she did not want to be alone with him. As a victim's next

21  of kin, Ms. Ybarra had the right to have me present.

22       9.    I was trained that Marsy's law was an amendment to the California

23  Constitution that guarantees victims of crime and their families' rights during the

24  prosecution of trials. Under both Marsy's law and the practices of the ODA VSU, victims

25  of crime and their families have the right to be treated with fairness and respect, the right

26  to notice of proceedings, the right to confer with a prosecutor, the right to be heard, and

27  the right to a speedy trial, among other rights. DDA Maner's conduct towards me and

28  Ms. Ybarra was not typical of the attorneys in the ODA. Other DDAs typically scan the

**36**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1     courtroom to see if the victim is present and make efforts to speak to victims and their

2     next of kin. When DDA Maner ignored Ms. Ybarra and me in court, I was upset and

3     shocked. His conduct was rude and disrespectful, and based on my training and

4     experience, a violation of Marsy's law.

5           10.     On February 16, 2012, I attended a meeting with DDA Maner, DDA

6     Maner's supervisors, Ms. Ybarra, and Ms. Ybarra's family member, Tina Cantu. The

7     meeting was convened by DDA Maner's supervisor, Chief DDA David Harris. At the

8     meeting, Ms. Ybarra and I expressed our concerns about DDA Maner's conduct.

9     Specifically, I expressed concern that DDA Maner had inappropriately excluded me from

10    discussions with Ms. Ybarra. I also told his supervisors that DDA Maner had ignored me

11    and Ms. Ybarra in the courtroom on multiple occasions. Ms. Ybarra shared her feelings

12    that she had been ignored by DDA Maner and that she did not understand what was

13    happening in the case. During the meeting, Chief DDA Harris told DDA Maner to keep

14    Ms. Ybarra informed of everything that happened on the case and not to exclude me

15    from any communications he had with her.

16          11.     On April 16, 2012, Ms. Ybarra and I attended a proceeding in the Solorio

17    case. We sat at the front of the courtroom. Despite the meeting we had with DDA

18    Maner in February 2012, DDA Maner again ignored us, and did not confer with us or

19    speak to us in any way. Instead, I watched DDA Maner arrive in court, go into the

20    Judge's chambers with defense counsel, then come out of chambers to announce the

21    trial was to be continued. DDA Maner then immediately left the courtroom. He left

22    without speaking to us even though he knew we were there. I was shocked at DDA

23    Maner's behavior. It was rude and uncalled for. I also felt bad because I was unable to

24    explain to Ms. Ybarra why the case had been continued. Ms. Ybarra was visibly upset

25    and crying after we left the courtroom. She felt ignored and did not understand why DDA

26    Maner continued the case. After the hearing, Ms. Ybarra and I went to a café in the

27    Courthouse. DDA Maner was in the café. He again ignored us and did not to talk to us.

28    Later that day, I contacted Chief DDA Harris to complain about Maner's conduct in the

**37**

1    hearing that day.

2        12.    On April 28, 2012, I attended the ODA's annual victims' rights event.  DA
3    Birgit Fladager was at the event.  I decided to introduce Ms. Ybarra to DA Fladager at
4    the event.  After bringing Ms. Ybarra to DA Fladager and making introductions, Ms.
5    Ybarra began crying and told DA Fladager that she felt mistreated and was unhappy
6    with DDA Maner's work on the Solorio case.

7        13.    In my twenty years of experience as a Victim Advocate, I cannot recall
8    observing any other DDA treat a victim or a victim's next of kin with such disrespect as
9    DDA Maner treated Ms. Ybarra.

10        I declare under the penalty of perjury under the laws of the United States that the
11    foregoing is true and correct.

12        Executed this 18th day of February, 2016, in Modesto, California.

ALEX LOYA

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

**38**

Exhibit G

Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone:  415.512.3000
Facsimile:  415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS MANER,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF STANISLAUS, BIRGIT FLADAGER, and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.: 1:14-CV-01014-MCE-MJS<br><br>**DECLARATION OF BIRGIT FLADAGER IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:       April 21, 2016<br>Time:       2:00 PM<br>Courtroom:7, 14th Floor<br>Judge:      Morrison C. England, Jr.<br><br>Trial Date: October 24, 2016 |

I, BIRGIT FLADAGER, hereby declare and state as follows:

1.      I am the District Attorney for the County of Stanislaus.  If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2.      I was first hired by the County of Stanislaus in 1990 as a Deputy District Attorney ("DDA") in the Office of the District Attorney ("ODA").  I was promoted to Chief DDA in 1999.  I decided to run for District Attorney of Stanislaus County in or about August 2005. I ran against Judge Michael Cummins.  I won the election against Judge Cummins in early June 2006 and was sworn into office on July 11, 2006. In 2010, I was re-elected and in 2014, I was re-elected to a third term.

**40**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

3. As DA, my responsibilities are to ensure the smooth functioning of the entire District Attorney's office; work with the Board of Supervisors and the Chief Executive Office on budget and personnel needs; represent the office in the public; serve as the chief law enforcement official of the County; partner with all other law enforcement/police chiefs and the court; and coordinate with the California District Attorneys Association to ensure good statewide policy and training. I rely on the Assistant District Attorney ("ADA") to manage office operations and oversee personnel matters. From the time I took office in July 2006 until March 2015, the ADA was Carol Shipley.

4. Prior to his 2013 *Skelly* conference, I do not recall meeting with DDA Maner in 2006, or any other time, at which he referenced the 2006 election or his support for my opponent Michael Cummins.

5. I recall being made aware of a Letter to the Editor written by DDA Maner that was published in the Modesto Bee on May 23, 2006. I think someone who worked on my campaign and not affiliated with or employed by the County showed it to me prior to the June 2006 election. I did not recall the contents of the letter in 2006 nor any time thereafter. At no time was DDA Maner's Letter to the Editor a factor in any personnel decision I made regarding DDA Maner.

6. Generally, all disciplinary or personnel decisions pertaining to DDAs are the responsibility of the ADA and the DDA's supervising Chief DDA. If something happens with a DDA, my expectation is that the supervising Chief DDA will resolve the matter as they see fit, in collaboration with the ODA's Human Resources Manager or the ADA, if necessary. I do not need to be informed of Letters of Reprimand, verbal reprimands, counseling memoranda, or other disciplinary actions at that level or below. I do expect to be informed of more serious discipline, i.e., suspensions and terminations. I am not involved in disciplinary investigations unless I need to be interviewed as a witness.

\\

**41**

7.      In March 2007, I learned that DDA Maner received complaints from members of the Gang Intelligence Taskforce – a multi-agency law enforcement taskforce that works closely with the ODA on gang-related criminal prosecutions. DDA Maner was assigned to the ODA's gang prosecution unit at the time. The complaints followed an email Maner wrote to three members of the Taskforce that criticized them for how they handled a discovery issue. After viewing the email DDA Maner sent to the Taskforce members, I believed the email was rude and disrespectful, and displayed poor judgment. The ODA must have a seamless relationship with our law enforcement partners; anything less negatively affects our ability to prosecute crimes. This email exchange damaged our working relationship with the Gang Intelligence Taskforce, which in turn could damage our ability to prosecute gang-related criminal activity. I also believed the disrespectful and critical tone of the email reflected poorly on the ODA. For these reasons, I recommended to the Chief DDAs and ADA Shipley that DDA Maner be transferred out of his gang assignment.

8.      Prior to the 2007 complaints from the Gang Intelligence Taskforce, I had not been involved in any personnel actions or decisions with regard to DDA Maner.

9.      It is typical for the ADA and Chief DDAs to discuss personnel matters at the ODA's weekly Chiefs Meetings, which were attended by the Chief DDAs, ADA Shipley, me, and the managers of our non-attorney units. Personnel matters include assignments, rotations, training, and the like. At Chiefs Meetings, I usually did not participate in discussions of personnel matters. I will provide input if necessary or desired but personnel matters, such as DDA assignments, are the province of the ADA and the Chief DDAs. With regard to DDA Maner, I had very little input into any decision with regard to DDA Maner's assignments except for the decision to rotate him out of his gang assignment in 2007.

10.      As DA, I serve as the *Skelly* officer for *Skelly* conferences involving employees of the ODA. After the ADA and/or the Chief DDA determines the appropriate level of discipline to propose, I serve as the person who hears the employee's side of the

**42**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   story at the *Skelly* conference.  My role at the *Skelly* conference is to listen to the

2   employee respond to the charges and evidence against him or her in the Notice of

3   Intended Discipline; the *Skelly* conference is not an evidentiary hearing.  After the *Skelly*

4   conference, I consider the information provided by the employee and his or her

5   representative, in conjunction with the ADA or Chief DDA's notice of proposed

6   disciplinary action, and all the attached evidence upon which the recommendation is

7   based, and order the disciplinary action I believe is warranted, based on all the evidence

8   before me.

9           11.    I have served as a *Skelly* officer on at least seven occasions.  *Skelly* rights

10  are only afforded to employees who may be suspended, terminated, or subject to a pay

11  reduction, such as a proposed demotion to a lower-paying position.  Two *Skelly*

12  conferences involved DDA Maner.  Two other *Skelly* conferences involved DDAs whose

13  suspensions were proposed for conduct involving a DUI.  I reduced the number of days

14  for the suspensions proposed in both of those matters.  Two other *Skelly* conferences

15  involved non-attorney employees of the ODA.  One involved a proposed termination on

16  the grounds of dishonesty and the other involved a proposed termination on the grounds

17  of drug use.  I upheld the proposed termination in both matters.  The remaining *Skelly*

18  conference for which I was the *Skelly* officer was for an employee of the County's

19  Probation Department.  I upheld the proposed discipline in this matter. DDA Maner's

20  performance issues were unique to him, and I have not served as a *Skelly* officer on a

21  discipline case where the performance issues before me were like DDA Maner's.  I

22  certainly have not served as a *Skelly* officer on any other case involving the sheer scope

23  and repetitive nature of the misconduct displayed by DDA Maner.

24          12.    In July 2007, Chief DDA Begen issued DDA Maner a Notice of Intended

25  Disciplinary Suspension.  I was the *Skelly* officer for this disciplinary matter.  I was not

26  involved in the decision to propose his suspension or the investigation that occurred

27  prior to DDA Begen's decision to propose DDA Maner's suspension.

28          13.    Shortly after the Notice was issued to DDA Maner, I received a copy of the

**43**

DECLARATION OF BIRGIT FLADAGER

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   Notice and all the supporting documents listed in the Notice as attachments, which

2   included DDA Maner's performance evaluations, various emails related to DDA Maner's

3   conduct between October 2006 and March 2007, historical disciplinary documents, and

4   documents related to the ODA's 2007 investigation of DDA Maner's misconduct. Prior to

5   DDA Maner's *Skelly* conference, I thoroughly reviewed the Notice and all attached

6   documents.

7         14.    My *Skelly* conference with DDA Maner was held on August 28, 2007.

8   Those present included me, DDA Maner, and DDA Maner's union representative, Pat

9   Thistle. During the conference, which was approximately forty-seven minutes long, DDA

10   Maner and Mr. Thistle presented Maner's side of the story to me. During the

11   conference, I told DDA Maner that he needed to treat people well; all the good

12   prosecution work in the world does not make up for treating people poorly. DDA Maner

13   told me that I would never see these kinds of complaints again. DDA Maner expressly

14   said: "You'll never see this happen again." We also discussed the importance of

15   apologies and making amends. DDA Maner told me that "nothing is worse than an

16   insincere apology." Attached to the Appendix of Evidentiary Support as **Exhibit 74** is a

17   true and correct copy of the transcript of the August 28, 2007, *Skelly* conference.

18         15.    During the *Skelly* conference, Mr. Thistle proposed that DDA Maner

19   receive counseling in lieu of suspension. I considered this suggestion to reduce the

20   level of discipline and invited Mr. Thistle and DDA Maner to come back to me with their

21   ideas and suggestions within a couple of weeks, and I would wait to make my decision

22   until then.

23         16.    I did not hear from Mr. Thistle until October 2007. Then, between October

24   2007 and March 2008, communications were exchanged regarding DDA Maner

25   attending counseling and entering into a "Last Chance Agreement" in lieu of suspension.

26   Under this "Last Chance Agreement," the suspension would be stayed pending DDA

27   Maner's completion of a counseling program, his agreement to apologize to various

28   individuals he had offended, and his agreement to follow all rules and policies applicable

**44**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1    to his work at the ODA for one year. A true and correct copy of my proposed "Last

2    Chance Agreement" and March 24, 2008, letter to DDA Maner about the agreement, is

3    attached to the Appendix of Evidentiary Support as **Exhibit 24**.

4        17.    On May 20, 2008, DDA Maner's union representative, Mr. Thistle, sent my

5    office a counter proposal. I did not agree to the changes proposed to our March

6    proposal. Via letter dated June 6, 2008, I informed Mr. Thistle that we did not agree to

7    their proposal and gave DDA Maner until July 11, 2008, to accept our original proposed

8    Last Chance Agreement. I did not hear from DDA Maner or his representative by that

9    date.

10       18.    After July 11, 2008 had passed with no communication from DDA Maner or

11   Mr. Thistle, I reviewed all the evidence before me in connection with DDA Maner's

12   proposed suspension, including the 2007 investigatory findings, the 2007 Notice of

13   Intended Disciplinary Action, DDA Maner's performance history, DDA Maner's

14   disciplinary history, and the response DDA Maner and Mr. Thistle provided during the

15   *Skelly* conference, prior to making my decision as to whether the proposed suspension

16   should be upheld or reduced.

17       19.    On August 11, 2008, in my capacity as the *Skelly* officer, I upheld the

18   proposed discipline and ordered that DDA Maner be suspended without pay for five days

19   via written notice entitled Order of Suspension. Attached to the Appendix of Evidentiary

20   Support as **Exhibit 25** is a true and correct copy of my Order of Suspension.

21   Suspension was warranted because DDA Maner continued to exhibit negative working

22   relationships with the clerical staff as exemplified by three new complaints. This was a

23   recurring problem warranting discipline since problems with clerical staff were noted in

24   his previous performance evaluations and a 2004 Letter of Reprimand. In addition, DDA

25   Maner was willfully disobedient when he failed to evacuate during a fire drill in January

26   2007; DDA Maner violated the County's Code of Ethics when he read confidential case

27   notes to a member of the public; and DDA Maner had emailed the Gang Intelligence

28   Taskforce a critical email that had severe potential negative ramifications for the ODA.

**45**

20. Maner timely appealed his five-day suspension and requested the appeal take place before an arbitrator.

21. After DDA Maner filed his appeal of the suspension, I had a number of communications with the County Counsel's office, DDA Maner's union representative, Mr. Thistle, and the ODA's HR Manager in preparation for the appeal. In early March 2009, County Counsel's Office entered into a settlement agreement with DDA Maner to set aside the five-day suspension in exchange for dropping his appeal, attending counseling on interacting with coworkers, and receiving a Letter of Reprimand. I was in agreement with this settlement and resulting reduction in discipline. On March 2, 2009, I issued DDA Maner a Letter of Reprimand and restored his five-days of lost pay, contingent upon DDA Maner completing counseling regarding workplace interaction with co-workers and others related to DDA Maner's work duties. Attached to the Appendix of Evidentiary Support as **Exhibit 26** is a true and correct copy of the Letter of Reprimand I authored and issued to DDA Maner on March 2, 2009.

22. DDA Maner's five days of pay were restored on March 4, 2009.

23. On February 14, 2012, I received an email from Mary Ann Ybarra regarding DDA Maner's conduct on her brother's murder case. Ms. Ybarra's brother had been murdered in 1999 but the suspect fled. In late 2011 or early 2012, the suspect had finally been captured and the case against him was going to trial. DDA Maner was the lead attorney on the case, referred to as the Solorio case, after the name of the suspect. In response, I directed DDA Maner, Chief DDA Begen and Chief DDA Harris to meet with Ms. Ybarra to address her concerns. A true and correct copy of the email complaint I received from Ms. Ybarra on February 14, 2012, and my email directing the Chief DDAs to meet with her to discuss her concerns is attached to the Appendix of Evidentiary Support as **Exhibit 1**. This email was when I became aware that Ms. Ybarra was next of kin to a victim in a case being handled by the ODA.

24. At a March 22, 2012 Chiefs Meeting, Chief DDA Begen raised ongoing issues and concerns about DDA Maner's behavior in the workplace.

**46**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

25.     My next involvement with Ms. Ybarra was when Alex Loya introduced me to her at a victims' rights event that the ODA hosted with the Family Justice Center on or around April 28, 2012. Mr. Loya worked for the ODA as a Victim Advocate. At the event, Ms. Ybarra approached me, crying, and told me that she was still upset with how DDA Maner was handling the case and how he was treating her. She said that she had not been treated well by DDA Maner, that DDA Maner made her uncomfortable when he excluded her Victim Advocate from a meeting, and that DDA Maner had ignored her at a court proceeding and continued the case with no explanation. She was crying so hard I held her in my arms to comfort her.

26.     I felt horribly for Ms. Ybarra. A victim does not deserve to be treated the way DDA Maner was treating Ms. Ybarra. The ODA has always been very concerned about and mindful of crime victims. That has been the case since I was first hired, which was well before Marsy's Law passed. Marsy's law was an amendment to the California Constitution, Article 1, Section 28, (b)(1). When Marsy's Law was passed by the electorate, special training was provided to staff to ensure that everyone knew their responsibilities. Every newly hired deputy district attorney receives two to three weeks of in-house training which includes a session with our Victim Services Unit program director; this is to ensure that every prosecutor understands their role in protecting the rights of crime victims, which specifically includes "to be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process."

27.     After the victims' rights event, I spoke with ADA Shipley about what had occurred with Ms. Ybarra and told her I wanted to find out exactly what had happened between the ODA and Ms. Ybarra.

28.     Effective on or about April 30, 2012, DDA Maner was transferred to Juvenile Court. The Solorio case was reassigned to another DDA.

29.     In December 2012, I received an email from Judge Jacobs, Presiding Judge of the Juvenile Court. Attached to the Appendix of Evidentiary Support as Exhibit

**47**

27 is a true and correct copy of the email I received from Judge Jacobs in December 2012. After receiving Judge Jacobs's email, I asked her to send a letter detailing her concerns with DDA Maner's conduct in Juvenile Court.

30.     On December 26, 2012, Judge Jacobs wrote me a formal letter detailing her complaints with DDA Maner's conduct toward suspects, judges, Court employees, and other attorneys. Attached to the Appendix of Evidentiary Support as **Exhibit 28** is a true and correct copy of the December 26, 2012, letter I received from Judge Jacobs. Judge Jacobs's December 26, 2012, letter is the only communication I have received from a judge about their unhappiness with a DDA's behavior.

31.     After receiving the letter, I forwarded it to ADA Shipley and DDA Maner's supervisor, Chief DDA Harris. I understood they followed up and initiated an investigation into the allegations that arose regarding DDA Maner's behavior while at Juvenile. I was not involved in the investigation of DDA Maner's conduct in Juvenile Court.

32.     In February 2013, I was contacted by Jill Silva, the County's Chief Probation Officer, regarding an incident involving DDA Maner at Juvenile Court. Because Ms. Silva did not offer specifics, I asked Presiding Judge Jacobs to verify whether any incident had occurred. Attached to the Appendix of Evidentiary Support as **Exhibit 29** is a true and correct copy of my February 25, 2013, email to Presiding Judge Jacobs and her response email of the same date. Presiding Judge Jacobs told me that DDA Maner commented "look what the cat dragged in" when courtroom clerk Tracy Ury walked into court, and that Ms. Ury was highly offended. After receiving Judge Jacobs's email I forwarded it to ADA Shipley to follow up. I understand it became part of the allegations DDA Maner was investigated for.

33.     Shortly after June 14, 2013, I was presented with a Notice of Intended Discharge authored by ADA Shipley, and all the documents listed in the Notice as attachments, which included the ODA's investigatory findings and other performance and discipline documents. Attached to the Appendix of Evidentiary Support as **Exhibit**

**48**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

DECLARATION OF BIRGIT FLADAGER

44 is a true and correct copy of ADA Shipley's Notice of Intended Discharge.

34.     Prior to DDA Maner's June 2013 *Skelly* conference, I reviewed ADA Shipley's Notice of Intended Discharge and all attached documents.

35.     This *Skelly* conference with DDA Maner was held on June 28, 2013. Those present included me, DDA Maner, three of DDA Maner's union representatives, Michael Eggener, Michael Ellison, and Derek Seymour, and Kym Vieira, an employee of the County Chief Executive Office's Human Resources Department. It is not uncommon for an HR employee to be present in a *Skelly* conference.

36.     During the conference, which was approximately an hour and fifteen minutes long, DDA Maner and Mr. Eggener presented DDA Maner's side of the story to me. DDA Maner also said I was biased against him because I ran for DA against Michael Cummins in 2006. He also mentioned during the *Skelly* that he had done work for Michael Cummins during the 2006 election. DDA Maner's comment was a surprise to me, as I had no bias against DDA Maner nor did I have any direct knowledge that DDA Maner had allegedly done work for Michael Cummins in 2006.

37.     After the June 28, 2013, *Skelly* conference, I made the decision to drop one of the charges against DDA Maner because I believed it was not supported by the evidence. Specifically, there was not enough evidence to show that DDA Maner had intentionally blamed a clerk for his calendaring mistake regarding a minor's appearance in Juvenile Court.

38.     I also decided that the Ybarra incident required additional investigation and documentation. Specifically, I asked the ODA's Chief Investigator to interview Ms. Ybarra, Mr. Loya, Chief DDA Harris, and me, about Ms. Ybarra contacting me at the victims' rights event. I wanted that information to be part of the record upon which the discipline was based. Attached to the Appendix of Evidentiary Support as **Exhibit 30** is a true and correct copy of Mr. Inderbitzen's July 15, 2013, report of his supplemental investigation.

39.     Due to the supplemental investigation and findings, the ODA needed to

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1  issue an amended notice of proposed discipline and DDA Maner would need another

2  opportunity to present his side of the story at a new *Skelly* conference. I decided to ask

3  Sheriff Adam Christianson to serve as the *Skelly* officer at the new *Skelly* conference

4  since I was now a witness in the investigation. In addition, because DDA Maner raised

5  the issue of his support for Michael Cummins in the 2006 election somehow motivating

6  the ODA's response to his misconduct, I believed it would be better for someone outside

7  the ODA to serve as the *Skelly* officer. This was the first time I had heard DDA Maner's

8  complaint that he felt I was biased against him because he supported Judge Cummins

9  for DA in 2006. I knew Sheriff Christianson was experienced in conducting *Skelly*

10  conferences and believed he would be a neutral, third-party who would make a just

11  decision regarding the level of discipline to impose.

12      40.    After reviewing Mr. Inderbitzen's supplemental investigation, and all the

13  documentation reviewed in preparation for drafting the initial proposed disciplinary

14  notice, I believed DDA Maner's misconduct, taken together with his performance and

15  disciplinary history, still warranted discharge. Thus, on July 19, 2013, I issued DDA

16  Maner an Amended Notice of Intended Discharge. Attached as **Exhibit 31** to the

17  Appendix of Evidentiary Support is a true and correct copy of the Amended Notice,

18  which I authored and served on DDA Maner via mail. The Notice included: (1) a

19  description of the basis for the proposed discharge; (2) all documents upon which the

20  decision to discharge was based; and (3) written notice that DDA Maner had the

21  opportunity to respond to the recommended discipline prior to its imposition. After

22  issuing the Amended Notice, I had no role in the ensuing disciplinary process.

23      41.    I did not hear from Sheriff Christianson between the time I asked him to

24  serve as the *Skelly* officer and when he informed me he would be reducing the level of

25  discipline to a thirty day suspension. This was during a brief phone conversation that

26  took place shortly after the August 2013 *Skelly* conference. Shortly thereafter, I received

27  a memorandum from him on August 18, 2013, that explained his decision to issue DDA

28  Maner a thirty day suspension instead of termination. Attached to the Appendix of

**50**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1    Evidentiary Support as **Exhibit 22** is a true and correct copy of Sheriff Christianson's

2    letter regarding the outcome of DDA Maner's *Skelly* conference.

3        42.    At the time of my deposition on October 19, 2015, I had forgotten that in

4    October 2012, ODA HR Manager, Ramon Bawanan, proposed that DDA Maner receive

5    a five day suspension for the conduct encompassed in his 2012 investigation into the

6    Ybarra incident. Since my deposition I have reviewed documentation regarding the

7    recommendation for a five-day suspension that refreshed my recollection. This was one

8    of the numerous documents I reviewed in making my July 2013 decision to propose DDA

9    Maner's discharge. I do not think Sheriff Christianson's August 18, 2013, memorandum

10    contains error.

11        43.    DDA Maner returned to work as scheduled on Monday, August 12, 2013,

12    where he was assigned to Department 6. His unpaid 30-day suspension began

13    Monday, August 16, 2013.

14        44.    On September 16, 2013, counsel for the ODA, Jones & Mayer,

15    corresponded with DDA Maner's union counsel regarding the selection of arbitrators for

16    the upcoming arbitration of DDA Maner's appeal of his thirty-day suspension. Attached

17    to the Appendix of Evidentiary Support as **Exhibit 32** is a true and correct copy of the

18    letter Jones & Mayer transmitted to DDA Maner's union counsel on September 16, 2013.

19    I was copied on the email version of the letter and reviewed it that day.

20        45.    At no time was DDA Maner's association with or support of Michael

21    Cummins a factor in any personnel decision I made regarding DDA Maner.

22        46.    At no time was DDA Maner's speech, association with any political

23    candidate or any other protected classification, or retaliation, a factor in any personnel

24    decision I made regarding DDA Maner.

25        47.    DDA Michael Houston is a current employee and has not been disciplined

26    or terminated since 2006.

27        48.    DDA Wallace McKenzie is a current employee and has not been

28    disciplined or terminated since 2006.

**51**

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of February, 2016, in Modesto, California.

BIRGIT FLADAGER

52

Exhibit H

Morin I. Jacob, Bar No. 204598
mjacob@lcwlegal.com
Lisa S. Charbonneau, Bar No. 245906
lcharbonneau@lcwlegal.com
LIEBERT CASSIDY WHITMORE
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105
Telephone:   415.512.3000
Facsimile:    415.856.0306

Attorneys for Defendants
COUNTY OF STANISLAUS and
BIRGIT FLADAGER

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DOUGLAS MANER,

                    Plaintiff,

          v.

COUNTY OF STANISLAUS, BIRGIT
FLADAGER, and DOES 1 through
20, inclusive,

                    Defendants.

Case No.:  1:14-CV-01014-MCE-MJS

**DECLARATION OF CAROL SHIPLEY IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

Date:       April 21, 2016
Time:       2:00 PM
Courtroom:7, 14th Floor
Judge:      Morrison C. England, Jr.

Trial Date: October 24, 2016

I, CAROL SHIPLEY, hereby declare and state as follows:

1.      I was employed by the County of Stanislaus's Office of the District Attorney ("ODA") from 1983 through March 2015. If called upon to testify, I could and would competently testify to the following facts from my own personal knowledge.

2.      I was hired in 1983 as a Deputy District Attorney ("DDA") at the ODA. In 1995, I was promoted to Chief DDA and in 1999 I was promoted to Assistant District Attorney ("ADA"). Around July 2005, I was elevated to Acting District Attorney upon the retirement of District Attorney James Brazelton. I served as the Acting DA until Birgit Fladager was elected and sworn in as DA in July 2006. After DA Fladager was sworn in, I returned to my ADA position until I retired from County employment in March 2015.

**54**

3. After leaving the ODA, I became the Executive Director of a nonprofit organization called the Stanislaus Family Justice Center in Modesto, California. The Family Justice Center offers assistance and services to victims and survivors of domestic violence, sexual assault, child abuse, elder abuse, and human trafficking.

4. As the ADA, my main duties were managing the day-to-day operations of the ODA. Although I made court appearances from time to time, most of my work as an ADA involved supervising the ODA's Chief DDAs, as well as our non-attorney units, including victim services, clerical, paralegals, human resources, and financial. The ODA's Human Resources Manager was one of my direct reports, thus through HR I oversaw all HR matters for the ODA, including discipline and personnel investigations into DDA misconduct.

5. Part of my job as ADA was overseeing the Chief DDAs, and in conjunction with the CEO's office, writing job descriptions for each level of DDA at the ODA. Attached as Exhibit 33 to the Appendix of Evidentiary Support is a true and correct copy of the job description for position of DDA V at the ODA. This description accurately describes the DDA position as it existed up to 2013. DDA Maner was at a DDA V level from on or about June 20, 1998 until his October 2013 resignation.

6. As is clear from the job description, a DDA V may direct, advise, mentor, and/or assist subordinate professional staff. In addition, a DDA V must assume the full range of responsibilities to the office and must know the duties, powers, limitations and authority of the ODA. Part of the job requirements of a DDA V is having the ability to work well with others, as well as the skills and experience to perform high-level supervisory tasks. It is expected that a DDA V will require minimal supervision with regard to interpersonal relations with staff or the public, and will have rotated through varied assignments to require very minimal supervision on office procedures or the requirements of the clerical department.

7. Like most district attorney offices, DDAs at the County of Stanislaus are subject to a system of rotating assignments through the various departments and

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

DECLARATION OF CAROL SHIPLEY

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   divisions of the ODA. All DDAs are expected to handle a wide variety of cases and tasks

2   while employed at the ODA. Rotations are necessary for DDAs to develop the breadth

3   of experience needed to promote within the Department. Chief DDAs are likewise

4   subject to rotating assignments and must be capable of supervising DDAs in every

5   assignment within the ODA. All DDAs are expected to work any assignment, and all

6   DDAs are expected to rotate based on the needs of the ODA at any given time.

7        8.     The decision to rotate or transfer DDAs between assignments is made by

8   the Chief DDAs, in conjunction with the ADA and DA.

9        9.     The entire time I worked at the ODA, all Chief DDAs, the ADA, and the DA

10  met once per week to discuss operations issues such as staffing, employee concerns,

11  workload, personnel issues, hiring decision, and other management matters. We

12  referred to these meetings as "Chiefs Meetings." The managers of the ODA's non-

13  attorney units would also participate if necessary for part of the meeting. Many

14  personnel decisions were made at Chiefs Meetings by consensus.

15       10.    As ADA, I was ultimately responsible for ensuring ODA employees

16  complied with the ODA's Personnel Policies. These personnel policies govern the terms

17  and conditions of employment of every employee at the ODA. It was common for unit

18  managers or Chief DDAs to ask me about our personnel policies and their application.

19  As such I had significant experience and familiarity with these policies. Attached to the

20  Appendix of Evidentiary Support as Exhibit 34 is a true and correct copy of the District

21  Attorney's Office Personnel Policies that were applicable from at least 2005 through

22  2013. While employed as a DDA, Doug Maner was subject to the ODA Personnel

23  Policies.

24       11.    As ADA, I was involved in labor negotiations on behalf of the ODA with our

25  various labor or bargaining units. One of our bargaining units, the County Attorney's

26  Association, included all non-management-level attorneys at the County. All DDAs at

27  the ODA were represented by the County Attorney Association. During his entire

28  employment at the ODA, DDA Maner was a member of the County Attorney's

**56**

Association.  My perception was that DDA Maner was involved in his labor union and as such understood his due process rights as a County employee   A true and correct copy of the labor agreement, i.e. MOU, between the County and the County Attorney's Association that I participated in negotiating and was in effect between July 1, 2010, and June 30, 2012, is attached to the Appendix of Evidentiary Support as Exhibit 35.  The 2010-2012 MOU is substantially identical to previous versions of the MOU, going back to at least 2005.

12.     One of my responsibilities as ADA was overseeing personnel issues and employee discipline.  Depending on the particular type of misconduct an employee engages in, the ODA generally seeks to use discipline to correct the behavior of its employees, however there is no strict progressive discipline policy.  Broadly speaking, the management of the ODA tries first to remediate the behavior and informally counsel the employee.  Then, if behavioral or conduct problems continue, we implement a more formal approach by documenting misconduct in written reprimands that outline the remedial steps that must be taken.  If this level of discipline fails to correct the problem(s), the appropriate level of discipline would likely rise to a suspension.  If discipline problems persist post-suspension, termination is likely warranted.  Even within this framework, every disciplinary decision is made on a case by case basis, depending on all the facts and circumstances of the issue at hand.  Even one instance of misconduct or poor performance could result in the termination of an employee.

13.     At the ODA, each DDA is supervised by a Chief DDA.  As ADA, I was the direct supervisor of each Chief DDA.  If a Chief DDA learned that one of his or her employees engaged in misconduct or poor performance, he or she could initiate an investigation into the matter. Chief DDAs also brought up disciplinary issues in Chiefs Meetings, consulted ODA's HR Manager, directly came to me for advice on how to proceed with an incident alleged to have occurred, and/or consulted with me about what level of discipline to impose if there was misconduct.  If I directly received a complaint about a DDA, I would confer with the employee's supervising Chief DDA to see if they

57

1 were aware of it and then I would follow the same process – either direct the Chief DDA
2 to investigate, investigate it myself, or refer the investigation to Human Resources.

3 14.   Generally speaking, if a complaint or allegation involved multiple witnesses
4 and/or spanned a long period of time, it would be more likely referred to ODA's HR
5 Manager for investigation.   That is, the more complex the complaint, the more time-
6 consuming the investigation, thus making the complaint more appropriate for the ODA's
7 HR Manager to investigate.   Since the ODA has its own investigation division, which is
8 trained to conduct investigations, the ODA's HR Manager also referred matters to the
9 ODA's investigation division to conduct the actual fact-finding interviews required for an
10 investigation.   Generally speaking, the more detailed the complaint and its allegations,
11 the more likely it was for the investigation to be conducted by the ODA's investigators.

12 15.   Although the Chief DDAs had a degree of independent decision-making
13 power to recommend disciplinary action in the form of suspension or termination, their
14 determinations were only proposals, i.e. recommendations.   For discipline involving a
15 suspension or more serious discipline, the recommendation would come to me, and I, in
16 consultation with the County Counsel's Office, would recommend the level of discipline.
17 After proposing a suspension or more serious discipline, the disciplined employee would
18 have pre-disciplinary rights to a *Skelly* conference at which he/she could present his/her
19 side of the story.   After District Attorney Birgit Fladager was elected in 2006, she typically
20 served as the *Skelly* officer, which meant she heard the employee's presentation as to
21 the proposed discipline recommended by me.   Not until just before the Skelly conference
22 would DA Fladager be provided with the Notice of Intended Discipline and its supporting
23 documents like investigation reports.   Then, after the *Skelly* conference, DA Fladager
24 would consider the employee's statements and the ODA's evidence and decide whether
25 to sustain or reduce the level of the proposed discipline.

26 16.   Although DA Fladager had a degree of independent decision-making
27 power to take disciplinary action, all suspensions, discharges, and other disciplinary
28 actions that result in a loss in pay, were subject to an appeal by evidentiary hearing b

**58**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   the County Hearing Board, which is a three member board appointed by the chair of the

2   Board of Supervisors. The decision of the hearing board or hearing officer is final and

3   binding. This procedure is set forth in the Stanislaus County Code Chapter 3.28, as well

4   as the CAA MOU at Attachment C, Section A. Attached to the Appendix of Evidentiary

5   Support as Exhibit 36 is at true and correct copy of Stanislaus County Code Chapter

6   3.28. As set forth in Chapter 3.28.110(E), the Hearing Board may affirm, revoke, or

7   modify the action of a department head or may modify such action to a less severe

8   punishment. Stanislaus County Code Chapter 3.28 was also incorporated into the

9   Stanislaus County Personnel Manual.

10        17.   In lieu of appeal of disciplinary action to the County Hearing Board,

11   pursuant to the CAA MOU, an employee may submit their appeal to an outside

12   arbitrator, whose decision would be final and binding. This procedure is set forth in the

13   CAA MOU at Section 22 and at Attachment C, "Binding Arbitration by an Outside

14   Arbitrator in Lieu of Section 3.28.060 Hearing Board and Hearings Officers of the

15   Stanislaus County Discipline Ordinance." Per the MOU, the arbitrator has the same

16   powers as the Hearing Board to affirm, revoke, or modify the action of a department

17   head.

18        18.   One of the duties of a Chief DDA is to perform annual performance

19   evaluations for their employees. Over the years, I reviewed hundreds of employee

20   performance evaluations. Generally, once the Chief DDAs write the evaluations, the

21   evaluations were reviewed by me, the District Attorney, and/or Human Resources before

22   being finalized and presented to the employee. Once DA Fladager took office in 2006,

23   she took over the final review of each performance evaluation for investigators and

24   DDAs.

25        19.   Attached to the Appendix of Evidentiary Support as Exhibit 37 is a true and

26   correct copy of DDA Maner's performance evaluation dated 1995 to 1999. I

27   contemporaneously reviewed this document, which was authored by DDA Maner's

28   supervisor Chief DDA Michael Stone, and signed it on February 3, 2000. During this **59**

period, DDA Maner had difficulty maintaining positive relationships with defense attorneys, which was noted by various judges. Furthermore, DDA Maner's relationship with the clerical staff and paralegals at this time was a problem. Through the clerical manager, one of my direct reports, and as the supervising attorney over the paralegals, I received many complaints from the paralegals and clerical staff about DDA Maner's conduct. Some of these complaints warranted follow up, some were minor. Regardless, DDA Maner's conduct toward the clerical staff needed improvement.

20.     In connection with my decision to seek to terminate DDA Maner's employment, I reviewed his history of performance evaluations at the ODA to help instruct what level of discipline to impose. As ADA, I was familiar with how these evaluations were created and maintained. After the performance evaluations are presented to the employee, the copy signed by the employee is kept in the employee's personnel file.

21.     Attached to the Appendix of Evidentiary Support as Exhibit 38 is a true and correct copy of DDA Maner's 1991/1992 performance evaluation, which was the first annual performance evaluation DDA Maner received. From the beginning of his employment, DDA Maner's relationships with the clerical staff were problematic; he tended to order them about rather than treat them as co-workers.

22.     Attached to the Appendix of Evidentiary Support as Exhibit 39 is a true and correct copy of DDA Maner's 1992/1993 performance evaluation. During DDA's Maner second year with the ODA, his relationships with his co-workers continued to suffer. DDA Maner displayed shortcomings in the area of interpersonal relations. Numerous complaints about DDA Maner's attitude and demeanor were received from clerical staff, members of the defense bar, and law enforcement officers. One judge's impression of DDA Maner was that he was rather negative. DDA Maner needed to work on his people skills.

23.     Attached to the Appendix of Evidentiary Support as Exhibit 40 is a true and correct copy of DDA Maner's 1993/1994 performance evaluation. During this evaluation

**60**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

DECLARATION OF CAROL SHIPLEY

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

period, DDA Maner continued to fall short of the standards of the office in his relations with staff, law enforcement, the bench and defense bar. DDA Maner gave confusing instructions to clerical staff, which resulted in an employee lodging a complaint with her supervisor. He also sought to have a murder trial reassigned because it conflicted with a scheduled vacation and seminar he wanted to attend. Also during this period: the clerical staff viewed DDA Maner as difficult and they complained about his attitude, demeanor, and refusal to comply with established policy and procedures; complaints came from the Modesto Police Department, including from the Commander of the Investigative Services Division and the Chief of Police; defense attorneys and judges viewed him DDA Maner as arrogant, inflexible, and/or lacking in good judgment. His conduct improved when he was transferred from his assignment in the Crimes Against Children Unit to a new assignment in the Preliminary Hearing Unit

24. Between June and September 2005, three members of the ODA's clerical staff had complained to me about DDA Maner's rude conduct toward them. Due to the number and nature of the complaints, I requested that the ODA HR Manager, Kathy Matt, conduct an investigation into the allegations against DDA Maner. While the investigation was pending, another paralegal complained about DDA Maner's conduct and that allegation was included in the ODA HR investigation as well.

25. I oversaw Ms. Matt's investigation of the five complaints. Attached to the Appendix of Evidentiary Support as Exhibit 41 is a true and correct copy of Ms. Matt's 2005 investigation. Her investigatory findings were (1) in June 2005, DDA Maner called a clerical employee "incompetent" in open court; and (2) that DDA Maner was condescending and insulting to a paralegal in September 2005. The September 2005 incident involved Paralegal Pam Blake. After DDA Maner had been very demanding of Blake with regard to a motion, he made a demeaning comment about her work that made her feel stupid.

26. Based on the information in Ms. Matt's investigation report, in December 2005, I was involved in a decision to give DDA Maner a counseling memo which

**61**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1  required him to attend classes called "Gender Communication" and "the Art of

2  communication." In making my decision, I also reviewed DDA Maner's recent

3  performance evaluations. Together, I determined that DDA Maner had displayed a

4  pattern of poor communication skills and he was told that discourteous treatment of other

5  employees or the public was cause for discipline. DDA Maner was also specifically

6  instructed not to make negative comments about our staff to an outside defense

7  attorney. It was our hope that coursework designed to address poor communication

8  skills and poor treatment of others would improve his behavior and stop the pattern of

9  poor communication skills. Attached to the Appendix of Evidentiary Support as Exhibit

10  42 is a true and correct copy of the counseling memorandum I issued to DDA Maner on

11  December 15, 2005.

12       27. Unfortunately, DDA Maner's behavior and pattern of poor communication

13  with co-workers did not stop. In May 2006, an ODA clerk complained that DDA Maner

14  had been rude to her and had been unreasonable in the work he had assigned her. On

15  May 10, 2006, DDA Maner was counseled not to overload clerical staff with work, and to

16  improve his communications with staff, and he was told he had yet to take the Gender

17  Communication class he was ordered to take in December 2005 and recommended he

18  attend the course right away. Attached to the Appendix of Evidentiary Support as

19  Exhibit 43 is a true and correct copy of an email documenting the May 10, 2006,

20  counseling of DDA Maner.

21       28. As ADA, I review performance evaluations for DDAs. In November 2006,

22  DDA Maner received a performance evaluation for the September 1, 2005 through

23  September 1, 2006 evaluation period. A true and correct copy of the 2005/2006

24  performance evaluation is attached to the Appendix of Evidentiary Support as Exhibit 44.

25       29. In the performance evaluation, DDA Maner was told he needed

26  improvement in the areas of: file control policy & procedure, personal attitude, his

27  relationship with clerical staff and his relationship with contacts outside of the ODA.

28  During this time period, DDA Maner had periodic problems with support staff and de

**62**

with people. In February 2006, he generated needless work for clerical staff when he failed to turn in case files but told clerical staff he had done so. Also in 2005, he received complaints from two physician witnesses in unrelated cases about subpoenas he had served with insufficient notice. We observed that the reason for the witnesses' failure to appear was that DDA Maner did not sufficiently accommodate the physicians' busy schedules. In August 2006, Presiding Judge Silveira complained that DDA Maner was rude and unprofessional to her on the record. We looked into Judge Silveira's complaint and decided that DDA Maner had inappropriately lashed out at the judge, which did not help our office or his case. We addressed these issues with DDA Maner contemporaneously via informal verbal counseling and noted the incidents in his performance evaluation.

30. I continued to receive complaints about DDA Maner in the Fall of 2006, which were discussed at our weekly Chiefs Meetings. By January 2007, in consultation with DDA Maner's supervisor, Chief DDA Begen, I directed the ODA's new HR Manager, Ramon Bawanan, to open an investigation into DDA Maners recent misconduct dating back to October 2006. In February 2007, new allegations were added to be investigated.

31. As ADA, I oversaw the 2007 investigation into DDA Maner's conduct. Mr. Bawanan's investigatory findings were: (1) in October 2006, DDA Maner entered a restroom and used a urinal only a few feet away from a female who was in the restroom painting the interior; (2) in January 2007, DDA Maner abruptly shut the door to a copy room while two clerical employees were having a conversation on either side of the door; (3) in January 2007, DDA Maner refused orders to evacuate during a fire drill and advised a clerk to similarly ignore the drill; (4) in January 2007, DDA Maner provided an unauthorized third party with confidential case information; and (5) in February 2007, DDA Maner sent an inappropriately critical email to members of the Gang Intelligence Taskforce. Based on the conduct encompassed by this investigation, I instructed Mr. Bawanan to propose to DDA Maner's supervisor, DDA Begen, that DDA Maner be **63**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1  suspended without pay for ten days.

2       32.    In March 2007, the Chief DDAs and I, in consultation with DA Fladager,

3  decided to rotate DDA Maner out of his gang prosecution assignment due to the

4  inappropriate and rude email DDA Maner sent to members of the Gang Intelligence

5  Taskforce. DDA Maner was rotated to an assignment in issuance where he would have

6  no interaction with gang prosecutions or the Gang Intelligence Taskforce. The rotation

7  had no effect on his salary or benefits. The issuance assignment was an important

8  assignment. Issuance is preferably filled by a senior DDA, i.e., a DDA V like Mr. Maner,

9  because this is where a determination is made as to whether a case will be issued or

10  rejected. It is extremely important to have Issuance staffed with attorneys who have

11  prosecuted felony trials as they are in a better position to evaluate the merits of a case,

12  likelihood of success in the event of trial, and anticipate evidentiary and suppression

13  issues.

14       33.    Around October or November 2009, the Chief DDAs and I decided to rotate

15  DDA Maner out of his issuance assignment to the calendar deputy assignment in

16  Department 6. The rotation was made as part of an office-wide rotation. Since the

17  implementation of direct calendaring, it was the intent of the ODA management staff to

18  have senior DDAs, ie, DDA Vs like Mr. Maner, assigned to a department calendar (such

19  as Department 6). Senior DDAs were expected to mentor the less experienced DDAs

20  assigned to the department. Senior DDAs are also capable of prosecuting any case that

21  is assigned to the department, particularly complex felony cases, whereas a lower

22  ranking DDA would not have sufficient experience for those cases. The rotation had no

23  effect on DDA Maner's salary or benefits.

24       34.    In April 2011, I directed the ODA's HR Manager, Mr. Bawanan, to

25  investigate two complaints against DDA Maner: one from a member of the Modesto

26  Police Department and one from a member of the Ceres Police Department. I oversaw

27  Mr. Bawanan's investigation, which took place between April and June 2011. Due to the

28  complexity of issues involved, including that the complaints were made by third part

**64**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   outside the ODA, I instructed Mr. Bawanan to have the ODA's Chief Investigator, Dan

2   Inderbitzen, conduct the witness interviews.

3        35.    The ODA's 2011 investigatory findings were: (1) in March 2011, DDA

4   Maner berated Modesto Police Officer Miller in front of other officers and citizens,

5   andthen ignored the officer; (2) in April 2011, DDA Maner upset Ceres Police

6   Department Detective Smith but was not disrespectful towards her; and (3) the

7   complaints were unrelated.  Chief DDA Begen told me he wanted to issue a Letter of

8   Reprimand to DDA Maner, and I concurred with that recommendation.

9        36.    In November or December 2011, Chief DDA Begen asked that he no

10   longer be required to supervise DDA Maner because of how problematic DDA Maner's

11   behavior was.  Chief DDA Begen expressed words to the effect that he had "had

12   enough, and could not take it anymore."  After speaking with Chief DDA Begen about his

13   concerns, I relieved him of his supervisorial duties and assigned DDA Maner to be

14   supervised by Chief DDA David Harris.

15        37.    In early 2012, Alex Loya, a Victim Advocate in the ODA, told me that DDA

16   Maner was not giving case information to Mary Ann Ybarra, the sister of a man who had

17   been murdered.  Mr. Loya was Ms. Ybarra's ODA  Victim Advocate.  Mr. Loya also told

18   me that Ms. Ybarra felt ignored by DDA Maner and that he was not answering her

19   questions.

20        38.    On February 14, 2012, I received an email from DA Fladager that directed

21   DDA Maner and his supervisors to meet with Ms. Ybarra face-to-face to address her

22   concerns.  A true and correct copy of the February 14, 2012, email from DA Fladager is

23   attached to the Appendix of Evidentiary Support as Exhibit 1.  The email also forwarded

24   a lengthy complaint from Ms. Ybarra about DDA Maner excluding Mr. Loya from a

25   conversation she had with DDA Maner in December 2011.

26        39.    On April 19, 2012, Ms. Ybarra emailed me directly with renewed

27   complaints about DDA Maner.  I was disappointed to learn that DDA Maner had not

28   resolved his issues with Ms. Ybarra.  Attached as Exhibit 3 to the Appendix of

**65**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1    Evidentiary Support is a true and correct copy of the email complaint Ms. Ybarra sent me

2    on April 19, 2012. I forwarded the complaint to DA Fladager and then to DDA Maner's

3    current supervisor, Chief DDA Harris, and former supervisor, Chief DDA Begen. I

4    directed Chief DDA Harris to have DDA Maner contact Ms. Ybarra that day.

5        40.    Based on my knowledge, training and experience as a prosecutor and a

6    Chief DDA in Stanislaus County, I am familiar with Marsy's law and how it is applied at

7    the ODA. At the ODA, we strive to be sensitive and responsive to the needs of victims of

8    crime and their families. It is bad enough to be a victim; victims should not be victimized

9    by the system. In addition to the ODA's own internal standards regarding our victims,

10   victims of crime and their families have articulated rights set forth in the California

11   Constitution at Article I, Section 28, also known as "Marsy's law." Marsy's law was

12   enacted by California voters in 2008 and gives victims of crime and their families such

13   rights as the right to be treated with fairness and respect, the right to notice of

14   proceedings , the right to confer with a prosecutor, the right to be heard, and the right to

15   a speedy trial. I and the ODA take Marsy's law very seriously. All DDAs at the ODA are

16   required to comply with Marsy's law, including DDA Maner.

17       41.    In late April 2012, after consulting with Chief DDA Harris, I directed our HR

18   Manager, Mr. Bawanan, to investigate DDA Maner's conduct toward Ms. Ybarra,

19   whether DDA Maner had violated Marsy's law, and whether DDA Maner violated his

20   supervisor's direct order to keep Ms. Ybarra informed of all case events. I oversaw the

21   investigation, which took place between May and October 2012. Mr. Bawanan's 2012

22   investigatory findings were: (1) in February and April 2012, DDA Maner was rude to Ms.

23   Ybarra; (2) in April 2012, DDA Maner failed to follow his supervisor's directive; (3) in

24   February and April 2012, DDA Maner did not follow Marsy's law when he failed to

25   apprise Ms. Ybarra of the status of the proceedings; and (4) DDA Maner was not truthful

26   in his investigatory interview. Based on his investigatory findings, Mr. Bawanan's

27   recommendation was that DDA Maner's conduct warranted a minimum of five days of

28   suspension. At the time I concurred, but additional complaints about DDA Maner

**66**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1    resulted in not issuing this proposed suspension to DDA Maner.

2        42.    On or about March 22, 2012, the Chief DDAs and I discussed transferring

3    DDA Maner out of his assignment in Department 6 and to an assignment in Juvenile

4    Court.   It was our hope that the transfer would result in fewer complaints from the public.

5    DDA Maner had worked the Juvenile assignment before, we knew he knew the job, and

6    we hoped that it would result in fewer complaints about DDA Maner's behavior.   The

7    rotation had no effect on his salary or benefits, and all DDAs are expected to work in any

8    assignment.

9        43.    DDAs who are assigned to Juvenile Court occupy offices in the Juvenile

10   Court courthouse.   When DDA Maner got out to Juvenile Court for his assignment on or

11   about April 30, 2012, he had to move to an office at Juvenile Court.   Other DDAs

12   occupied DDA Maner's same Juvenile Court office prior to, and after, DDA Maner

13   occupied the office.

14       44.    Prior to moving forward with the proposed suspension, however, the ODA

15   received new complaints about DDA Maner's conduct in his Juvenile Court assignment.

16   Specifically, DDA Maner had received another complaint from a Presiding Judge that

17   contained a litany of complaints against DDA Maner.   After conferring with Chief DDA

18   Harris and DA Fladager, who had been directly contacted by the Presiding Judge, I

19   directed the new ODA HR Manager, Cari Griffin, to begin an administrative investigation

20   into DDA Maner's conduct at Juvenile Court.   I ordered the investigation due to DDA

21   Maner's conduct in his Juvenile Court assignment, not for any retaliatory, harassing or

22   discriminatory reason.

23       45.    I oversaw the administrative investigation that took place into DDA Maner's

24   Juvenile Court misconduct, which took place between February to May 2013.   Due to

25   how new Ms. Griffin was to County employment, the complexity of the issues involved

26   and the number of witnesses that needed to be interviewed, I directed the Ms. Griffin to

27   work with ODA's Chief Investigator, Mr. Inderbitzen, to conduct the witness interviews

28   and make factual findings.

**67**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

46.     Mr. Inderbitzen's investigatory findings were: (1) in December 2012 DDA Maner was untruthful about who was at fault for a calendaring issue and made false statements during an administrative interview; (2) in December 2012, DDA Maner blocked another attorney's path and threatened his arrest without reason to do so; (3) DDA Maner was frequently late to court; (4) in February 2013, DDA Maner made disparaging comments about a judge in her own courtroom and to her own staff; and (5) DDA Maner said, "look what the cat dragged in" when a clerk entered a courtroom. Attached to the Appendix of Evidentiary Support as Exhibit 45 is a true and correct copy of Mr. Inderbitzen's May 6, 2013, report of the administrative investigation he had conducted into DDA Maner's conduct.

47.     After receiving Mr. Inderbitzen's May 2013 report, I decided that the volume and severity of the complaints encompassed by the 2012 and 2013 investigations warranted serious discipline.

48.     In preparation for issuing my disciplinary recommendation, I reviewed the 2012 and 2013 investigatory findings, DDA Maner's personnel history and file, various performance-related documents and emails, and consulted with the County Counsel's Office. Based on all the information before me, I decided that DDA Maner's misconduct, taken together with his performance and disciplinary history, warranted termination. I did not consult with DA Fladager about the appropriate level of discipline because her preference is not to be involved since she serves as the *Skelly* officer in the event the employee chooses to appeal a termination to a *Skelly* conference. In June 2013, I proposed that DDA Maner be discharged via a Notice of Intended Discharge. Attached to the Appendix of Evidentiary Support as Exhibit 46 is the Notice of Intended Discharge I authored and personally served on DDA Maner on June 14, 2013.

49.     The Notice included: (1) a description of the basis for the proposed discharge; (2) all documents upon which the decision to discharge was based; and (3) written notice that DDA Maner had the opportunity to respond to the recommended discipline prior to its imposition. The Notice also attached an unsigned Order for

**68**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1 Discharge that I had drafted with the assistance of the ODA's HR Manager, Cari Griffin.

2 Attached to the Appendix of Evidentiary Support as Exhibit 47 is a true and correct copy

3 of the unsigned Order for Discharge. The signatory on the unsigned Order was DA

4 Fladager because she would have been acting as the *Skelly* officer and thus deciding

5 whether to go forward with my recommendation to terminate DDA Maner.

6     50. When I served the Notice of Intended Discharge on DDA Maner, I was

7 accompanied by Ms. Griffin and Kevin Bertalotto, the lieutenant in the ODA's

8 investigation division. It is common for an investigator to accompany me on the personal

9 delivery of a notice of discharge or notice of proposed discharge to an employee.

10     51. After proposing DDA Maner's discharge, I had little involvement in the

11 disciplinary process going forward. However, sometime after DDA Maner's first *Skelly*

12 conference on June 28, 2013, DA Fladager conferred with me on supplemental

13 investigation she wanted done into the issues related to Ms. Ybarra's complaints. In

14 conjunction with DA Fladager, I directed the ODA's Chief Investigator, Mr. Inderbitzen, to

15 perform additional interviews with Ms. Ybarra, Mr. Loya, Chief DDA Harris, and DA

16 Fladager pertaining to his conduct toward Ms. Ybarra, possible violations of Marsy's law,

17 and whether or not DDA Maner violated a direct order of Chief DDA Harris.

18     52. By early August 2013, the Chief DDAs and I decided to rotate DDA Maner

19 to an assignment in Department 6. The rotation had no effect on his salary or benefits.

20 DDA Maner's rotation to Department 6 included moving offices out of the Juvenile Court

21 and back into the main ODA offices.

22     53. I learned that DDA Maner's employment was reinstated after a *Skelly*

23 conference with Sheriff Adam Christianson. DDA Maner returned to work on Monday,

24 August 12, 2013, and assumed his assignment in Department 6. He then began to

25 serve a 30-day suspension on Monday, August 26, 2013.

26     54. On August 29, 2013, or shortly thereafter, Ms. Griffin presented me with a

27 letter from DDA Maner's union representative, Mr. Michael Eggener, which constituted

28 DDA Maner's appeal of his thirty-day suspension. Attached to the Appendix of

**69**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1   Evidentiary Support as Exhibit 48 is a true and correct copy of the August 29, 2013,

2   letter requesting appeal.

3        55.      On September 5, 2013, or shortly thereafter, Ms. Griffin presented me with

4   a letter from Mr. Eggener that notified the County that DDA Maner was requesting

5   binding arbitration of his appeal, per the terms of his MOU.  Attached to the Appendix of

6   Evidentiary Support as Exhibit 49 is a true and correct copy of the September 5, 2013,

7   letter requesting arbitration.

8        56.     On September 26, 2013, or shortly thereafter, Ms. Griffin presented me

9   with a letter from Michael Nelson, counsel for DDA Maner's union, which notified the

10  County that DDA Maner was dropping the appeal of his suspension. Attached to the

11  Appendix of Evidentiary Support as Exhibit 50 is a true and correct copy of the

12  September 26, 2013, letter.

13       57.     In 2013 the ODA was under-staffed at the Chief DDA level.  In order to

14  free-up Chief DDAs to perform more supervisory duties, I directed Chief DDA Harris to

15  draft a list of collateral duties performed by Chief DDAs, in the hopes that we could

16  create an assignment for someone at least at a DDA V level to perform these duties.

17  The collateral duties were Chief DDA functions essential to the ODA operations.  This

18  assignment was called the Collateral Support Assignment ("CSA").  Attached to the

19  Appendix of Evidentiary Support as Exhibit 7 is a true and correct copy of the document

20  Chief DDA Harris drafted and I finalized.

21       58.     The Chief DDAs and I originally envisioned that Doug Fontan, a former

22  Chief DDA, would perform the CSA.  Unfortunately, Doug Fontan had retired and was

23  unable to return to perform the CSA position.  In or around September 2013, I, the DA,

24  and the Chief DDAs agreed that DDA Maner should be rotated into the CSA assignment

25  after his return to the ODA post-suspension.  DDA Maner's transfer to the CSA was not

26  punitive.  DDA Maner was transferred to the CSA because he was one of the few senior

27  attorneys with the required experience to perform these essential, Chief-level duties.  In

28  addition, the Chief DDAs and I believed that DDA Maner would receive fewer complaints

**70**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

if he worked in the CSA because its functions were primarily within the ODA. Still, the CSA required court appearances from time to time. Because we hoped that DDA Maner's conduct would improve upon return from his suspension, we believed he would be competent to perform those courtroom duties.

59. After DDA Maner resigned on October 7, 2013, the Chief DDAs and I continued to perform these functions. Upon his retirement, Chief DDA Begen spent time volunteering at the office and took on the functions, and then after Mr. Begen left, former Chief DDA John Goold was hired as a part time employee and he picked up the functions.

60. As ADA, I oversaw attendance of ODA employees, including whether an employee was on paid or unpaid leave. DDA Maner was on paid leave from June 17, 2013, through June 28, 2013, on paid vacation from June 29, 2013, through July 8, 2013, and again on paid leave from July 9, 2013, through August 9, 2013. DDA Maner returned to work on August 12, 2013. DDA Maner served his unpaid suspension from August 26, 2013, through October 4, 2013.

61. I directed all DDAs to use name stamps when signing issued complaints. Using a name stamp helped the clerical staff process complaints because every stamped name was legible.

62. Between June 1, 2006, and my retirement in March 2015, I oversaw five separate administrative investigations into ODA employees other than DDA Maner.

63. In June 2007, the ODA HR Manager, Kathy Matt, conducted an administrative investigation into an employee's misconduct, which resulted in a Letter of Reprimand. As ADA, I oversaw the investigation. The Letter was issued by Chief DDA Casey on July 5, 2007. The misconduct involved a DDA's failure to appropriately document an alleged agreement between the ODA and a murder defendant. This was the first instance of misconduct involving this DDA and thus the first disciplinary action taken against this person.

64. In or around mid- 2007, the ODA HR Manager, Ms. Matt, conducted an administrative investigation into an employee's misconduct. As ADA, I oversaw the

**71**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

investigation. The misconduct was a DUI charge. After completion of the investigation, in June 2007, I proposed the employee be suspended for forty-five days. After the employee's *Skelly* conference, DA Fladager reduced the level of discipline to a twenty day suspension. The Order for Suspension was issued on July 25, 2007. In addition, the employee agreed to attend counseling, attend Alcoholics Anonymous meetings, and submit to drug and alcohol testing. Failure to attend counseling, failure to attend AA meetings, or failure to pass a drug and alcohol test would result in immediate termination. This was the first instance of misconduct involving this DDA and thus the first disciplinary action taken against this person.

65. In November 2011, the ODA HR Manager conducted an administrative investigation into a different employee's misconduct. As ADA, I oversaw the investigation. After the investigation concluded, I issued the employee a notice of intended suspension for a length of forty-five days. The misconduct was a DUI conviction. After the employee's *Skelly* conference, DA Fladager reduced the level of discipline to a ten day suspension. The Order for Suspension was issued in December 2011. The employee also agreed to attend counseling and submit to drug and alcohol testing for one year. If the employee missed a counseling appointment or failed a drug or alcohol test, that employee would be terminated. This was the first instance of misconduct involving this DDA and thus the first disciplinary action taken against this person.

66. In early 2012, the ODA HR Manager conducted an administrative investigation into another employee's misconduct, which resulted in a Letter of Reprimand. As ADA, I oversaw the investigation. The Letter was issued by Chief DDA Begen to the employee on March 20, 2012. The misconduct here involved inappropriate and statements made by an ODA employee to a probation officer in September 2011. This was the first instance of misconduct involving this DDA and thus the first disciplinary action taken against this person.

67. In late December 2012 or early January 2013, there was an administrative investigation into another employee's misconduct, which resulted in a Letter of

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Reprimand. As ADA, I oversaw the investigation. The Letter was issued by Chief DDA Begen to the employee on January 11, 2013. The misconduct here involved unprofessional and misleading statements made by an ODA employee to a member of the public. This was the first instance of misconduct involving this DDA and thus the first disciplinary action taken against this person.

68. I did not know that DDA Maner wrote a Letter to the Editor of the Modesto Bee in 2006 until after DDA Maner filed this lawsuit in April 2014.

69. At no time was DDA Maner's May 2006 Letter to the Editor in the Modesto Bee a factor in any personnel decision I made regarding DDA Maner.

70. At no time was DDA Maner's association with Michael Cummins a factor in any personnel decision I made regarding DDA Maner.

71. At no time was DDA Maner's speech, association with any political candidate or any other protected classification, or retaliation, a factor in any personnel decision I made regarding DDA Maner.

Maner's complaint of bias at his June 2013 Skelly conference was the first I had heard of any complaint from DDA Maner about retaliation or any other allegations of adverse action against DDA Maner due to his 2006 political speech, his association with any political candidate or other protected classification.

73. It is the ODA's practice to evaluate issues of employee misconduct and how to address such misconduct on a case by case basis. Generally, the ODA investigates allegations of DDA misconduct that come to the attention of management. However, if management is not aware of an allegation of misconduct warranting a personnel investigation, the ODA cannot investigate or take investigatory or disciplinary action.

\\
\\
\\
\\

**73**

1      I declare under the penalty of perjury under the laws of the United States that the

2  foregoing is true and correct.

3      Executed this 23rd day of February, 2016, in Modesto, California.

_____
CAROL SHIPLEY

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

**74**

Exhibit I

1   Morin I. Jacob, Bar No. 204598
    mjacob@lcwlegal.com
2   Lisa S. Charbonneau, Bar No. 245906
    lcharbonneau@lcwlegal.com
3   LIEBERT CASSIDY WHITMORE
    A Professional Law Corporation
4   135 Main Street, 7th Floor
    San Francisco, California 94105
5   Telephone:   415.512.3000
    Facsimile:    415.856.0306
6
7   Attorneys for Defendants
    COUNTY OF STANISLAUS and
    BIRGIT FLADAGER
8

9                    UNITED STATES DISTRICT COURT

10                   EASTERN DISTRICT OF CALIFORNIA

11   DOUGLAS MANER,                    Case No.: 1:14-CV-01014-MCE-MJS

12                   Plaintiff,        **DECLARATION OF GERARD BEGEN IN**
                                       **SUPPORT OF DEFENDANTS' MOTIONS**
13          v.                         **FOR SUMMARY JUDGMENT, OR, IN THE**
                                       **ALTERNATIVE, FOR PARTIAL SUMMARY**
14   COUNTY OF STANISLAUS, BIRGIT      **JUDGMENT**
     FLADAGER, and DOES 1 through
15   20, inclusive,                    Date:       April 21, 2016
                                       Time:       2:00 PM
16                   Defendants.       Courtroom:7, 14th Floor
                                       Judge:      Morrison C. England, Jr.
17
                                       Trial Date: October 24, 2016
18

19

20          I, Gerard Begen, hereby declare and state as follows:

21          1.      I worked as an attorney for the County of Stanislaus' Office of the District

22   Attorney ("ODA") in various capacities from 1986 to 2014.  If called upon to testify, I

23   could and would competently testify to the following facts from my own personal

24   knowledge.

25          2.      My first position at the ODA was Deputy District Attorney ("DDA").  In 1995,

26   I was promoted to a Chief DDA position.  As a Chief DDA, my direct supervisor was

27   Assistant District Attorney ("ADA") Carol Shipley.  I retired from the Chief DDA position in

28   March 2013.  After my retirement, I worked for the ODA on a temporary basis as needed

**76**

                                            1

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

in various DDA capacities, until November 2014.  I have not worked for the ODA since November 2014.

3.     As Chief DDA, my job duties changed over time, but generally and consistently included supervising DDAs, overseeing various departments or divisions, as assigned, and assisting in the management of the ODA.  From at least 2005 to my retirement, Chief DDAs and ADA Shipley would meet with other ODA managers, such as the ODA HR Manager and/or the Manager of the ODA's Investigation Division (referred to as the "Chief Investigator"), on a weekly basis in what was referred to as the "Chiefs Meeting."  The DA would also attend the meetings.  At some point during the meeting, the non-attorney managers would leave and the attorneys would continue the meeting to discuss attorney-specific, management-level issues.

4.     One of my duties as a Chief DDA at the ODA was performing yearly performance evaluations of the DDAs I supervised.  In my time at the ODA, I served as DDA Douglas Maner's direct supervisor from 1994 to 1996, 2000 to 2003, and again from 2006 through 2011.

5.     Attached to the Appendix of Evidentiary Support as **Exhibit 51** is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 1994 through August 1995, which I authored.  During this evaluation period, I observed that DDA Maner's relationship with others tended to be his "Achilles Heel."  He exhibited impatience with non-attorney employees, as exemplified by him seeking to have clerical staff do things for him that were not part of their job assignments, showing a preference for dealing with supervisors to the exclusion of others, and requiring clerks who need access to materials in his office to "come back later."  There were also incidents involving employees of other agencies, specifically law enforcement, that required supervisory intervention.  I perceived that DDA Maner considered himself and his needs more worthy of consideration than other people and their feelings.  People described his handling of witnesses and victims to me as "indifferent and uncaring," and that he tended to "ignore" them.  His flaws were his relationships with other people.

**77**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

6.     Attached to the Appendix of Evidentiary Support as **Exhibit 52** is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 1999 through August 2000, which I authored.  During this evaluation period, I observed that he continued to be deficient in his relationship with clerical workers in the ODA.  His relationship with the ODA clerical staff during this period plummeted and many expressed to me views about Maner that were extremely negative.  Again, his drawback was his inability to treat the clerical staff as anything but servants.

7.     Attached to the Appendix of Evidentiary Support as **Exhibit 53** is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 2000 through August 2001, which I authored.  During this evaluation period, I observed that Maner's relationship with the clerical workers in the office was still deficient and there were incidents during which Maner was rude to clerical staff and used inappropriate language within earshot of the clerical staff.  Also during this time period, DDA Maner took more time off than he had accrued, which was a violation of County policy and resulted in him being docked some pay.

8.     The specifics of the incident with clerical staff that I referenced in DDA Maner's 2000/2001 annual performance evaluation was a 2001 complaint from a paralegal who alleged she had been harassed by DDA Maner and that DDA Maner had created a hostile work environment.  The ODA Human Resources Manager at the time, Kathy Matt, investigated the complaint between January and March 2001.  In March 2001, Ms. Matt provided me with her summary and report of her investigation, which I reviewed thoroughly in my capacity as DDA Maner's supervisor.  A true and correct copy of the investigatory report prepared for me by Ms. Matt is attached to the Appendix of Evidentiary Support as **Exhibit 54**.

9.     Based on Ms. Matt's investigatory findings, I concluded that DDA Maner had used profanity in the office in violation of the County's anti-harassment policy.  In my capacity as DDA Maner's supervisor, I verbally counseled DDA Maner about this incident.  The incident was serious enough that it merited being addressed in his annual

**78**

DECLARATION OF GERARD BEGEN

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

performance evaluation.  As such, I documented the incident in his 2000/2001 performance evaluation.  None of the following were a factor in my decision to verbally counsel DDA Maner in 2001: any protected speech he engaged in, any of his political or other protected associations, nor any other alleged protected activity.

10.     Attached to the Appendix of Evidentiary Support as **Exhibit 55** is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 2001 through August 2002, which I authored.  During this evaluation period, I observed that Maner still experienced difficulty interacting with the clerical staff and it was incumbent upon him to improve those relationships.  His inability to consistently treat the clerical staff in accordance with general standards of civility remained a blemish on his career.

11.     Attached to the Appendix of Evidentiary Support as **Exhibit 56** is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 2002 through August 2003, which I authored.  I noted in the evaluation that in the past there has been some concern expressed about his relationship with the clerical staff, but the input received this evaluation year was good.

12.     I believe DDA Maner was dishonest with me in September 2005 about the reason he wanted to issue an arrest warrant to a physician witness who works in one of the County's jails.  I was not his supervising Chief DDA at the time.  When DDA Maner came to me for approval to issue the arrest warrant to the physician witness, he told me it was because the witness refused to appear at a preliminary hearing.  I gave my approval.  However, shortly after this conversation, I overheard DDA Maner tell someone the same case was going to be continued.  I then asked DDA Maner whether the continuance was due to the witness's refusal to appear.  DDA Maner answered in the negative.  I then told DDA Maner we do not issue bench warrants for physician witnesses who work in the County jails where the case was continuing for other reasons.

13.     In my opinion, DDA Maner was not forthright when he did not explain that the case was being continued.  Based on my experience as a DDA and Chief DDA, i

**79**

4

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1    would have been prudent for DDA Maner to tell me if the case was being continued

2    when he explained why he was seeking an arrest warrant.  DDA Maner omitted this

3    information to send the physician witness a message about failing to appear pursuant to

4    subpoena.  I did not believe sending such a message was appropriate because if DDA

5    Maner had issued the warrant, it could have damaged the ODA's important and ongoing

6    working relationship with physicians at the jails.  I wrote a written statement about the

7    incident and submitted it to Kathy Matt, the ODA Human Resources Manager at the

8    time, via ADA Carol Shipley for follow up.

9         14.    I became DDA Maner's supervisor again in the Fall of 2006.  In October

10   2006, I received an email from Chief DDA John Goold, who was upset that DDA Maner

11   had walked into a bathroom and, despite knowing that a woman was painting a mural in

12   the bathroom, proceeded to urinate in front of her.  A true and correct copy of the email

13   sent to me from Chief DDA Goold is attached to the Appendix of Evidentiary Support as

14   **Exhibit 57**.  I discussed the incident with DDA Maner at the time.  DDA Maner appeared

15   not to take the incident seriously.

16        15.    In March 2007, I was contacted by Modesto Police Lieutenant Dave Sundy

17   about a complaint against DDA Maner from members of the Gang Intelligence Taskforce

18   – a multi-agency law enforcement taskforce that works closely with the ODA on gang-

19   related criminal prosecutions.  DDA Maner was assigned to the ODA's gang prosecution

20   unit at the time.  The complaint stemmed from an email DDA Maner wrote to three

21   members of the Gang Intelligence Taskforce that rudely criticized their work and blamed

22   them for something DDA Maner himself was, at least in part, responsible for.  A true and

23   correct copy of the email I received from Modesto Police Lieutenant Dave Sundy that

24   included DDA Maner's offending email is attached to the Appendix of Evidentiary

25   Support as **Exhibit 58**.

26        16.    I soon discussed the complaint with DA Fladager.  Together, we

27   determined that DDA Maner should be rotated out of his gang unit assignment.  A basic

28   requirement of prosecuting gang-related criminal activity is to have positive working

**80**

DECLARATION OF GERARD BEGEN

relationships with the Gang Intelligence Taskforce. DDA Maner's email showed a lack of good judgment because it impaired our relationship with members of the Gang Intelligence Taskforce and its member law enforcement agencies. A good relationship with law enforcement agencies is critical for a district attorneys' office; law enforcement agencies are our partners during prosecutions. We transferred DDA Maner out of the gang unit in mid-March 2007. I did not transfer DDA Maner out of retaliation for his support of any political candidate or association with any political candidate in 2006. I transferred DDA Maner out of his gang assignment due to the problems he was having working with Gang Intelligence Taskforce.

17. Based on DDA Maner's history of complaints from other staff and the public, DA Fladager and I decided that DDA Maner should be rotated to issuance because it would reduce the number of people with which he had to interact and could possibly interact with badly.

18. In or around May 2007, the ODA HR Manager at the time, Ramon Bawanan, provided me with a write-up of an administrative investigation he had been conducting since approximately January 2007 regarding a series of complaints against DDA Maner, spanning from the October 2006 bathroom/urinating in front of a woman incident to DDA Maner's unacceptable and rude email to members of the Gang Intelligence Taskforce. In addition to listing the charges and his investigatory findings, Mr. Bawanan's report included a recommendation as to the level of discipline he believed was warranted. Mr. Bawanan's recommendation was a ten-day suspension. Attached to the Appendix of Evidentiary Support as **Exhibit 59** is a true and correct copy of Mr. Bawanan's investigatory findings and disciplinary recommendation, which I received and reviewed.

19. After receiving it, I thoroughly reviewed Mr. Bawanan's report and all the underlying documentation regarding the numerous incidents encompassed by the investigation. My final recommendation as to the appropriate level of discipline to impose on DDA Maner was a five-day suspension. Attached to the Appendix of

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Evidentiary Support as Exhibit 59 is a true and correct copy of the Notice of Intended Disciplinary Suspension I wrote and served on DDA Maner on July 26, 2007. The Notice included: (1) a description of the basis for the proposed suspension; (2) all documents upon which the decision to suspend was based; and (3) written notice that DDA Maner had the opportunity to respond to the recommended discipline prior to its imposition.

20. I proposed that DDA Maner be suspended for five days due to the conduct encompassed by Mr. Bawanan's investigatory report. The investigation involved an unprecedented number of independent instances of staff or the public complaining about DDA Maner's behavior. It was not typical for a DDA to receive so many complaints from staff and/or the public. Since DDA Maner's current misconduct was substantially similar to the misconduct for which he had been disciplined previously, I determined previous disciplinary efforts, such as counseling or written reprimands, had not been effective. DDA Maner needed to receive a more serious and severe level of discipline on this occasions. Since past informal counseling and letters of reprimand issued by myself and other of DDA Maner's supervisors had not adequately addressed the issue, I felt a five-day suspension was warranted here.

21. After DDA Maner was transferred out of his gang unit assignment, he received very few complaints from other staff or the public about his conduct. Indeed, no disciplinary action was initiated against DDA Maner from March 2007 through approximately March 2011. As DDA Maner's supervisor, I was generally pleased with his performance during this time period and expected him to continue working without incident into the future.

22. Although I began supervising DDA Maner again in early 2006, I did not complete a performance evaluation for him for the September 2006 through August 2007 time period. I decided not to perform such an evaluation after discussions with ADA Shipley, during which we decided that due to the disciplinary process underway in 2006 and 2007, we would evaluate DDA Maner after the process had completed. Since DDA Maner was at the top salary step in his DDA classification, skipping a performa

**82**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

evaluation for the year had no effect on his compensation.

23.     Attached to the Appendix of Evidentiary Support as **Exhibit 61** is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 2007 through August 2008, which I authored.  During this evaluation period, I observed that DDA Maner needed to improve his office procedure; he tended to want to do things his way, which was frustrating for staff and me as his supervisor.  I devoted an inordinate amount of time to get DDA Maner to do what his fellow DDAs had no trouble doing, on trivial matters, resulting in wasted time for all involved.

24.     On March 28, 2008, I issued DDA Maner a corrective memorandum regarding the proper procedure for filling out witness input sheets.  DDA Maner was using his own method of filling out these sheets, which was confusing and frustrating the ODA's clerical staff.  Attached to the Appendix of Evidentiary Support as **Exhibit 62** is a true and correct copy of the memorandum I authored and then sent to DDA Maner regarding problems with his witness input procedure.

25.     At various times in 2008, I had some conflict with DDA Maner regarding his vacation requests.  As he had done years before, DDA Maner sought approval for vacation well in advance of the vacation date and when he had not yet accrued the vacation hours he sought to take.  This can pose a problem when vacation accruals are not sufficient when the pre-approved vacation is actually set to begin.  Generally, most senior employees do not have this problem as they have sufficient vacation accruals to cover the proposed vacation.  In September, things had escalated to the point where I brought in the ODA HR Manager at the time, Ramon Bawanan, and had to point out the relevant section of the Personnel Manual regarding leave approvals to DDA Maner.  I ended up pre-approving only a portion of what DDA Maner had originally requested.  Attached to the Appendix of Evidentiary Support as **Exhibit 63** is a true and correct copy of a September 2008 email exchange with DDA Maner regarding pre-approval for vacation in 2009.

\\

**83**

DECLARATION OF GERARD BEGEN

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

26.     Attached to the Appendix of Evidentiary Support as Exhibit 64 is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 2008 through August 2009, which I authored.  During this evaluation period, DDA Maner received only a negative complaint from a clerical staff member – a worker who said she was afraid to interact with DDA Maner.

27.     Attached to the Appendix of Evidentiary Support as Exhibit 65 is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 2009 through August 2010, which I authored.  During this evaluation year, we decided to curtail DDA Maner's appearances at "lifer hearings," at which convicts with life sentences appeal to the parole board for a reduction in their life sentences, due to staffing and budget cuts.  Going forward, DDA Maner would only appear at lifer hearings under certain extraordinary circumstances.

28.     Attached to the Appendix of Evidentiary Support as Exhibit 66 is a true and correct copy of DDA Maner's annual performance evaluation for the time period of September 2010 through August 2011, which I authored.  During this evaluation period, I observed that DDA Maner received two separate complaints from outside law enforcement agencies regarding misconduct.  These are discussed more thoroughly below.  The ODA's relationship with partner law enforcement agencies is critical to the successful prosecution of criminals in the community.  Maner's antics put those relationships in jeopardy.  Here, the area of "people skills" continued to challenge DDA Maner and limit his horizons.

29.     In March 2011, I was disappointed to receive a complaint from a partner law enforcement agency about DDA Maner's rude conduct.  This time, Modesto Police Department, K9 Officer Dwight Miller complained that DDA Maner was unprofessional, condescending, dismissive and even snide toward him and other police officers in a courtroom.  A true and correct copy of the email I was forwarded regarding Officer Miller's complaint is attached to the Appendix of Evidentiary Support as Exhibit 67.

\\

**84**

DECLARATION OF GERARD BEGEN

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

30. In or around April 2011, Detective Tonya Smith from the Ceres Police Department had complained about Maner's disrespectful treatment and disparaging comments toward her, including commenting that her work was "crap." In September 2011, ODA HR Manager Bawanan provided me with a copy of the email in which Detective Smith complained about DDA Maner's conduct. I reviewed that email in my capacity as DDA Maner's supervisor. A true and correct copy of the email complaint from Detective Smith is attached to the Appendix of Evidentiary Support as **Exhibit 68**.

31. DDA Maner's rude conduct toward police officers harmed the ODA's relationship with our partner law enforcement agencies and made it more difficult for the ODA to successfully prosecute criminal activity. Thus, these complaints were problems in and of themselves. Additionally, however, because DDA Maner had received discipline for similar misconduct in the past, these complaints were especially concerning. Even prior to the Gang Intelligence Taskforce complaints from 2007, I remember problems DDA Maner had with law enforcement dating back to the mid 1990's when he called a Modesto Police Officer lazy and incompetent to a bailiff. Somehow, the comment got back to the officer, who then complained to the ODA. Even back then I had to counsel DDA Maner on improving his relations with law enforcement. Also at that time, I remember talking to DDA Maner on how to appropriately apologize to this officer. Fifteen years later I was dealing with the exact same issues.

32. Due to the seriousness of the matter, and due to DDA Maner's history of problematic relations with law enforcement, I decided, in consultation with ADA Shipley, to refer the officers' complaints to ODA HR Manager Bawanan for investigation.

33. In September 2011, I received a memorandum from ODA HR Manager Bawanan that summarized Investigator Dan Inderbitzen's findings. Mr. Bawanan recommended that DDA Maner receive a Letter of Reprimand. A true and correct copy of the September 29, 2011, memorandum from Ramon Bawanan to me is attached to the Appendix of Evidentiary Support as **Exhibit 69**.

\\

**85**

10

DECLARATION OF GERARD BEGEN

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

34.     Also in September 2011, Mr. Bawanan gave me a copy of a memorandum the ODA's Chief Investigator, Dan Inderbitzen, wrote to Mr. Bawanan summarizing Mr. Inderbitzen's investigation into the Officer Miller and Detective Smith complaints.  A true and correct copy of the June 16, 2011, memorandum from Investigator Inderbitzen to Mr. Bawanan that I reviewed is attached to the Appendix of Evidentiary Support as **Exhibit 70**.

35.     After reviewing Mr. Inderbitzen and Mr. Bawanan's findings, I concluded that DDA Maner had been discourteous and rude to Officer Miller.  I agreed with Mr. Bawanan's recommendation that the appropriate remedial action was a Letter of Reprimand that directed DDA Maner to apologize to Officer Miller and to attend behavioral counseling.  I did not instruct DDA Maner to apologize to Detective Smith because he already did so in April 2011.  Attached to the Appendix of Evidentiary Support as **Exhibit 71** is a true and correct copy of the Letter of Reprimand I issued to DDA Maner on October 11, 2011.

36.     On November 9, 2011, DDA Maner emailed me a draft of the apology he was directed to send to Officer Miller.  I was shocked: the draft was wholly and wildly inadequate; it did not even constitute an apology.  Rather, the first draft stated "As a result of the complaint that you filed with my office regarding my behavior on 3/22/11, I have been required by my office to issue an apology.  I apologize for my conduct on 3/22/11."  Conveying to someone that you are being directed to apologize and perfunctorily saying "I apologize," is not an apology.  Further, if DDA Maner had sent his original apology, it would have further damaged his reputation, his and the ODA's relationship with the partner law enforcement agency, and the position of the ODA.  A true and correct copy of my email exchange with DDA Maner about his apology, which includes his unacceptable first draft of the apology, is attached to the Appendix of Evidentiary Support as **Exhibit 72**.

37.     I thus had to instruct DDA Maner – someone with twenty years of experience as an attorney – on how to write an apology to a colleague.  Even more **86**

DECLARATION OF GERARD BEGEN

shocking was that DDA Maner was able to quickly draft a practically perfect apology, which indicated to me that he always had the ability to do so but simply did not care to put in the effort on the first go around.

38.     Based on the apology incident, and the history of complaints I had been involved with regarding DDA Maner during my time supervising him, I continued to question his judgment. I also found supervising him to be taxing and time-consuming because he was making trivial errors just to evade department rules, such as his personal and problematic procedure for filling out witness input sheets, which nonetheless needed to be addressed. For these reasons, around late November 2011, I formally requested that I no longer be required to serve as DDA Maner's direct supervisor. I had had it with supervising DDA Maner. Because of his behavior, I refused to continue to supervise him.

39.     By January 2012, I was no longer supervising DDA Maner. However, I did interact with DDA Maner when he assisted the dedicated issuance attorneys in reviewing a portion of the misdemeanor complaints. During this time, I regularly received complaints from clerical staff about DDA Maner's issuance work because he refused to follow the ODA's standard procedures. For example, he wrote illegibly and refused to use a name stamp – unlike every other DDA. He also refused to use our template for listing priors. All of this was frustrating and confusing for the clerical staff, and resulted in complaints. Because I was not DDA Maner's direct supervisor at the time, I told his new supervisor, Chief DDA David Harris, about the issues raised by the clerical staff about DDA's failure to follow established procedures in issuance. DDA Maner's failure to follow instructions was time consuming for me – even when I was no longer his direct supervisor.

40.     On February 14, 2012, I received an email from DA Fladager that directed me, Chief DDA Harris, and DDA Maner to convene a meeting with a victim's next of kin, Mary Ann Ybarra. Ms. Ybarra had contacted the ODA because she was upset with how DDA Maner had conducted himself toward her in prosecuting her brother's case. M

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Ybarra's brother was murdered and DDA Maner was the lead attorney on the case. A true and correct copy of the February 14, 2012, email from DA Fladager is attached to the Appendix of Evidentiary Support as **Exhibit 1**.

41.     On February 16, 2012, I attended a meeting with Chief DDA Harris, DDA Maner's then-supervisor, DDA Maner, Mr. Ybarra, Ms. Ybarra's County-appointed Victim Advocate, Alex Loya, and Ms. Ybarra's relative, Tina Cantu. During the meeting, I observed DDA Maner acting dismissive and disinterested in the concerns articulated by Ms. Ybarra and Mr. Loya. I also observed Chief DDA Harris instruct DDA Maner to appropriately include and otherwise keep Ms. Ybarra informed of case developments in conformance with Marsy's law.

42.     At no time was Douglas Maner's support of Michael Cummins in 2006 a factor in any personnel decision I made regarding DDA Maner. I never discussed DDA Maner's political views or 2006 support for Michael Cummins with DA Fladager, ADA Shipley, or any Chief DDA prior to this lawsuit.

43.     I disciplined DDA Maner before and after the DA election of 2006 due to his conduct, not because of his political views, political activity, political associations, or any other protected activity, and not out of retaliation

44.     I did not know that Douglas Maner wrote a Letter to the Editor of the Modesto Bee in 2006 until after DDA Maner filed this lawsuit in April 2014.

///
///
///
///
///
///
///
///
///

**88**

DECLARATION OF GERARD BEGEN

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 19th day of February, 2016, in Modesto, California.

_____
GERARD BEGEN

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

**89**

Exhibit J

1   Morin I. Jacob, Bar No. 204598
    mjacob@lcwlegal.com
2   Lisa S. Charbonneau, Bar No. 245906
    lcharbonneau@lcwlegal.com
3   LIEBERT CASSIDY WHITMORE
    A Professional Law Corporation
4   135 Main Street, 7th Floor
    San Francisco, California 94105
5   Telephone:   415.512.3000
    Facsimile:   415.856.0306
6
    Attorneys for Defendants
7   COUNTY OF STANISLAUS and
    BIRGIT FLADAGER
8

9               UNITED STATES DISTRICT COURT

10              EASTERN DISTRICT OF CALIFORNIA

11  DOUGLAS MANER,                      Case No.: 1:14-CV-01014-MCE-MJS

12              Plaintiff,

13      v.                              **DECLARATION OF MORIN I. JACOB IN
                                        SUPPORT OF DEFENDANTS' MOTIONS
14  COUNTY OF STANISLAUS, BIRGIT        FOR SUMMARY JUDGMENT, OR, IN THE
    FLADAGER, and DOES 1 through        ALTERNATIVE, FOR PARTIAL SUMMARY
15  20, inclusive,                      JUDGMENT**

16              Defendants.            Date:      April 21, 2016
                                        Time:      2:00 PM
17                                      Courtroom:7, 14th Floor
                                        Judge:     Morrison C. England, Jr.
18                                      Trial Date: October 24, 2016

19

20      I, MORIN I. JACOB , hereby declare and state as follows:

21      1.      I am an attorney licensed to practice law in the state of California.  I am a

22  partner  at the law firm of Liebert Cassidy Whitmore, counsel of record for Defendants in

23  the matter pending in the United States District Court for the Eastern District of

24  California, entitled *Douglas Maner v. County of Stanislaus, et al.,* Case No. 1:14-CV-

25  01014-MCE-MJS.  I am the attorney primarily responsible for the handling of this case,

26  and I am familiar with the pleadings and discovery. If called upon to testify, I could and

27  would competently testify to the following facts from my own personal knowledge.

28      2.      Plaintiff Douglas Maner filed this lawsuit on April 10, 2014.  I have

**91**

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

1 | represented Defendants in this matter since they were served with the Complaint.

2 | Attached to the Appendix of Evidentiary Support as **Exhibit 73** is a true and correct copy

3 | of Plaintiff's Complaint.

4 |     3.    Attached to the Appendix of Evidentiary Support as **Exhibit 74** is a true

5 | and correct copy of the transcript of an audio recording of the *Skelly* conference dated

6 | August 28, 2007. On or around October 23, 2015, Defendants, via my law office, served

7 | the audio recording of the 2007 *Skelly* conference in electronic format to Plaintiff via his

8 | counsel, Mr. Peter Bradley, in response to one or more of Plaintiff's discovery requests.

9 |     4.    On August 21, 2015, I deposed Plaintiff Douglas Maner in connection with

10 | the above-captioned lawsuit. Attached to the Appendix of Evidentiary Support as **Exhibit**

11 | **75** is a true and correct copy of excerpts of the transcript of the Deposition of Douglas

12 | Maner, Volume I, dated August 21, 2015. I reviewed the transcript in the course and

13 | scope of my work for this litigation and can confirm its authenticity.

14 |     5.    On September 23, 2015, counsel for Plaintiff, Peter Bradley, took the

15 | deposition of Gerard Begen in connection with the above-captioned lawsuit. I attended

16 | and participated in this deposition on behalf of Defendants. Attached to the Appendix of

17 | Evidentiary Support as **Exhibit 76** is a true and correct copy of excerpts of the transcript

18 | of the Deposition of Gerard Begen, dated September 23, 2015. I reviewed the transcript

19 | in the course and scope of my work for this litigation and can confirm its authenticity.

20 |     6.    On November 6, 2015, counsel for Plaintiff, Peter Bradley, took the

21 | deposition of Wallace McKenzie in connection with the above-captioned lawsuit. I

22 | attended and participated in this deposition on behalf of Defendants. Attached to the

23 | Appendix of Evidentiary Support as **Exhibit 77** is a true and correct copy of excerpts of

24 | the transcript of the Deposition of Wallace McKenzie, dated November 6, 2015. I

25 | reviewed the transcript in the course and scope of my work for this litigation and can

26 | confirm its authenticity.

27 |

28 |     I declare under the penalty of perjury under the laws of the United States that the

**92**

foregoing is true and correct.

Executed this 24th day of February, 2016, in San Francisco, California.

_____
MORIN I. JACOB

Liebert Cassidy Whitmore
A Professional Law Corporation
135 Main Street, 7th Floor
San Francisco, California 94105

**93**

Exhibit 1

# DOUG MANER - Fwd: Concerned Victim Family Member..Victim: Bobby Ybarra, Defendant: Felipe Solorio

| | |
|---|---|
| **From:** | BIRGIT FLADAGER |
| **To:** | BEGEN, JERRY; HARRIS, DAVE; MANER, DOUG |
| **Date:** | 2/14/2012 7:14 PM |
| **Subject:** | Fwd: Concerned Victim Family Member..Victim: Bobby Ybarra, Defendant: Felipe Solorio |
| **CC:** | SHIPLEY, CAROL |

Doug and Jerry (and Dave, since there has been a change in supervisors)--

I would suggest that the three of you have a sit down conversation about this case--and perhaps consider a full briefing of it at a homicide meeting with the detectives invited to attend--in order to realistically assess the strengths and weaknesses of the case and ascertain whether an offer should be made in the case and, if so, what it should be.

Separate and apart from that, but of equal importance, a face to face conversation with Ms. Ybarra should also occur--soon. I may be incorrect, but I believe that Ms Ybarra was previously active with the Sund Carrington Foundation so she would have significant experience with how victims may be treated in the criminal justice system--both good and bad. Even if I am mis-remembering her, she does have prior experience with Steve Casey's handling of the case during a prior trial. Like all homicide victim's family members, she deserves to be treated with dignity, compassion and respect and it sounds like she does not feel like that is currently happening. Please address that ASAP and then let me know the status.
Thank you.


>>> mary ann ybarra <ybarram123@yahoo.com> 2/14/2012 5:34 PM >>>
Ms Fladager,

My name is Mary Ann Ybarra (Victim's Sister); I have a few concerns about my brother's case (Bobby Ybarra).

I have called several times to schedule a meeting with Doug Maner Supervisor's Jerry Began before the holidays and he told me to call after the holidays. I called after the holidays, as requested and left messages with Jerry Began and Dave Harris to meet with me and a couple of family members and Doug Maner, with no avail.

Felipe Solorio (defendant) had been at large for 13 years before he was captured by the Mexican police and turned over to the Stanislaus FBI, Investigator and detectives. I have attended several hearings since March 2011. Each time they have been continued due to defense lawyer requiring discovery or missing discovery.

During the last hearing 12/16/2011, Doug Maner called me into a court conference room to go over a discussion he had with defense lawyer. Without VA Alex Loya – telling him he didn't have to be in there. At first I thought it was ok but after hearing what Doug and Defense Lawyer had discussed I felt I needed someone there. Hoping Alex was in there with me.

**95**

## MSJ Exhibit 1 - 1

P's Doc Prod #1

I guess Felipe Solorio feels he's responsible for something like voluntary manslaughter where he would do less than 10 years and didn't have to go in front of a parole board.

Maner was telling me that because case is so old a jury probably wouldn't be convinced and Solorio could go free if it went to a trial. He said there were several witnesses that had died and the other witnesses maybe would not be reliable enough. I feel that there have been other older cases where a jury was convinced and defendants were found guilty. I feel that Doug Maner is not a people person and is not working hard enough. I know we still have not gone thru a preliminary hearing but I feel his heart is not into this case.

Is it not the prosecutor's job to be responsible for seeing that lawbreakers are punished for their crimes and to convince a judge or jury that a person is guilty of committing such a crime.

I feel that Felipe Solorio:

1. Instigated the murder of my brother Bobby Ybarra

2. Drove the Car to Grayson

3. Drove by Bobby's house several times trying to convince him to walk to his car.

4. Had Alardin's kids in car and drove to his house to drop off his kids.

5. Drove to Westley to Jeff Muniz house to pick up shotgun.

6. Drove back to Grayson where they found my brother walking to store (which was close to home) stopped and Alardin got off and shot my brother.

7. Drove away.

I feel that Felipe Solorio deserves the same amount of time the shooter received or 15 years to life.

During the trial for the shooter and 2 others I felt Steve Casey was a lot more compassionate with the family members. I know not all prosecutors are the same but the family needs to know that you've done all to make sure justice gets served.

I'm sorry for such a lengthy email but I'm concerned that Bobby's family will not get the justice deserved.


Thank you,

Mary Ann Ybarra


**96**

Exhibit 2



**From:** DOUG MANER
**To:** HARRIS, DAVE
**Date:** 4/17/2012 8:24 AM
**Subject:** Re: Felipe Solorio

I emailed alex & called ms. ybarra

>>> DAVE HARRIS 4/16/2012 7:13 PM >>>
Both.

>>> DOUG MANER 04/16/12 11:53 AM >>>
I didn't discuss it with them, after the case was called I walked back to 6 to
finish my cases and they didn't ask me any questions.
I would prefer to deal with them directly too, but neither approached me, or
called\emailed.
Would you like me to call either one?
>>> DAVE HARRIS 4/16/2012 11:49 AM >>>
Okay... did you explain this to Ms. Ybarra and Alex? I'd prefer not to be getting
more emails or phone calls about this...

>>> DOUG MANER 4/16/2012 11:47 AM >>>



**Redaction**

>>> DAVE HARRIS 4/16/2012 11:41 AM >>>
What happened on this case today?

# 98

Exhibit 3

My mistake. I guess you already supervise him, Dave. I would like contact made with Ms Ybarra today, that we are looking into this. Thanks.

>>> BIRGIT FLADAGER 4/19/2012 1:49 PM >>>
What we don't know is how the phone call the next morning went.
Was he polite, helpful, explained what was going on? If so, then maybe he had a brain lapse and didn't intentionally ignore her. I'm not saying that's likely, just possible.

>>> CAROL SHIPLEY 4/19/2012 1:32 PM >>>
I'm not stepping into this. I'm not sure reassigning it is the correct thing to do, but Doug needs to build a better rapport with the victim.

>>> mary ann ybarra <ybarram123@yahoo.com> 4/19/2012 9:37 AM >>>
Carol,

I truly sorry for bothering you with this again. I was going to send to Ms. Fladager but I thought I send it to you and instead.

But I thought that by meeting with Doug, supervisors and Alex it would kind of put us on the right track.

Well Monday there was another hearing and after a couple of hours Doug and Mr. Chase continued the case. I figured Doug would talk to me after but instead he walked out the back where they keep the defendants awaiting trial. I know he had to have seen me cause I was sitting in the front with Alex.

I hurried up and walk out but all I saw was him walking the down the stairs. I called the DA office to leave a message for Mr. Manor and the receptionist said I should leave a message with Alex and he would find out why the reason for continuance. The next morning bright and early Mr. Manor called me.

I hope by me getting complaining to Ms. Fladager make things worse.

I seem to get more sympathy from the defendants lawyer (Mr. Chase-the way he looks at me like he knows who I am) while we were in the elevator than from Mr. Manor. I think there's something wrong with this picture.

I have talked to my husband about possibly getting my own lawyer. I truly think that this case should be re-assigned to another DA. Possibly Marlissa Fierra.

Thanks,

Mary Ann YBarra

**100**

**MSJ Exhibit 3**

101

Exhibit 4

From:     mary ann ybarra <ybarram123@yahoo.com>
To:       DAVE HARRIS <DAVE.HARRIS@standa.org>
CC:       ALEX C LOYA <alex.loya@standa.org>
Date:     4/23/2012 9:36 AM
Subject:  Re: Doug Maner

Good Morning Mr. Harris,

Sorry for not getting back to you in a timely manner. I was very busy at work and then wasn't feeling well afterward.

I did get a call from Mr. Maner early Tuesday morning. I was cordial with him but he seemed a little rude. But I'm a little tired of all this I know nothing I say or do will change this. That might just be the way Mr. Maner is used to being with family of homicide victims. Its bad enough that the family is going thru hell dealing with this process but doesn't deserve to be treated like this.

But all said and done all I want is justice for my brother, Bobby Ybarra.

Please remind Mr. Maner that I am at each hearing and would like for him to at least give me a few minutes out of his busy court schedule to let me know whats going on.

FYI and between me and you - This isn't the first time that I've dealt with Mr. Maner, he was the DA in the beginning for the other 3 men involved in this case. He was the same way and I didn't know any different. I was glad when he was removed and put on another case. I was very unhappy when I heard that he was the DA on this case again.

Thank you,

Mary Ann Ybarra (Sister of Victim: Bobby Ybarra)

---

From: DAVE HARRIS <DAVE.HARRIS@standa.org>
To: ALEX C LOYA <alex.loya@standa.org>; ybarram123@yahoo.com
Sent: Thursday, April 19, 2012 2:10 PM
Subject: Doug Maner

Hi Ms. Ybarra,
Did Doug call you after the last court appearance. ..I had asked him to.

**103**



# Office of the District Attorney

*Birgit Fladager, District Attorney*

## MEMORANDUM

| | |
|---|---|
| To: | Ramon Bawanan |
| From: | DPH |
| Date: | Doug Maner |
| Subject: | Intended Action |

Doug Maner is currently assigned to the murder case of Felipe Solorio (Case #205545). The victim in the case is Robert Ybarra, Jr. and his next of kin that appears in court is Mary Ann Ybarra.

During February 2012, Ms. Ybarra started calling to make a complaint about Maner. She called Jerry Begen first and then was directed to me because of the change in supervisors. Maner was out and I couldn't talk to him about the complaint before I called the victim back. On 2-14-12 I sent him an e-mail outlining what I wanted to happen.

On 2-16-12 the case was continued and Ms. Ybarra was invited to the meeting to address her complaints. Having not heard from this office Ms. Ybarra had sent an e-mail to Ms. Fladager complaining about how she was being treated by Maner. During the 2-16 meeting Ms. Ybarra was allowed to express her issues with the office and Mr. Maner. Present during the meeting were Maner, Begen, Alex Loya, Ms. Ybarra, another relative of hers and myself.

A prior incident had occurred where Maner had taken Ms. Ybarra into an anteroom outside of the courtroom and discussed the case with her. However, Maner excluded Loya - the victim advocate. Both Loya and Ybarra confirmed this. (Maner and Loyla do not get along.) During the 2-16 meeting Maner was directly told by me to keep Loya informed of anything that happens on the case that the victim's next of kin (VNOK) should know.

At the end of the 2-16 meeting Maner was told to make sure he followed the law (Marcy's law) and office policy and to keep the VNOK informed of everything that happened.

On 4-16-12 another hearing occurred in the case, and Maner failed to do as directed. Maner continued the case and failed to advise Loya or Ybarra for the reason even though they were sitting near the front of the courtroom. Loya alerted me to the problem and I sent Maner an e-mail. Maner attempted to justify his actions and had to be told to contact both Loya and Ybarra. Ms. Ybarra sent an



**EXHIBIT**
6

**MSJ Exhibit**

**105**

STAN000064

email to Carol Shipley complaining about Maner's behavior again. Ms. Ybarra has also responded to me by email confirming that Maner was rude. Maner has no excuse for his actions because his calender on the 16th of April was very lite. I have included with this memo all of the e-mails, correspondence and a copy of the calendar. It is my position that Maner should be disciplined for insubordination (for violating a direct order) and for violating Marsy's law.

Proposition 9, commonly known as the "Victims' Bill of Rights Act of 2008, Marsy's Law," was enacted by the voters on November 4, 2008. It went into effect on November 5, 2008, and is now the law. Marsy's law amended Cal.Const. Art. 1, § 28, and provided victims and their next of kin to defined rights, such as, the right to be treated with fairness and respect (subdivision (b)(1)); notice of proceedings and the right to confer with the prosecutor (subdiv. (b)(6)); to be heard (subdiv. (b)(8)); and a speedy trial (subdiv. (b)(9)).

Maner violate all of this sections - he was rude ("fairness and respect"); failed to inform Ms. Ybarra of what was occurring ( "conferring with prosecutor") and continued the case without her input (the right to be heard and a speedy trial has been interpreted to mean that the victim may object to a continuance).

**106**
STAN000065

Exhibit 6



## Stanislaus County
## Office Of The District Attorney

Birgit Fladager, District Attorney

### MEMORANDUM



| | |
|---|---|
| **To:** | **David Harris, Chief Deputy District Attorney** |
| **From:** | **Ramon Bawanan, Human Resources Manager** |
| **Date:** | **October 17, 2012** |
| **Subject:** | **Administrative Investigation Summary and Recommendation** |



### Introduction and Background Facts:

On April 23, 2102, I was advised by CDDA Harris that he had received a complaint from a Ms. Ybarra involving DDA Doug Maner (MANER). CDDA Harris also reported that MANER had disobeyed an order from him.

During the same week, after speaking with Carol Shipley, Assistant District Attorney, the administrative investigation of this complaint was assigned to Ramon Bawanan, Human Resources Manager.

On April 23, 2012, CDDA Harris sent me an email (See Exhibit #1) with documents attached to assist me in reviewing background information from this complaint.

On May 8, 2012, I hand delivered a letter regarding the Notice of Internal Investigation to MANER's office at Juvenile Hall. (See Exhibit #2) That letter indicated the following allegations:

Code of Ethics Violation(s): (See Exhibit #3)
- Demonstrate the highest standards of personal integrity, truthfulness, and honesty in all public activities.
- Treat all individuals in a respectful, courteous, and professional manner.
- Respect the County's responsibility to comply with State and Federal regulations.
- Uphold the public trust.
- Create and maintain positive relationships.
- Make decisions that benefit the public interest.
- Comply with all laws and regulations applicable to the County.

A. Causes for Discipline – 3.28.010 (See Exhibit #4)
   1) *Inexcusable neglect of duties (Subsection D)*
   2) *Insubordination (Subsection E)*
   3) *Discourteous treatment of the public or other employees. (Subsection J)*
   4) *Violation of a departmental rule (Subsection N)*
   5) *Other failure of good behavior either during or outside of duty hours which is of such a nature that it causes discredit to the employee's department or employment. (Subsection O)*

After a number of emails (See Exhibit #5) between OE3 and me, a fact finding interview was finally scheduled. The delays were attributed to OE3's schedule, BAWANAN's schedule and MANER's schedule. There was no intent to purposely delay this fact finding interview by any party involved.

In some of those emails, OE3 requested information in advance of the fact finding interview. No advance information was provided as their requests were outside of the scope of the administrative interview process.

OE3 also sent a letter dated May 11, 2012, (See Exhibit #6) requesting additional information in advance of the fact finding interview. No advance information was provided as their requests were outside of the scope of the administrative interview process.

Also, during the interview, MANER and his union representative were annoyed that requested information and documents were not provided in advance. They grew more annoyed when the Letter of Reprimand dated October 11, 2011 (See Exhibit #7) was introduced.

On July 26, 2012, a fact finding interview was held with Alex C. Loya, Interviewer II – Victim Advocate. This interview last approximately 15 minutes. Unfortunately, the tape recorder malfunctioned and no information was saved.

There was a delay in finalizing this investigation due to not having the transcription completed.

**Process:**

As mentioned, after a few emails with OE3, a date of Wednesday, July 11, 2012 at 2PM was scheduled for the administrative interview. The interview held in the Public Meeting Room on the 3rd Floor of the District Attorney's Office Building began at 1:38PM and with one recess was adjourned at 2:36PM. The interview as taped by both parties. MANER was interviewed in the presence of his Business Agent Eggener and HR Assistant Carol Rothschild.



**Allegations:**

    (1) MANER was rude to Ms. Ybarra.
    (2) MANER was rude to Victim Advocate Alex C. Loya.
    (3) MANER did not follow the orders of CDDA Harris.
    (4) MANER did not follow the requirements of Marcy's Law.

**Findings of Facts:**

    **(1)** Based on Ms. Ybarra comments in her email dated 4/23/2012, she felt MANER was rude to her.

    **(2)** MANER and LOYA have a strained relationship. By omitting LOYA from a meeting with Ms. Ybarra, it could be interpreted as being rude, but due to this strained relationship, I do not believe his omission of LOYA from a meeting would be considered rude. It would be more in the area of failing to **Create and maintain positive relationships** and an *Inexcusable neglect of duties.*

    **(3)** MANER was advised in a meeting on 2/16/12 by CDDA Harris to keep Ms. Ybarra advised on the court proceedings and to follow Marcy's Law. MANER failed to follow the orders of CDDA Harris and did not follow Marcy's Law. His excuse that he was busy in another court room does not justify his behavior. Ms. Ybarra and LOYA were sitting in front of the court room and MANER could have easily advised them both of the status of the proceedings. Also, it was determined that Department 6 had a lighter than normal docket.

    LOYA confirms that MANER was advised by CDDA Harris to keep Ms. Ybarra and LOYA appraised of the court proceedings as required by Marcy's Law.

Marcy's Law (Exhibit #8) states "*#6 -- Conference with the Prosecution and Notice of Pretrial Disposition -- To reasonable notice of and to reasonably confer with the prosecuting agency, upon request, regarding, the arrest of the defendant if known by the prosecutor, the charges files, the determination whether to extradite the defendant, and, upon request, to be notified of and informed before any pretrial disposition f the case.*"

    Please see and review the transcript (See Exhibit #9) from the fact finding interview held on July 11, 2012.

**Conclusions:**

    1. MANER was rude to Ms. Ybarra based on her comments in her email dated 4/23/2012.
    2. MANER was not rude to LOYA.
    3. MANER's behavior violated the direction of CDDA Harris.
    4. MANER violated Marcy's Law and the following: **Respect the County's responsibility to comply with State and Federal regulations, Uphold the public trust, Create and maintain positive relationships, Make decisions that benefit the public interest and Comply with all laws and regulations applicable to the County.**

**110**
STAN000304

**MSJ Exhibit 6 - 3**



In the Letter of Reprimand dated October 11, 2011 and signed by MANER states:

> "This Letter of Reprimand and accompanying Corrective Action Plan will be referenced in your next performance review".

> "Should you fail to abide by this Letter of Reprimand and or the Corrective Action Plan and or should this type of behavior occur in the future, you will be subject to disciplinary action."

MANER's inappropriate behavior continued to occur within four (4) months of being issued the Letter of Reprimand.

<u>Recommendation:</u>

Based on his current unacceptable behavior, Doug Maner should

1) Be issued an unpaid disciplinary suspension – minimum five (5) days.
2) Be required to write a letter of apology to Ms. Mary Ann Ybarra. The substance of that letter should be approved by the District Attorney or designee.
3) Be required to attend counseling to deal with this type of behavior.
4) Be required to complete counseling within the next ninety (90) calendar days or as approved by the District Attorney or designee.
5) Have disciplinary action referenced in his next performance review.



<u>Interviewer's additional comments.</u>

I believe that MANER was not truthful in his answers regarding having been directed by CDDA Harris to keep Ms. Ybarra appraised on the case.

The following admonishment (or at least in part) is what was stated and recorded prior to the fact finding interview taking place. (See Exhibit #9)

"This is a confidential administrative investigation regarding possible inappropriate behavior. You do not have the right not to answer any questions that I pose to you today. **You must answer all the questions and you must answer truthfully.** Refusal to answer any of the questions will be considered insubordination which could lead to disciplinary action up to and including termination. **If any of the answers you give us determine to be untruthful it will be considered a dishonest act which can also lead to disciplinary action up to and including termination.** You have the right to have a representative present with you, which you do, at this meeting."

The aforementioned admonishment can be found on Page 4 of 29, lines 6 thru 13 of the transcript of the fact finding meeting. The **bolded** sentences are for identification purposes only.

The following is a question asked and MANER's response to that question.



*RB:* *Well…let me…let me say it this way. After the meeting where you were directed by Dave Harris to keep Ms. Ybarra appraised of what was going on did you keep her appraised every time you have a court date?*

**111**

DM:    I did not have a meeting with Dave Harris where he appraised me or told me to keep her involved with what was going on.



The meeting referenced was held on February 16, 2012.

The aforementioned question and answer can be found on Page 11 of 29, lines 22 thru 27 of the transcript of the fact finding meeting.

LOYA confirmed that he heard CDDA Harris in the February 16, 2012 meeting issue the directive to MANER.

I believe that MANER was not truthful in his answers regarding Department 6

MANER states the following in the fact-finding meeting regarding Department 6.

DM:    But let me just tell you.  That whenever she came up to me and asked a question I would answer it.  Frequently I would seek her out after court and I would say, okay here's what happened today, here's what's going on but not every time because this is not my only case.  **I had a calendar in Department 6 that is often very busy.  This homicide was assigned in Department 4, a different floor in the courthouse, and I had to run up and down the stairs and put my Department 6 cases on hold while I handled this one upstairs and so I had some pressure to get back and handle my cases.**  So, I didn't always talk to her and every court date but anytime she'd indicate she had a question I tried to take the time to talk with her.

The aforementioned answer can be found on Page 10 of 29, lines 9 thru 17 of the transcript of the fact finding meeting. The **bolded** sentences are for identification purposes only.

**"That particular day I'd not meet with her because I was busy and I had to go down stairs to Department 6."**

The aforementioned answer can be found on Page 12 of 29, lines 2 thru 3 of the transcript of the fact finding meeting. The **bolded** sentence is for identification purposes only.

It was determined that Department 6 on the date in question had a lighter than normal docket.

## Collateral Support Assignment

      For a long period of time non-legal staff have had to do without attorney guidance on a daily basis due to staffing cuts. Various attorneys and management have tried to meet this un-met need resulting in inconsistent approaches and difficulties. We are now going to assign someone to ensure that staff are given the appropriate legal direction in a timely fashion on a daily basis. This assignment requires the attorney to be in the office during business hours from 8 to 5 to be able to answer the legal questions of non-attorney staff. For example, the following are needs that occur on a nearly "every day" basis.

**1203.3 and 1203.4** – After Investigations has completed a case work-up for defendants seeking to terminate probation or have the case reduced pursuant to these code sections, an attorney must make the final decision to oppose or not oppose the request. Currently, clerical staff attempt to draft the legal response to be filed. This work will be taken over by the DDA; this is for both Oppositions as well as Non-Oppositions.

**4852.01** - After Investigations has completed a case work-up for defendants seeking a Certificate of Pardon and Rehabilitation, an attorney must make the final decision to oppose or not oppose the request. Currently, clerical staff attempt to draft the legal response to be filed. This work will be taken over by the DDA;

**1381** – When an inmate files a speedy trial demand the case must be reviewed to see if the inmate will be returned for prosecution. After a decision is made to bring the defendant back, recall the warrant and/or file a dismissal, the file will be returned to clerical staff to prepare the corresponding paperwork. [The decision made on these cases typically results in the use a shell, which the DDA might be able to assist with.]

**1389 IAD** - When a federal inmate files a speedy trial demand the case must be reviewed to see if the inmate will be returned for prosecution. A review of the documents is essential to make sure the IAD has been complied with. After a decision is made, clerical staff attempt to draft the legal response necessary, such as a motion to recall the warrant or filing a dismissal. This work will be taken over by the DDA;

**In-custody extradition requests** – When a defendant is arrested on a warrant outside of our county, the arresting agency and the local agency holding the warrant both will request a decision from this office whether we will return the defendant/extradite. Arrests occur 24 hours a day and it is necessary that an attorney be available at least during the duration of business hours to make this decision. After a decision is made, clerical staff currently attempt to draft the legal response necessary, such as a motion to recall the warrant or filing a dismissal, or the extradition paperwork. This work will be taken over by the DDA;

**Agency records requests** – Federal, State and local agencies constantly seek records from this office to fulfill each agency's function/purpose; however, not every governmental agency is entitled to complete access to our files. An attorney must review the request and determine to

**114**
STAN001715

what extent we can or should comply. This is not a clerical function. This work will be taken over by the DDA;

**Miscellaneous** – There are many other areas where, on a daily basis, non-attorney staff need to seek guidance to know what to do. This may range from questions asked by the public (coming through the front desk, or the mail) to not knowing how to deal with unusual legal paperwork. It is necessary that an attorney be available at least during the duration of business hours to answer these questions, make a decision and guide staff. This work will be taken over by the DDA. The Chief of the Week (COW) may refer questions/matters to this DDA in order to free up the chief to concentrate on supervisory responsibilities.


There are also other areas where non-attorney staff need help and guidance, or where they themselves cannot act; these events occur repeatedly, but not as regularly as the above items. Examples include:

**D12 reduction requests** – This office does not staff the arraignment court, so an attorney must be available to deal with requests from the court. The most common request from the court is for us to allow the court to reduce certain misdemeanor cases as part of a plea. This work will be taken over by the DDA.

**D10 offers** - This office does not staff drug court or mental health court (due to budget constraints), so an attorney must be available to deal with requests from the court. The most common request from the court is for us to make an offer to a defendant. This work will be taken over by the DDA.

**8103 cases** – Mental health gun restoration cases cannot be addressed by non-attorney staff and occasionally require court appearances. This work will be taken over by the DDA.


The DDA will also be tasked with other functions as assigned by the supervising CDDA, or requested by the other CDDAs, for example:

**Floater** – During times of heavy or unexpected staff absences, the DDA will act as a floater. This will require that the DDA be available by phone to be advised of an assignment.

**Other Duties As Assigned** – This may include returning phone calls asking for legal decisions, or other duties as assigned.

**115**

Exhibit 8

Subject: Fwd: Re: Fwd: Rotations
To: doug2205@gmail.com


---------- Forwarded message ----------
From: "DAVE HARRIS" <DAVE.HARRIS@standa.org>
To: "DOUG MANER" <DOUG.MANER@standa.org>
Cc: "CARI GRIFFIN" <CARI.GRIFFIN@standa.org>
Date: Fri, 04 Oct 2013 13:46:06 -0700
Subject: Re: Fwd: Rotations
Attached is the assignment you will be in. This will take place officially on the 14th,
but I will start sending a lot of these items to you on Monday. Also, you will need
to meet with Cari and I on Monday. I will let you know what time on Monday.


>>> DOUG MANER 9/23/2013 10:01 AM >>>
Dave
I don't see my name attached to any assignment.
What is my new assignment?
thanks
Doug


New assignment DDA.docx
20K

---

**doug maner** <doug2205@gmail.com>                    Mon, Oct 7, 2013 at 2:19 PM
To: PETERSEAN@aol.com

[Quoted text hidden]

New assignment DDA.docx
20K

# 117

P's Doc Prod #1
911                    2/2

## Collateral Support Assignment

For a long period of time non-legal staff have had to do without attorney guidance on a daily basis due to staffing cuts. Various attorneys and management have tried to meet this unmet need resulting in inconsistent approaches and difficulties. We are now going to assign someone to ensure that staff are given the appropriate legal direction in a timely fashion on a daily basis. This assignment requires the attorney to be in the office during business hours from 8 to 5 to be able to answer the legal questions of non-attorney staff. For example, the following are needs that occur on a nearly "every day" basis.

**1203.3 and 1203.4** – After Investigations has completed a case work-up for defendants seeking to terminate probation or have the case reduced pursuant to these code sections, an attorney must make the final decision to oppose or not oppose the request. Currently, clerical staff attempt to draft the legal response to be filed. This work will be taken over by the DDA; this is for both Oppositions as well as Non-Oppositions.

**4852.01** - After Investigations has completed a case work-up for defendants seeking a Certificate of Pardon and Rehabilitation, an attorney must make the final decision to oppose or not oppose the request. Currently, clerical staff attempt to draft the legal response to be filed. This work will be taken over by the DDA;

**1381** – When an inmate files a speedy trial demand the case must be reviewed to see if the inmate will be returned for prosecution. After a decision is made to bring the defendant back, recall the warrant and/or file a dismissal, the file will be returned to clerical staff to prepare the corresponding paperwork. [The decision made on these cases typically results in the use a shell, which the DDA might be able to assist with.]

**1389 IAD** - When a federal inmate files a speedy trial demand the case must be reviewed to see if the inmate will be returned for prosecution. A review of the documents is essential to make sure the IAD has been complied with. After a decision is made, clerical staff attempt to draft the legal response necessary, such as a motion to recall the warrant or filing a dismissal. This work will be taken over by the DDA;

**In-custody extradition requests** – When a defendant is arrested on a warrant outside of our county, the arresting agency and the local agency holding the warrant both will request a decision from this office whether we will return the defendant/extradite. Arrests occur 24 hours a day and it is necessary that an attorney be available at least during the duration of business hours to make this decision. After a decision is made, clerical staff currently attempt to draft the legal response necessary, such as a motion to recall the warrant or filing a dismissal, or the extradition paperwork. This work will be taken over by the DDA;

**Agency records requests** – Federal, State and local agencies constantly seek records from this office to fulfill each agency's function/purpose; however, not every governmental agency is entitled to complete access to our files. An attorney must review the request and determine to

1

**118**

P's Doc Prod #1
912

what extent we can or should comply. This is not a clerical function. This work will be taken over by the DDA;

**Miscellaneous** – There are many other areas where, on a daily basis, non-attorney staff need to seek guidance to know what to do. This may range from questions asked by the public (coming through the front desk, or the mail) to not knowing how to deal with unusual legal paperwork. It is necessary that an attorney be available at least during the duration of business hours to answer these questions, make a decision and guide staff. This work will be taken over by the DDA. The Chief of the Week (COW) may refer questions/matters to this DDA in order to free up the chief to concentrate on supervisory responsibilities.

There are also other areas where non-attorney staff need help and guidance, or where they themselves cannot act; these events occur repeatedly, but not as regularly as the above items. Examples include:

**D12 reduction requests** – This office does not staff the arraignment court, so an attorney must be available to deal with requests from the court. The most common request from the court is for us to allow the court to reduce certain misdemeanor cases as part of a plea. This work will be taken over by the DDA.

**D10 offers** - This office does not staff drug court or mental health court (due to budget constraints), so an attorney must be available to deal with requests from the court. The most common request from the court is for us to make an offer to a defendant. This work will be taken over by the DDA.

**8103 cases** – Mental health gun restoration cases cannot be addressed by non-attorney staff and occasionally require court appearances. This work will be taken over by the DDA.

The DDA will also be tasked with other functions as assigned by the supervising CDDA, or requested by the other CDDAs, for example:

**Floater** – During times of heavy or unexpected staff absences, the DDA will act as a floater. This will require that the DDA be available by phone to be advised of an assignment.

**Other Duties As Assigned** – This may include returning phone calls asking for legal decisions, or other duties as assigned.

**119**

P's Doc Prod #1
913

Exhibit 9



# Stanislaus County
## Office Of The District Attorney

Birgit Fladager, District Attorney

## MEMORANDUM

| | |
|---|---|
| **To:** | **Doug Maner** |
| **From:** | **Dave Harris** |
| **Date:** | **October 7, 2013** |
| **Subject:** | **Performance Improvement Plan** |

As a Deputy District Attorney V you are a representative of this office and the people. Your highest priority is to serve the people of Stanislaus County with the highest levels of respectful conduct, behavior and performance thereby protecting the public's trust and confidence in the District Attorney's Office, its staff and its mission.

As such, and to avoid any misunderstandings with regard to my expectations, the following information will serve to clearly define such expectations and will serve as a developmental tool to improve your overall performance for the next six months.

At intervals subject to the discretion of the District Attorney, but in no event less than monthly, your supervisor and you will meet to discuss any workplace conduct issues.

Doug, it is hoped that by clearly defining performance expectations, you will make positive changes and that the pattern of unacceptable behavior and job performance will not be repeated. It is imperative that you understand that your behavior affects the entire Office and has especially negative consequences when it is directed at law enforcement agencies or the courts. It is critical that we maintain a positive working relationship with those entities.

The following corrective measures will be implemented in order for you to bring your performance to an acceptable level:

1. Your job performance warrants close supervision for an extended period of time and will be monitored closely. It is expected that you will accept such supervision as a constructive manner to improve your behavior and work performance.

2. Treat superiors, peers, subordinates, law enforcement agencies, courts and the public with the highest level of respectful conduct, and be courteous and civil at all times in your relationships with everyone.

**121**

**MSJ Exhibit 9 - 1**

STAN001761

3. Conduct yourself in a manner that fosters the greatest harmony and cooperation between yourself and others.

4. Be tactful, control your temper, exercise patience and discretion and not intentionally antagonize any person with whom you come in contact.

5. Attend counseling and/or team building classes specific to workplace conduct, behavior and interpersonal relationships within six months and provide proof of attendance.

6. Comply with work rules, safety rules, professional responsibility rules, job performance standards and other applicable policies and procedures while employed by the Office of the District Attorney.

7. Respond to the duties assigned efficiently, meeting deadlines and answering questions in a timely manner.

Upon completion of the initial six month period of this Performance Improvement Plan, the District Attorney or designee will review your progress and determine if the terms of this condition of employment shall be lifted, extended, and/or modified.

Your behavior and compliance with the conditions set forth in this Performance Improvement Plan will be monitored. Should you show and sustain improvement in both your behavior and work performance as discussed in this Performance Improvement Plan, it is anticipated that you will be returned to courtroom/trial work. Because those duties require substantial interaction with law enforcement agencies and the courts, it is vital that your behavior be such that it will reflect positively on the Office of the District Attorney. I am confident that by seeking the recommended counseling and being constantly attentive to your relationships with others, you will be a positive contributor to this Office.

This Performance Improvement Plan will be referenced in your next performance evaluation.

Should you fail to abide by this Performance Improvement Plan and/or should this type of behavior occur in the future, you will be subject to disciplinary action.

I have read and understand this Performance Improvement Plan. I will meet these performance standards from this date forward.

_____          _____
          Doug Maner                                      Date

| Review Date: | Signature |
|---|---|
|  |  |
|  |  |

**132**

**MSJ Exhibit 9 - 2**

STAN001762

|  |  |
|---|---|
|  |  |
|  |  |
|  |  |

Exhibit 10



# Stanislaus County
## Office Of The District Attorney

Birgit Fladager, District Attorney

## MEMORANDUM



| | |
|---|---|
| **To:** | **Dave Harris, Chief Deputy District Attorney** |
| **From:** | **Ramon Bawanan, Human Resources Manager** |
| **Date:** | **March 12, 2012** |
| **Subject:** | **Vacation Scheduling and Approvals** |

This memorandum serves to clarify the vacation scheduling and approval process regarding Doug Maner's requests.

Management staff and the District Attorney met to go over the issues raised here. It was the consensus of the meeting that Personnel Manual section 3.36.050 prevents us from allowing an employee to encumber more time than they have earned.

> The policy states: in Section 3.36.050 <u>Approval Required</u> – *"…No employee shall be allowed to use vacation time in an amount which exceeds their balance of earned vacation unless otherwise provided pursuant to this ordinance or pursuant to an applicable Memoranda of Understanding."*

However, it was also agreed that Mr. Maner's proposal to "compromise" was not an unreasonable request. Based on his willingness to enter into this compromise Doug (and others) may submit requests for vacation hours based on his current vacation balance and what he would be eligible to earn by the time of the requested vacation.

AS AN EXAMPLE ONLY: He could request 200 hours of vacation (40 hours on the "books" and he would earn an additional 160 hours in the current calendar year). As long as his requests were within these parameters, they could be approved. We would also need to approve or disapprove based on the needs of the operation.

However, as Mr. Maner agreed, should for some reason his approved requests total all vacation hours earned and eligible for the current calendar year <u>and</u> he uses additional vacation hours not currently earned and approved, he would need to rescind or cancel the same amount of vacation hours previously requested and approved. We would not approve any vacation hours above the amount on the "books" or that he would be eligible to earn in the current calendar year. It will also be Mr. Maner's obligation to track his hours to ensure that he does not go into the "red."

I hope that this clarifies this issue. Should you have any further questions or concerns, please contact me directly.

**125**

126

Exhibit 11

# OFFICE OF THE DISTRICT ATTORNEY, STANISLAUS COUNTY

## *ATTORNEY PERFORMANCE EVALUATION*

Name and Title: Douglas Maner     Report Period: 09/01/03-9/01/2004

Recommendation: N/A (topped out)     Effective Date: 09/01/2004

After each factor, check the appropriate description that best describes the person being rated.
U = Unsatisfactory; I = Needs Improvement; S = Satisfactory; E = Exceptional; O = Outstanding

| | U | I | S | E | O | | U | I | S | E | O |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **PERSONAL** | | | | | | **RELATIONSHIPS** | | | | | |
| 1. Appearance | | | X | | | 1. Supervisors | | | | X | |
| 2. Attitude | | | | X | | 2. Deputy District Attorneys | | | | X | |
| 3. Poise | | | | X | | 3. Investigators | | | | X | |
| 4. Resourcefulness | | | | X | | 4. Paralegals | | X | | | |
| 5. Versatility | | | | X | | 5. Clerical Staff | | | X | | |
| 6. Judgment | | | | X | | 6. Contacts outside of Office | | | | X | |
| 7. Application to Duties | | | | X | | 7. Handling the Public | | | X | | |
| 8. Dependability | | | | X | | 8. Defense Attorneys | | | X | | |
| 9. Attendance | | | | X | | 9. Citizens | | | X | | |
| **POLICY & PROCEDURE** | | | | | | **TRIAL** | | | | | |
| 1. Case Issuance | | | X | | | 1. Organization / Strategy | | | | X | |
| 2. Case Processing | | | | X | | 2. Preparation | | | | X | |
| 3. Case Disposition | | | | X | | 3. Presentation | | | | X | |
| 4. File Control | | | | X | | 4. Argumentation | | | | X | |
| 5. Communications | | | | X | | 5. Legal Research | | | | X | |
| 6. Office Management | | | | X | | 6. Legal Writing | | | | X | |
| | | | | | | 7. Specialized Knowledge | | | | X | |

## *OVER-ALL RATING*

| Unsatisfactory | Needs Improvement | Satisfactory | Exceptional | Outstanding |
|---|---|---|---|---|
| | | | X | |

Use an attachment for comments and suggestions how to improve performance.
All ratings of *Unsatisfactory* or *Outstanding* must be substantiated in writing.
*Signatures are on the last page.*



Δπ EXHIBIT 34
Deponent Maner
8-21-15 Rptr. SD
WWW.DEPOBOOK.COM

**127**

STAN000144

**MSJ Exhibit 11 - 1**

## SUPERVISOR'S COMMENTS

As of the writing of this evaluation Mr. Maner is assigned to the recently created Gang Task Force. Prior to that, he was assigned to the Domestic Violence Unit since June of 2003 until the creation of the Gang Task Force and his transfer August 30th, 2004. To the extent they are accurate, statistics from the ICJIS database show that during the past year Mr. Maner handled the disposition of 157 criminal cases with sentences ranging from probation to state prison. In his role as the domestic violence unit prosecutor, he attended Domestic Violence Coordinating Council meetings and chaired one sub-committee.

Two cases went to jury trial during the past year. In People v. Moore (#1060872) the defendant was convicted of felony domestic violence and given six years in state prison for causing the victim two black eyes. In People v. Gopal (#1060116), the defendant was sentenced to a life term plus five years in state prison for attempted murder. Other non-jury cases resulted in sentences ranging from 16 years to suspended state prison with a strike conviction. In one probation case (Martin #1030809), he was able to successfully argue for the imposition of a suspended state prison commitment. Mr. Maner was also tapped on short notice to help in a murder case handled by another DDA when the case became problematic due to suggestions of jury tampering. His assistance was much appreciated by the prosecutor involved.

At the request of the District Attorney, Mr. Maner attended meetings on lifer hearings conducted by the California District Attorney's Association (CDAA) and brought valuable information back to this office on how to conduct lifer hearings and what procedure should be followed even before a defendant is finally sent to state prison, such as filing Penal Code §1203.01 statements relating to the offense which become part of an inmate's lifer file. He has made several suggestions to improve the performance of our prosecutors at parole hearings.

Several e-mails were received from law enforcement investigators regarding Mr. Maner's performance. All three highly praised his experience, aggressiveness, thorough preparation and willingness to work with law enforcement. They described him as a good "sounding-board" for detectives when discussing cases and said that his approach was very business-like and effective.

Having seen him in action during many appearances in court, this supervisor has no doubt that Mr. Maner is an extremely experienced and capable prosecutor. He stays on top of changes in the law, is able to conduct his own research, seeks out solutions to issues, and shares new information as it comes to his attention, some of which has been shared with the rest of the office by e-mail or as an item on the agenda for morning meetings. His current assignment to the gang unit plays to his strengths of taking on difficult cases involving criminals who deserve aggressive treatment. It is this aggressive treatment that has earned him the respect of law enforcement and other prosecutors in the office.

128
STAN000145

If there was one concern that came up during the past year with Mr. Maner's performance, it was in the way he sometimes handles his personal contacts with clerical and other professional non-attorney staff in the office. One incident in particular sparked a personnel investigation that resulted a letter of reprimand for discourteous treatment. Mr. Maner is an intelligent, experienced, and professional prosecutor, which makes the conduct all the more puzzling to this supervisor. Perhaps his aggressiveness and intensity spill-over from the courtroom to the office. Regardless of the reason, it appears that he has taken steps since this last incident to deal more courteously with staff and it is hoped this positive aspect will continue.

As a goal for the coming year, Mr. Maner will put together and present a training session to other prosecutors on handling parole hearings.

1. This report represents my best judgment of this attorney's performance.

SUPERVISOR _____   Date _10-22-2004_

2. I concur and approve this report.

ASSISTANT DISTRICT
ATTORNEY   _Carol Shipley_   Date _11/22/04_

3. This report has been discussed with me by my Supervisor or Department Head.

EMPLOYEE   DISCUSSED W/EMPLOYEE   Date _____

REFUSED TO SIGN PER EMAIL 1-7-2005
FROM EMPLOYEE

_Greg — thanks for stepping up on the parole hearings — your ideas will help us now & in the future. Keep working on the personnel aspects._
_Carol S._

**129**
STAN000146

**MSJ Exhibit 11 - 3**

Exhibit 12

 

### Stanislaus County
### Office Of The District Attorney

### James C. Brazelton, District Attorney

## MEMORANDUM

**To:** JOHN GOOLD, CHIEF DEPUTY DISTRICT ATTORNEY

**From:** KATHY MATT, HUMAN RESOURCES MANAGER

**Date:** JANUARY 20, 2004

**Subject:** INVESTIGATION/DEPUTY DISTRICT ATTORNEY DOUG MANER

---

On Thursday, January 8, 2004, you asked that I conduct an administrative investigation into an employee complaint made to you by Paralegal Dolores Nemanic concerning Deputy District Attorney Doug Maner. I immediately contacted Ms. Nemanic, and asked that she (Nemanic) submit her complaint to me in writing.

On Friday, January 9, 2004, I received a written complaint from Paralegal Dolores Nemanic alleging "inappropriate behavior" by Deputy District Attorney Doug Maner. Ms. Nemanic stated in her complaint that Deputy District Attorney Doug Maner demonstrated inappropriate behavior towards her during a telephone conversation that took place on Wednesday, January 7, 2004.

**Witnesses Contacted:**

> Dolores Nemanic, Paralegal III
> Pam Blake, Paralegal III
> Barbara Roehrick, Paralegal III
> Aaron Gallagher, Senior Criminal Investigator
> Judy Ash, Paralegal III
> Doug Maner, Deputy District Attorney V

#### Witness Interview/Dolores Nemanic

On Monday, January 12, 2004, at 2:55 p.m. I met with Paralegal Dolores Nemanic to interview her concerning her complaint of inappropriate conduct by Deputy District Attorney Doug Maner.

Paralegal Nemanic stated that either on Friday, December 26, 2003, or Monday, December 29, 2003, she (Dolores) was present with Paralegal Pam Blake and Paralegal Barbara Roehrick when Senior Criminal Investigator Aaron Gallagher approached them to ask for assistance with a research project. Senior Criminal Investigator Gallagher had obtained prior approval from Chief Birgit Fladager to ask for Paralegal assistance. Paralegal Blake advised Senior Criminal Investigator Gallagher that they were short staffed with Kim Northcutt being off work, and she (Pam) was going to be off for the holidays. Senior Criminal Investigator Gallagher responded that as soon as they could get to it would be appreciated. Paralegal Blake then entered

**131**

the project on her assignment log.

Paralegal Nemanic stated that on Wednesday, December 31, 2003, she (Nemanic) received an e-mail from Paralegal Blake asking if she (Nemanic) could help out by doing the research project requested by Senior Criminal Investigator Gallagher. She (Nemanic) agreed to do it, and on Wednesday December 31, 2003, e-mailed Senior Criminal Investigator Gallagher asking him (Gallagher) for detailed information needed before conducting the research. She (Nemanic) remembered the issue had a lot of gray area, and needed to know precisely what he (Gallagher) wanted. He (Gallagher) responded back to her (Nemanic) on Monday, January 5, 2004, with the detail.

I asked Paralegal Nemanic who was it that she (Nemanic) was suppose to report her findings to. She (Nemanic) stated that it was for Aaron Gallagher. He (Gallagher) had gone to Chief Birgit Fladager and Chief John Goold and had obtained approval to seek assistance from the Paralegals. She (Nemanic) had approval from Chief John Goold to assist with the project. I asked Paralegal Nemanic if at any time was she (Nemanic) told that the research was for Deputy District Attorney Maner. She (Nemanic) responded, "No".

I asked Paralegal Nemanic when she (Nemanic) completed the project. She (Nemanic) stated she (Nemanic) completed the research on January 5, 2004, but kept looking for other cases. She (Nemanic) checked with some of the attorneys in the office trying to get some kind of direction from them. The attorney's she (Nemanic) spoke with conveyed that she (Nemanic) wasn't going to find anything that would say what she (Nemanic) wanted it to say.

I asked Paralegal Nemanic if Senior Criminal Investigator Gallagher had expressed an opinion or concerns over her findings. She (Nemanic) stated that he (Gallagher) did not express any concerns. He (Gallagher) wanted case law that supported or rejected his (Gallagher's) question concerning cell searches.

On Wednesday, January 7, 2004, Paralegal Nemanic received a telephone call from Deputy District Attorney Doug Maner. DDA Maner said something to the effect of "what do you think you're doing giving advice to investigators when I have already told them about this...told them what they are to do." DDA Maner was hostile, angry, and was yelling at her (Nemanic).

I asked Paralegal Nemanic how she (Nemanic) responded back to DDA Maner. She (Nemanic) stated that she (Nemanic) was pretty taken back, and her first reaction was that she (Nemanic) had done something wrong. She (Nemanic) then got mad, and told DDA Maner to stop. She (Nemanic) didn't give anybody any advice. She (Nemanic) had been given a research project, and had no idea he (Maner) had anything to do with it. She (Nemanic) gave the outcome of her research to the person she (Nemanic) was told to give it to. DDA Maner then calmed down some what. They briefly talked on top of each other.

I asked Paralegal Nemanic to describe her tone. She (Nemanic) stated she (Nemanic) was assertive because she was angry, and wanted to cry..crawl in a hole. She (Nemanic) stated she (Nemanic) was courteous and professional in her response back to DDA Maner.

I asked Paralegal Nemanic how the conversation with DDA Maner made her feel. She (Nemanic) stated that it made her feel very small although her intellectual side told her not to let him (Maner) get to her as it wasn't his (Maner's) project.

I asked Paralegal Nemanic if any other employees were near her work area when the conversation with DDA Maner took place. Paralegal Nemanic responded that Paralegal Judy Ash was at her (Ash's) desk, and her desk is about 15 feet away. Paralegal Ash could not make out words, but did hear the voice.

**132**

I asked Paralegal Nemanic if DDA Manner ever apologized to her (Nemanic). She (Nemanic) stated that DDA Maner the following Friday (January 9) after the "Friday" meeting out in the hallway approached her, and told her that he (Maner) got the sense that he (Maner) had offended her in some way. Paralegal Nemanic responded back to DDA Maner that he (Maner) had made her angry, and that he (Maner) upset her. DDA Maner responded back that he (Maner) didn't mean it. Paralegal Nemanic told DDA Maner that he (Maner) did mean it, and that he (Maner) yelled at her. DDA Maner stated back to her that he (Maner) did not yell. Paralegal Nemanic told him (Maner) that he (Maner) did yell, and that Judy Ash was sitting there, and heard him. DDA Maner stated he (Maner) didn't mean it.

In conclusion Paralegal Nemanic stated that prior to this incident she (Nemanic) had an "okay" working relationship with DDA Maner.

### Witness Interview/Pam Blake

On Tuesday, January 13, 2004, at 11:03 a.m., I met with Paralegal Pam Blake to conduct an interview concerning a complaint made by Paralegal Dolores Nemanic alleging inappropriate conduct made by Deputy District Attorney Doug Maner.

Paralegal Blake stated that on December 24, 2003, at 9:00 a.m., she (Blake) received an e-mail from Chief Birgit Fladager advising that Senior Criminal Investigator Aaron Gallagher would be bringing a project to her. The project was concerning research on jail cell searches. Senior Criminal Investigator came to her (Blake's) work area, and explained to her (Blake) what it was he (Gallagher) was looking for. He (Gallagher) needed case law checked because of something Investigations was wanting to do. Paralegal Nemanic was present during this conversation.

I asked Paralegal Blake how she (Blake) responded to Senior Criminal Investigator Gallagher's request. She (Blake) told Senior Criminal Investigator Gallagher that they (Paralegal pool) would do the research depending on workload. He (Gallagher then left. He (Gallagher) was going out of town. She (Blake) had remembered that Paralegal Nemanic had done some research on this issue years prior for DDA Doug Maner. She (Blake) discussed it with Paralegal Nemanic.

On Wednesday, December 31, 2003, Paralegal Blake e-mailed Paralegal Nemanic to ask if she (Nemanic) was familiar with a "Barr" case, and would she (Nemanic) mind conducting the research project as they were getting busy with Paralegal Northcutt being absent from the job. Paralegal Nemanic volunteered her assistance with the project. I asked Paralegal Blake if she (Blake) was aware that DDA Maner had an interest in the research. Paralegal Blake responded that she (Blake) had the impression that it was Investigations that needed the research done.

I asked Paralegal Blake if Paralegal Nemanic told her (Blake) that DDA Maner was upset with her over this project. Paralegal Nemanic told her (Blake) during the week of January 5, 2004, that she (Nemanic) had received a call from DDA Maner. DDA Maner was upset with her (Nemanic), and yelled at her.

In conclusion I asked Paralegal Blake if Paralegal Nemanic appeared to be upset during the conversation when she (Blake) told her (Blake) about DDA Maner yelling at her (Nemanic). Paralegal Blake stated that Paralegal Nemanic was visibly upset.

**133**

## Witness Interview/Barbara Roehrick

On Wednesday January 14, 2004, at 1:16 p.m. I met with Paralegal Barbara Roehrick to conduct an interview concerning a complaint made by Paralegal Dolores Nemanic alleging inappropriate conduct by Deputy District Attorney Doug Maner.

Paralegal Roehrick stated she (Roehrick) was present on Friday December 19, 2003, when Senior Criminal Investigator Aaron Gallagher came to ask for paralegal assistance on a research project on cell searches.

I asked Paralegal Roehrick how it came to be that Paralegal Nemanic ended up with the research project. She (Roehrick) stated that she (Roehrick) and Paralegal Blake were both busy, and Paralegal Nemanic helps out when she (Nemanic) has time available plus she (Nemanic) had prior practical experience with the cell search issue.

I asked Paralegal Roehrick if she (Roehrick) had been aware that DDA Maner had an interest in the research. She (Roehrick) stated she (Roehrick) did not know of DDA Maner's interest until Paralegal Nemanic told her which was right after she (Nemanic) received a telephone call from DDA Maner.

I asked Paralegal Roehrick to tell me what Paralegal Nemanic told her (Roehrick) about the phone call from DDA Maner. She (Roehrick) stated that Paralegal Nemanic told her (Roehrick) that she (Nemanic) picked up the phone. She (Nemanic) wasn't certain that he (Maner) had even identified himself on the phone. He (Maner) just started yelling about the results of the research. He (Maner) told her (Nemanic) that she (Nemanic) was wrong. He (Maner) was rude, and didn't give her (Roehrick) a chance to explain. She (Nemanic) felt like she (Nemanic) was being attacked.

I asked Paralegal Roehrick to describe Paralegal Nemanic's tone and demeanor during the conversation about DDA Maner. She (Roehrick) stated that Paralegal Nemanic was visibly upset..not her normal calm self. She (Roehrick) was not shaking but seemed stunned.

In conclusion Paralegal Roehrick suggested that I interview Paralegal Judy Ash as she (Ash) sits 15 (fifteen) to 20 (twenty) feet away from Paralegal Nemanic, and Paralegal Nemanic had mentioned that Paralegal Ash heard the phone call.

## Witness Interview/Aaron Gallagher

On Thursday, January 15, 2004, at 2:05 p.m., I met with Senior Criminal Investigator Aaron Gallagher to conduct an interview concerning a complaint made by Paralegal Barbara Roehrick alleging inappropriate conduct by Deputy District Attorney Doug Maner.

On either Tuesday, December 23, 2003, or Wednesday, December 24, 2003, Senior Criminal Investigator Gallagher obtained approval from Chief Birgit Fladager to utilize the paralegal pool to conduct research on jail cell searches conducted by DA Investigators. Chief Fladager e-mailed Paralegal Nemanic and Paralegal Blake, and maybe one other person advising of her (Fladager's) approval to assist on the project. Immediately thereafter, Senior Criminal Investigator Gallagher talked to Paralegal Blake and Paralegal Nemanic, and maybe one other person about the specifics he (Gallagher) wanted on the research. He (Gallagher) was leaving on vacation, and wanted to make sure they precisely understood what he (Gallagher) needed. Paralegal Nemanic indicated she (Nemanic) had done research on this issue in the past, and offered to take the lead on it.

**134**

I asked Senior Criminal Investigator Gallagher if he (Gallagher) told the paralegals that DDA Maner was interested in the research? He (Gallagher) responded that he (Gallagher) did not mention DDA Maner, but probably did tell them about meetings with the investigators over the issue.

I asked Senior Criminal Investigator Gallagher if after his (Gallagher's) initial contact with Paralegal Blake and Paralegal Nemanic, if he had (Gallagher) any further conversations with Paralegal Blake concerning the research project. He (Gallagher) stated that he (Gallagher) had exchanged e-mails with her (Nemanic). The first e-mail was dated Wednesday, December 31, 2003, which was sent to him (Gallagher) by Paralegal Nemanic. He (Gallagher) responded back to her on Monday, January 5, 2004. The content of the e-mails was regarding more clarity relating to the project.

Senior Criminal Investigator Gallagher stated that on Wednesday, January 7, 2004, around 4:15 p.m. or so, Paralegal Nemanic sent out an e-mail to Deputy District Attorney Doug Maner, and copies to him (Gallagher), Chief Goold, Chief Fladagar, and possibly Assistant District Attorney Shipley. He (Gallagher) said that by the content of the e-mail it was obvious that something had happened, but he (Gallagher) didn't know what...but something obviously rattled her cage.

On Wednesday, January 7, 2004, Senior Criminal Investigator Gallagher sent an e-mail to DDA Maner discussing the cell search issue, and included the research findings conducted by Paralegal Nemanic. He (Gallagher) stated in the e-mail that he (Gallagher) believed there may be a way around the cell search issue, but he (Gallagher) didn't have anything to rely on, and asked if he (Maner) did have something. It was after this e-mail conversation with DDA Maner that he (Gallagher), Chief Goold, and Chief Fladager received a copy of the e-mail sent to DDA Maner by Paralegal Nemanic. On January 7, 2004, he (Gallagher) sent an e-mail to Chief Goold and Chief Fladager advising that he (Gallagher) didn't know what inspired Paralegal Nemanic's e-mail, but he (Gallagher) would try and find out in the morning.

On the morning of Thursday, January 8, 2004, Senior Criminal Investigator Gallagher was over at the Child Abduction Unit researching a file. Paralegal Nemanic approached him (Gallagher) and told him (Gallagher) that what had happened was uncalled for. DDA Maner called her (Nemanic) and started screaming at her (Nemanic) over the phone. He (Gallagher) responded that he (Gallagher) was sorry about whatever had happened. I asked Senior Criminal Investigator Gallagher to describe Paralegal Nemanic's tone and demeanor. He (Gallagher) stated she wasn't irritated, but you could tell she (Nemanic) wasn't happy about it...maybe annoyed would be a good word to describe it.

In conclusion, I asked Senior Criminal Investigator Gallagher to his (Gallagher's) knowledge if the way DDA Maner found out about Paralegal Nemanic's research project was from the e-mail that he (Gallagher) had sent to him (Maner). He (Gallagher) responded that he (Gallagher) did believe that's how DDA Maner found out about the research project.

### Witness Interview/Judy Ash

On Tuesday, January 16, 2004, at 2:55 p.m. I met with Paralegal Judy Ash to conduct an interview concerning a complaint made by Paralegal Dolores Nemanic alleging inappropriate conduct by Deputy District Attorney Doug Maner.

I asked Paralegal Ash if she was (Ash) at work the morning of Wednesday, January 7, 2004. She (Ash) stated she (Ash) was at work on that day. I asked Paralegal Ash if her (Ash's) work area is in a private office or an office cubical or an open area. She (Ash) stated it was in an open area. I asked Paralegal Ash how far her (Ash's) work area is from the work area of

**135**

Paralegal Dolores Nemanic. She (Ash) responded that it was about 8 (eight) feet.

I asked Paralegal Ash if on the morning of January 7, 2004, around 10:00 a.m., if she (Ash) noticed anything different or unusual with Paralegal Nemanic while handling a telephone call. She (Ash) responded that she (Ash) heard someone on the other end of the telephone clear over from her (Ash's) desk. She (Ash) could hear them so they were speaking very loud. She (Ash) heard Paralegal Nemanic say, "I haven't given anybody any advice". When Paralegal Nemanic got off the phone, she (Ash) asked her (Nemanic) about the call because it seemed so loud and because Paralegal Nemanic was visibly upset.

I asked Paralegal Ash if she (Ash) could make out what was being said by the party on the other end of the telephone. She (Ash) stated that she (Ash) could not make out what was being said....it was just loud. I couldn't make out if the caller was even angry...it was just loud. I asked Paralegal Ash if it sounded like the person on the other end of the telephone call was courteous and professional. She (Ash) responded, "No".

I asked Paralegal Ash what else did Paralegal Nemanic say about the telephone call if anything. She (Ash) said that Paralegal Nemanic told her (Ash) that she (Nemanic) was given an assignment to do some research, and that she (Nemanic) wasn't giving anybody any legal advice. She (Nemanic) was only doing what she (Nemanic) was asked to do. She (Nemanic) said it was DDA Maner, and that he (Maner) had been yelling at her (Nemanic), and accusing her (Nemanic) of giving out legal advice. During this conversation Paralegal Nemanic was very upset, she (Nemanic) was angry, and shaken by DDA Maner's accusation.

I asked Paralegal Ash to describe Paralegal Nemanic's tone and demeanor during the telephone conversation. She (Ash) stated Paralegal Nemanic was very business like. She (Nemanic) was courteous and professional.

In conclusion, I asked Paralegal Ash if she (Ash) could usually hear the voice of a caller on the telephone with Paralegal Nemanic. She (Ash) stated it is unusual for her to be able to hear her (Nemanic's) calls.

### Witness Interview/Doug Maner

On Tuesday, January 20, 2004, at 2:45 p.m. I met with Deputy District Attorney Doug Maner to interview him regarding a complaint alleged by Paralegal Dolores Nemanic alleging inappropriate conduct by him (Maner).

I asked Deputy District Attorney Maner what his working relationship with Paralegal Nemanic is. He (Maner) responded, "Legal research". I asked Deputy District Attorney Maner if he (Maner) had supervisory responsibility over Paralegal Nemanic. He (Maner) responded, "I don't think so". I clarified by asking Deputy District Attorney Maner if he (Maner) was responsible for Paralegal Nemanic's performance evaluations, counseling, discipline. He (Maner) responded, "No, I don't".

I asked Deputy District Attorney Maner if he (Maner) recalled the early part of January calling Paralegal Nemanic concerning a research project on cell searches. He (Maner) did recall calling Paralegal Nemanic, but couldn't remember what date. He (Maner) did not request the research, but that Senior Criminal Investigator Aaron Gallagher had requested that he (Maner) contact her (Nemanic) and communicate with her (Nemanic) regarding the project. He (Maner) called Paralegal Nemanic because he (Maner) was asked to do so by Senior Criminal Investigator Gallagher for the purpose of giving her (Nemanic) input regarding cell searches. He (Maner) has a lot of experience in that area, and has litigated that issue a number of times.

**136**

I asked Deputy District Attorney Maner what he (Maner) said to Paralegal Nemanic during the telephone conversation. He (Maner) responded that it was too long of a conversation to give a verbatim recollection so he (Maner) doesn't know exactly what he (Maner) said.

I asked Deputy District Attorney Maner to describe his (Maner's) tone of voice during the phone conversation with Paralegal Nemanic. He (Maner) stated he (Maner) used a normal tone of voice. He (Maner) and Paralegal Nemanic had a difference of opinion regarding the project, but that he (Maner) wasn't angry. He (Maner) believed he (Maner) was courteous and professional.

I asked Deputy District Attorney Maner how Paralegal Nemanic responded back to him during their phone conversation. He (Maner) stated at one point she (Nemanic) seemed defensive or upset. They disagreed regarding her (Nemanic's) opinion, and he (Maner) told her (Nemanic) that he (Maner) hoped that she (Nemanic) wasn't advising investigator's not to search the cells of any of these defendants. He (Maner) got the feeling that she (Nemanic) was upset by his (Maner's) comment. She (Nemanic) told him (Maner) that she (Nemanic) wasn't advising anybody of anything.

I asked Deputy District Attorney Maner if Paralegal Nemanic was angry. He (Maner) stated he (Maner) sensed a certain tension in her (Nemanic's) voice. At the lower level of emotions being defensive, irritable, angry, is really speculative to tell.

I asked Deputy District Attorney Maner if Paralegal Nemanic was courteous and professional during their phone conversation. He (Maner) stated that Paralegal Nemanic was courteous and professional. She (Nemanic) was upset. She (Nemanic) disagreed with him (Maner), and he (Maner) sensed a tone of defensiveness or irritation, but he (Maner) doesn't have a complaint about her (Nemanic).

I asked Deputy District Attorney Maner if he (Maner) ever apologized to Paralegal Nemanic because of the telephone call. He (Maner) stated he (Maner) did apologize. Paralegal Nemanic had sent him (Mane) an e-mail. He (Maner) read between the lines, and sensed that something about the call had upset her (Nemanic). A day or two later he (Maner) asked her (Nemanic) if there was something about the discussion that had upset her (Nemanic). She (Nemanic) had responded that he (Maner) had yelled at her (Nemanic), and he (Maner) denied it. He (Maner) told her (Nemanic) that he (Maner) didn't remember doing it, didn't think he (Maner) did, but if he (Maner) did do anything to offend her (Nemanic) he (Maner) was apologetic. It wasn't his (Maner's) intention to upset or irritate her (Nemanic). She (Nemanic) accepted his (Maner's) apology.

In conclusion, Deputy District Attorney Maner stated that he (Maner) never admitted yelling at her (Nemanic), but that if he (Maner) did do something that offended, he (Maner) was sorry as it was not his (Maner's) intention. The two of them (Maner and Nemanic) thought the matter had concluded at that time.

### Witness Follow-Up/Interview/Aaron Gallagher

On Wednesday, January 21, 2004, at 1:07 p.m., I met with Senior Criminal Investigator Aaron Gallagher to conduct a follow-up interview concerning a complaint made by Paralegal Dolores Nemanic alleging inappropriate conduct by Deputy District Attorney Doug Maner.

I asked Senior Criminal Investigator Gallagher if he (Gallagher) requested that Deputy District Attorney Maner contact Paralegal Nemanic regarding the research project. He (Gallagher) responded, "No". I asked him (Gallagher) if he (Gallagher) was absolutely positive about not making the request to Deputy District Attorney Maner. Senior Criminal Investigator Gallagher stated that unless one could infer out of the e-mail that he (Gallagher) had sent to

**137**

Deputy District Attorney Maner that it was a request to make contact with Paralegal Nemanic. He (Gallagher) cannot see how Deputy District Attorney Maner could have gotten that impression from his (Gallagher's) e-mail. The e-mail was the only communication he (Gallagher) had with him (Maner). There were no telephone calls or personal conversation..only the e-mail.

### Conclusion

The totality of circumstances were considered in determining whether policy was violated. It is the investigator's finding that Deputy District Doug Maner violated County and DA policy of "Discourteous Treatment of the Public and Other Employees" and the County's Code of Ethics.

**138**

Exhibit 13



OFFICE OF THE
## DISTRICT ATTORNEY
CHIEF EXECUTIVE OFFICE

**JAMES C. BRAZELTON**
District Attorney

Stanislaus County Courthouse
800 11th Street 2000 APR -7 A 11: 01 TEL: (209) 525-5550
Room 200, 2nd Floor
P.O. Box 442, Modesto, CA 95353

FAX: (209) 525-5545

April 6, 2004

Douglas Maner
10008 River Oak Circle
Oakdale, CA 95361

SUBJECT: LETTER OF REPRIMAND FOR DISCOURTEOUS TREATMENT OF THE
PUBLIC OR OTHER EMPLOYEES

On Thursday, January 8, 2004, I was notified of an incident that
occurred concerning inappropriate behavior demonstrated by you
towards a co-worker. As a result, I requested an administrative
investigation be conducted by Personnel Manager Kathy Matt. Her
findings regarding that incident be detailed below.

On Wednesday, January 7, 2004, prior to 10:00 a.m., you called
Paralegal Dolores Nemanic on the telephone. The apparent purpose
of your call was to question Paralegal Nemanic's legal research on
warrantless jail cell searches that she had conducted at the
request of Senior Criminal Investigator Aaron Gallagher. During
that telephone call, you spoke to Paralegal Nemanic in a loud,
angry, and demeaning tone of voice. This led to Paralegal
Nemanic's contacting me and relating the incident. At the time I
observed that she was emotionally upset and almost in tears,
apparently as a result of your actions.

During your interview with the Ms. Matt, you stated that you
called Paralegal Nemanic at the request of Senior Criminal
Investigator Aaron Gallagher. You stated that Senior Investigator
Gallagher wanted you to give Paralegal Nemanic your input
regarding warrantless jail cell searches. Contrary to your
statement, during his interview Senior Criminal Investigator
Gallagher said that he did not request that you contact Paralegal
Nemanic.

You also stated during your interview with Ms. Matt that even
though you could not recall the specifics of your conversation
with Paralegal Nemanic, you were not angry and you spoke in a
normal tone of voice. However, at the time it occurred, Paralegal

**140**
STAN000166

**MSJ Exhibit 13 - 1**

Judy Ash, who was sitting nearby, overheard your telephone call to Paralegal Nemanic. You spoke loudly enough that she could hear your voice talking on the telephone from her desk, even though she sat approximately eight feet away. Paralegal Ash describes Paralegal Nemanic's demeanor immediately after your phone call as upset, angry, and shaken.

My conclusion based upon this investigation and my observations is that on Wednesday, January 7, 2004, you demonstrated inappropriate behavior towards Paralegal Dolores Nemanic. This behavior is in violation of the following code sections:

1. County Personnel Code Section 3.28.010, J, Discourteous Treatment of the Public or other Employees
2. County Code of Ethics and Conflict of Interest Policy
3. District Attorney's Personnel Code Section 12-300, Standards of Conduct for all Employees
4. District Attorney's Personnel Code Section 12-301, Specific Prohibitions (1), display an officious or overbearing attitude towards a private citizen, law enforcement officer, or county employee
5. District Attorney's Personnel Code Section 12-2102, J, Discourteous Treatment Of the Public or Other Employees

In July of 2003 I spoke to you regarding a similar incident involving staff in which you were overheard by another employee who thought you were being condescending and arrogant. All of your job performance evaluations dating back from 1994 to 2002, with the exception of one, address the need for improvement in your interpersonal relationships with office staff.

As a result of your behavior, I am giving you this letter of reprimand. You are hereby directed to sign up for and attend the Workplace Wellness Workshop on "People skills" to be held on May 3rd 2004 from 3:00 p.m. to 5:00 p.m. and you are directed to sign up for the next available session on "Managing Your Anger Workshop" held by Workplace Wellness after your return from vacation in June (the current class date conflicts with your vacation).

Should you again display inappropriate behavior during the course of your duties, formal disciplinary action may be taken against you, which could include suspension, demotion or termination.

Sincerely,

John J. Goold
Chief Deputy

cc. personnel file

**141**

Exhibit 14

**From:** JOHN GOOLD
**To:** RAMON BAWANAN
**Date:** 10/3/2006 5:38:46 PM
**Subject:** Doug Maner

I'd like to file a formal complaint for Doug Maner's actions today. He walked into the 4th floor men's room when the door was propped open, there was plastic sheeting on the floor, painter's equipment obviously present, and proceeded to walk by my spouse, say "Hi", and proceed into a stall to urinate despite a woman being present.

My wife left the restroom and came to my office, obviously embarassed. She stayed in my office for approx. 5- 10 minutes and asked me several times if I thought Maner would be gone. I walked back with her to the restroom to confirm it was once again empty. I told Jerry Begen, Maner's supervisor of the incident. Jerry Begen talked to me and expressed his disgust with Maner's actions and stated he would talk to Maner.

Later this afternoon Doug came to the restroom to tell my wife "I didn't know it was you." When she expressed her shock at his actions and that she didn't understand how he wouldn't know he did anything wrong, he replied "I came to apologize and I did." He then left.

I was out of the office at this time. I called my wife by cellphone as I left juvenile probation. She said DM gave her the creeps and asked me to return to the downtown office and stand by there until she was done. She did not want to be on the same floor alone with Doug Maner.

During the time she was in the fourth floor restroom today, several other males came by to use the facilities. Not one of them did so. To a man they all stopped, recognized someone (a woman) was working in there, and left to use the restroom on another floor.

Doug Maner's reputation for being rude and abusive to women in this office is legion. Now it has continued with outsiders, specifically the spouse of a supervisor. I am angered and insulted by his inappropriate actions and his lack of understanding or insight into his rudeness. I would appreciate your looking into this.


John Goold, Chief Deputy
Stanislaus County District Attorney
John.Goold@mail.standa.org
*******************************************************
Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.
*******************************************************



**CC:**          JOHN GOOLD


# 143

**MSJ Exhibit 14**

Exhibit 15

| From: | DOUG MANER |
|---|---|
| To: | GOOLD, JOHN |
| Date: | Wed, Jan 24, 2007  9:55 AM |
| Subject: | I received a complaint re john baker's handling of a case,# 1103347 |

& since john's not returning the victim's calls & you're his boss ,I'm forwarding it to you.
The victim is kruse lucas autobody, the owner is ernie kruse, email addy bentbenz@aol.com, 577 1747.
I know ernie as he's done some autobody work for me over the years and we were discussing some car repair & he brought this up since he knows where I work.

He says the case was dismissed at trial "because the DA wasn't prepared", and wanted to know what his options were.
I pulled the file, and read john's notes to him. He wasn't satisfied and would like a more detailed response, or better yet a re-filing.
He's spoken w\ the detective (CPD higganbotham) who's also upset about out handling of this case.
The file indicates jhb dismissed at jtpt after our misdo offer was rejected and because a wit was unserved& he just was assigned the case, & "we need more proof".
Ernie was very friendly & easy going, he just wants a better explanation.
Sounds like we may want to re-file, or at least PR the victim.
good luck

**FILE COPY**

**145**
STAN002885

# Memorandum

To:        Stanislaus County Employees

From:      Patricia Hill Thomas, Interim Chief Executive Officer
           Pat Sweeny, Deputy Executive Officer/Human Resources

Date:      Friday, June 25, 2004

Subject:   **Personnel Manual Revision**

---

The mission of the Stanislaus County Human Resources Unit is to create an environment that cultivates, attracts, and retains an outstanding workforce. We take that goal seriously and are always trying to improve our processes and the way we do business. We value our hard working employees. The skills and dedication of our staff, permits the 27 departments of County government to deliver services to our customers.

Presently, the County has over 4,000 employees who work in hundreds of different job classifications and are covered by rules and policies in the form of:

1. County Ordinances;
2. Resolutions of the Board of Supervisors;
3. Memorandum of Understanding with employee bargaining units; and
4. County administrative rules, regulations and policies.

This Personnel Manual is a compilation of these various forms of personnel policies and represents a guide for departments in implementing day-to-day personnel administration. This manual should serve as a reference document for administrative decisions regarding personnel decisions. The manual does contain the Personnel Ordinances, but it is not intended to be a complete reprint of the County Ordinance Code, nor is it intended to be a substitute for consulting with the Chief Executive Office, County Counsel or Auditor-Controller's Office. Please continue to check with the appropriate staff member before making major personnel decisions.

Updates will be made and posted on the County web site at: www.co.stanislaus.ca.us. We hope you find this new format customer friendly and easy to use!

**PERSONNEL MANUAL**

**147**

STAN001008

# Table of Contents



| 1 | Definitions |
| 2 | Department Heads |
| 3 | Position Classifications and Appointments |
| 4 | Salary Compensation |
| 5 | Recruitment and Selection |
| 6 | Special Recruitments—PEP and Hiring Preference for Veterans' |
| 7 | Pre-Employment/Post-Offer |
| 8 | Drug Free Workplace Policy |
| 9 | Not Applicable |
| 10 | Time—Work Week/Breaks/Overtime/Work Hours |
| 11 | Leave Benefits—Holiday/Vacation/Sick/OJI/Military/Jury Duty |
| 12 | Benefit Packages/Relocation/Car/Professional Development |
| 13 | Employee Assistance Program/Workplace Wellness—Benefit |
| 14 | Employee Suggestion Awards Program—Benefit |
| 15 | Probationary Period |
| 16 | Employee Conduct and Behavior Expectations |
| 17 | Financial Policies—Purchase Card/Travel Policy/Contracts/Agreements |
| 18 | Safety Policies—Driver Authorization/Security/Violence/Bomb |
| 19 | Performance Evaluations |
| 20 | Transfer and Reinstatement Policy |
| 21 | Corrective Action and Discipline |
| 22 | Reduction-in-Force—RIF |
| 23 | Separation of Employment—Resignation and Retirement |
| 24 | Not Applicable |
| 25 | Deceased Employee |
| 26 | Employer-Employee Relations |
| 27 | MOU/General Complaint and Grievance Procedures |
| 28 | Equal Employment Opportunity Grievance Procedures |
| 29 | Personnel Records and Criminal History Information |
| 30 | Ordinance Index |
| 31 | Subject Index |

**148**

STAN001009

# PERSONNEL MANUAL
## TAB 01
## DEFINITIONS

### INDEX

- Generally ........................................................................................ 1
- Affirmative Action ........................................................................... 1
- Allocation ........................................................................................ 1
- Anniversary Date ............................................................................. 1
- Applicant ......................................................................................... 1
- Appointing Authority ....................................................................... 1
- Appointment .................................................................................... 2
- Board ............................................................................................... 2
- Calendar Month ............................................................................... 2
- Calendar Year .................................................................................. 2
- Certification ..................................................................................... 2
- Classification or Class ..................................................................... 2
- Classification Description or Class Specification ............................ 2
- Classification Series ........................................................................ 3
- Classified Service ............................................................................ 3
- Compensation .................................................................................. 3
- Compensation Plan .......................................................................... 3
- Confidential Employee .................................................................... 3
- Continuous Service .......................................................................... 3
- Consult in Good Faith ...................................................................... 4
- County ............................................................................................. 4
- County Service or Service of the County ........................................ 4
- Date of Appointment ....................................................................... 4
- Date of Separation or Termination .................................................. 4
- Demotion .......................................................................................... 4
- Department ....................................................................................... 4
- Department Head .............................................................................. 4
- Director of Personnel/Personnel Department .................................. 5
- Dismissal or Discharge .................................................................... 5
- Elective Service ............................................................................... 5
- Eligible ............................................................................................ 5
- Eligible List ..................................................................................... 5
- Employee .......................................................................................... 5
- Employee Relations Officer ............................................................ 5
- Extra Help ........................................................................................ 6
- Fiscal Year ....................................................................................... 6

**149**

STAN001010

- Full-time .................................................................... 6
- Impasse ..................................................................... 6
- Layoff ...................................................................... 6
- Leave of Absence ......................................................... 6
- Limited Certification ..................................................... 7
- Management Employee .................................................... 7
- Minimum Qualifications .................................................. 7
- Merit Principles ........................................................... 7
- Officers .................................................................... 8
- Participant ................................................................. 8
- Part-time .................................................................. 8
- Position ................................................................... 8
- Probationary Appointment ................................................ 8
- Probationary Release ...................................................... 8
- Professional Employee .................................................... 9
- Provisional Appointment .................................................. 9
- Provisional Employee ..................................................... 9
- Reclassification/Reallocation ............................................. 9
- Recognized Employee Organization ....................................... 9
- Supervisory Employee ..................................................... 9
- Suspension ................................................................. 9
- Termination ................................................................ 10
- Title or Title of Class ..................................................... 10
- Unclassified Service ....................................................... 10
- Year ........................................................................ 10

**150**

STAN001011


### 3.04.010    Generally

A. When used in this title, any amendment hereof, and in any ordinance or resolution classifying and fixing the salaries and compensation or authorizing the employment of personnel in any department, bureau, or office of the County, the terms set forth in this chapter shall have the meanings set forth in this chapter unless it is clearly apparent from the context that they are used in a different sense.

B. Words used in the masculine form include the feminine and the neuter. (Ordinance NS 1021 § 1 (part), 1981; prior code § 2-180 (part).

### 3.04.015    Affirmative Action

"Affirmative Action" is defined as an objective program designed to assure equal employment opportunity based on the relative, job-related merit and fitness of applicants and employees. (Ordinance CS 557 § 1, 1994).

### 3.04.020    Allocation

"Allocation" means the assignment of an individual position to an appropriate class. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180 (a)).

### 3.04.030    Anniversary Date

"Anniversary Date" means the date which constitutes one year of service with the County for the purpose of computing salary range increases or fringe benefit accrual. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(b)).

### 3.04.040    Applicant

"Applicant" means a person who has made formal application for a County position. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(c)).

### 3.04.050    Appointing Authority

"Appointing Authority" means any person or groups of persons (generally department heads) having the power by law or ordinance to make an appointment to any position in County service. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(d)).

**151**

STAN001012

**MSJ Exhibit 16 - 5**

**3.04.060     Appointment**

"Appointment" means the offer of and acceptance by an eligible of a position in the County service in accordance with these rules. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(d)).

**3.04.070     Board**

"Board," when used alone, means the Board of Supervisors of Stanislaus County. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(f)).

**3.04.080     Calendar Month**

"Calendar Month" means any of the twelve months starting on the first day thereof and terminating at the close of the last day thereof and shall be synonymous with "month." (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(g)).

**3.04.090     Calendar Year**

"Calendar Year" means a year starting on January 1st and terminating at the close of the following December 31st. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(h)).

**3.04.100     Certification**

"Certification" means the submission by the Personnel Department of names of eligibles from an appropriate eligible list to an appointing authority pursuant to these provisions.  (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(i)).

**3.04.110     Classification or Class**

"Classification" or "class" means the organized designation of all positions in the County service such that positions having substantially similar duties and responsibilities are assigned the same descriptive title, and the same requirements as to education, experience, knowledge and ability demanded of incumbents, and so that the same schedule of compensation may be made to apply with equity. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(j)).

**3.04.120     Classification Description or Class Specification**

"Classification Description" or "Class Specification" means the written description of the characteristics of a class, prepared and maintained in the Personnel Department, setting forth the definition, typical tasks, minimum qualifications and other relevant standards and information. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(k)).

**152**

STAN001013

**MSJ Exhibit 16 - 6**

### 3.04.125     <u>Classification Series</u>

"Classification Series" means one or more occupational groups having classes of positions with duties substantially similar in nature and character with progressively higher levels of responsibility. (Ordinance CS 557 § 3, 1994).

### 3.04.130     <u>Classified Service</u>

"Classified Service" means all regular full-time and regular part-time positions in all departments and offices in the County as set forth in the salary and position allocation resolution except those designated by the Board of Supervisors as being in the Unclassified Service. (Ordinance CS 557 § 4, 1994; Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(l)).

<u>**Classified positions are subject to all rights and protections as allowed for by applicable Federal or State law, Memorandum of Understanding provisions, or Ordinance Code.**</u>

### 3.04.140     <u>Compensation</u>

"Compensation" means the salary, wage, fee, allowances and all other forms of valuable consideration earned by, or paid to, any employee by reason of service in any position. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(m)).

### 3.04.150     <u>Compensation Plan</u>

"Compensation Plan" means a schedule of salaries or salary ranges established by this title for the classes recognized in the classification plan, and the provisions of this title pertaining to fixing and changing compensation. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(n)).

### 3.68.080     <u>Confidential Employee</u>

"Confidential Employee" means an employee, as designated by the County, who, in the course of his duties, has access to confidential information relating to the County administration of employer-employee relations. (Prior code § 2-230(b)(2)).

### 3.04.160     <u>Continuous Service</u>

"Continuous Service" means service without break or interruption during which the employee has been employed by the County. In computing continuous service approved leaves of absence, whether with or without pay, shall not be construed as a break in employment or service. Other absences aggregating in excess of ninety days in any period of twelve months, including layoffs on account of lack of work, lack of funds, or abolishment of positions, shall be construed as breaking continuous service. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180 (o)).

<u>**Periods of unpaid leaves of absence, which include unpaid suspensions, do not count towards seniority, nor do they count towards benefit accrual.**</u>

**153**
STAN001014

**MSJ Exhibit 16 - 7**

**3.68.090**     <u>Consult in Good Faith</u>

"Consult in Good Faith" means to communicate orally or in writing for the purpose of presenting and obtaining views or advising of intended actions; and, as distinguished from meeting and conferring in good faith regarding matters within the required scope of such meet and confer process, does not involve an exchange of proposals and counterproposals in an endeavor to reach agreement, nor is it subject to Article V of this chapter. (Prior code § 2-230(b)(3)).

**3.04.170**     <u>County</u>

"County" means Stanislaus County, California. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(p)).

**3.04.180**     <u>County Service or Service of the County</u>

"County Service" or "Service of the County" means all departments, employees and officials as defined in this chapter, that are subject to control and regulation by the Board of Supervisors. (Ordinance CS 557 § 5, 1994; Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(q)).

**3.04.190**     <u>Date of Appointment</u>

"Date of Appointment" is the first day of officially recorded employment in a position by a newly appointed employee. (Ordinance NS 1021§ 1 (part), 1981: prior code § 2-180(r)).

**3.04.200**     <u>Date of Separation or Termination</u>

"Date of Separation or Termination" is the last day of officially recorded employment in a position by an employee. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(s)).

**3.04.210**     <u>Demotion</u>

"Demotion" means a change in status of an employee, from a position in one class to a position in another class having a lower range of compensation or to a lower salary step within the same salary range. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(t)).

**3.04.220**     <u>Department</u>

"Department" is synonymous with "Office." Department means one of the officially constituted departments of the County government. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(u)).

**3.04.230**     <u>Department Head</u>

"Department Head" means the head of an established department as designated by the Board of Supervisors. (Ordinance CS 557 § 6, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(v)).

**154**
STAN001015

**MSJ Exhibit 16 - 8**

**3.04.235      Director of Personnel/Personnel Department**

"Director of Personnel/Personnel Department," when used in this title, means the Chief Executive Officer or Chief Executive Office. (Ordinance CS 557 § 7, 1994).

**3.04.240      Dismissal or Discharge**

"Dismissal" or "Discharge" means the involuntary separation of an employee by an act of the appointing authority. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(w)).

**3.04.250      Elective Service**

"Elective Service" means all positions of elected officials. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(x)).

**3.04.260      Eligible**

"Eligible" means an applicant whose name appears on an eligible list.  (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(y)).

**3.04.270      Eligible List**

"Eligible List" means an officially established list of names of persons who have been examined in an open competitive or promotional examination arranged in order of merit and are eligible for employment in a specific class. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(z)).

**3.04.280      Employee**

"Employee" means a person legally occupying a position with the County. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(aa)).

**3.68.110      Employee Relations Officer**

"Employee Relations Officer" means the County Chief Executive Officer. (Ordinance CS 557 § 60, 1994: prior code § 2-230(b)(5)).

**Exempt—"Fair Labor Standards Act"      Federal Law**

Under Section 13 (a) of the "Fair Labor Standards Act," employees who work in a bona fide executive, administrative, or professional capacity and who are salaried employees are not covered by the overtime provisions of the Act.  This includes all management employees.  It also includes all other employees who meet the Act's exemption requirements and who may be eligible for overtime by County regulations and Memorandum of Understanding provisions.

**155**
STAN001016

**MSJ Exhibit 16 - 9**

**3.04.290      Extra Help**

"Extra Help" means employment in the Unclassified Service because of peak work load periods, regular employee absence, seasonal or unusual conditions. An individual assigned to extra help employment is precluded from working for the County in any one or more extra help positions for a total of more than two thousand eighty hours in a year, excluding overtime work. Ordinance CS 557 § 8, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(bb)).

**Fair Labor Standards Act—Federal Law**

The Fair Labor Standards Act is the Federal law governing overtime work and compensation for employees determined by the County to be covered by the Act.

**3.04.295      Fiscal Year**

"Fiscal Year" means the period beginning July 1st and terminating at the close of the following June 30th. (Ordinance CS 557 § 2, 1994).

**3.04.300      Full-time**

"Full-time" means work in a position in the Classified or Unclassified Service in which the employee is required to work the standard work week or work year of two thousand eighty hours prescribed for normal employment in the classification. (Ordinance CS 557 § 9, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(cc)).

**3.68.120      Impasse**

"Impasse" means that the representatives of the County and a recognized employee organization have reached a point in their meeting and conferring in good faith where their differences on matters to be included in the Memorandum of Understanding, and concerning which they are required to meet and confer, remain so substantial and prolonged that further meeting and conferring would be futile. (Prior code § 2-230(b)(6)).

**3.04.310      Layoff**

"Layoff" means termination of employment of an employee because of lack of funds or work, because of changes of duties or organization, or in order to permit the exercise of rights established by ordinance, resolution or Memorandum of Understanding. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(dd)).

**3.04.320      Leave of Absence**

"Leave of Absence" means written request and permission to be absent from duty for specified period, which gives the employee the right to return to the position at the expiration of such period. (Ordinance CS 557 § 10, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(ee)).

**156**
STAN001017

**MSJ Exhibit 16 - 10**

### 3.04.330      Limited Certification

"Limited Certification" means a certification of eligibles who are selected from an existing list for specialized skill, knowledge, license, physical or funding requirements. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(ff)).

### 3.68.130      Management Employee

"Management Employee" means an employee, as designated by the County, having responsibility for formulating, administering or managing County policies or programs, including those with authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward or discipline other employees, to adjust their grievances or to effectively recommend such action. Management employees shall include but not be limited to department heads, assistant department heads and major division chiefs. (Prior code § 2-230(b)(7)).

**The Chief Executive Officer has the authority to designate management positions.**

### 3.04.340      Minimum Qualifications

"Minimum Qualifications" means those qualifications of education, experience, ability, knowledge, licenses and other requirements established for entrance to examinations and for appointments to the various classifications in County service. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(gg)).

### 3.04.350      Merit Principles

"Merit Principles" means recruiting, selecting, training, allocating and promoting employees on the basis of relative job-related abilities, knowledge and skills and requiring the fair treatment of applicants without regard to race, color, national origin, ancestry, religion, sex, pregnancy related condition, age, physical disability, (includes AIDS), mental disability, medical condition (cancer related), marital status, sexual orientation, or political affiliation. (Ordinance CS 557 § 11, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(hh)).

### Non-Exempt—Fair Labor Standards Act (Federal Law)

Non-exempt means employees covered by the overtime regulations of the Fair Labor Standards Act. This includes employees in classifications that have been deemed covered under the Act as determined by the Chief Executive Officer through the application of the Act's definition of covered employees.

**157**

STAN001018

**MSJ Exhibit 16 - 11**

### 3.04.360     Officers

"Officers" means all County elective or appointive officers established by State Law or County Ordinance. If, for the purpose of the classification plan, the Board by ordinance or resolution should give a title to the position held by an officer, which title is different from the name of the office as established by State Law, such title shall not affect any powers or duties vested in or imposed upon such officer by law. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(ii)).

### 3.04.370     Participant

"Participant" means a person employed under a Federal, State or other agency employment or training program including but not limited to programs under the Comprehensive Employment and Training Act. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(jj)).

### 3.04.380     Part-time

A. "Part-time" means extra help work in the Unclassified Service in which the employee is authorized to work less than the standard work day, work week or work month, which may follow a predetermined schedule or seasonally recurring pattern of hours.

B. "Regular part-time" means work in the Classified or Unclassified Service in which the employee fills an allocated position and receives pro-rated benefits and is authorized to work less than the standard work day, work week or work month on a percentage basis of fifty-five percent or greater and yet less than one hundred percent, and which normally follows a predetermined schedule. (Ordinance CS 557 § 12, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(kk)).

### 3.04.385     Position

"Position" means any assignment or employment whether occupied or vacant calling for the performance of specified and related duties as authorized in the salary and position allocation resolution. (Ordinance CS 557 § 13, 1994).

### 3.04.390     Probationary Appointment

"Probationary Appointment" means the status held by an employee during the predetermined period of time required for the on-the-job trial period prior to being granted permanent status for an employee certified and appointed to the Classified Service. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(11)).

### 3.04.395     Probationary Release

"Probationary Release" means the action taken by the Department Head or his/her designee, releasing the probationary employee from the Classified Service during the on-the-job trial period prior to being granted permanent status. (Ordinance CS 557 § 14, 1994).

**158**
STAN001019

**MSJ Exhibit 16 - 12**

### 3.68.140　Professional Employee

"Professional Employee" means employees engaging in work requiring specialized knowledge and skills attained through completion of a recognized course of instruction, including but not limited to, attorneys, physicians, registered nurses, engineers, architects, and the various types of physical, chemical and biological scientists. (Prior code § 2-230(b)(8)).

### 3.04.400　Provisional Appointment

"Provisional Appointment" means the status acquired by an employee who possesses the minimum qualification established for the class and who has been appointed to fill a position for which no valid eligible list exists. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2- 80(mm)).

### 3.04.410　Provisional Employee

"Provisional Employee" means an employee holding a position under a provisional appointment. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(nn)).

### 3.04.420　Reclassification/Reallocation

"Reclassification/Reallocation" means a reassignment of position by raising it to a higher classification or reducing it to a lower classification, on the basis of substantial changes in the kind, difficulty or responsibility of duties performed in such positions, or reassigning a position to another classification at the same compensation. (Ordinance CS 557 § 15, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(oo)).

### 3.68.160　Recognized Employee Organization

"Recognized Employee Organization" means that one employee organization which has been formally recognized by the County as the employee organization that represents the employees in an appropriate representation unit pursuant to Article III of this chapter. (Prior code § 2-230(b)(10)).

### 3.68.170　Supervisory Employee

"Supervisory Employee" means any employee having authority to plan, supervise, assign, direct, review and assist five or more subordinates in the performance of their work if in connection with the foregoing functions, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. (Prior code § 2-230(b)(11)).

### 3.04.440　Suspension

"Suspension" means an enforced absence of an employee for disciplinary purposes, or pending investigation of charges made against an employee. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(qq)).

**159**
STAN001020

**MSJ Exhibit 16 - 13**

**3.04.445**      <u>Termination</u>

"Termination" means either the voluntary or involuntary separation from County service. (Ordinance CS 557 § 17, 1994).

**3.04.450**      <u>Title or Title of Class</u>

"Title" or "Title of Class" means the designation or name given to a class, or to each position allocated to such class. It shall have the meaning defined in the class specification. (Ordinance CS 557 § 18, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(rr)).

**3.04.460**      <u>Unclassified Service</u>

"Unclassified Service" means positions exempted from the Classified Service including, unless otherwise provided, all elected officials, department heads, assistant department heads; appointments to extra help, emergency, trainee positions or other limited-term positions and contracted positions compensated on an hourly flat-rate or fee-for-service basis, unless designated Classified by the Board. Unless otherwise provided, the Unclassified Service shall generally include positions responsible for the formulation or effective recommendation of policy and/or positions in a direct reporting relationship to elected officials. Employees assigned to the Unclassified Service are ineligible to gain permanent status and may be terminated without cause or notice at any time by the appointing authority. An employee filling a position assigned to the Unclassified Service who is removed therefrom, may have the right to return to the Classified Service as set forth in Section 3.08.270, Appointment from Classified Service. (Ordinance CS 557 § 19, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(ss)).

**3.04.470**      <u>Year</u>

"Year" means a period of three hundred sixty-five consecutive days. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180(tt)).

**160**

STAN001021

**MSJ Exhibit 16 - 14**

**PERSONNEL MANUAL
TAB 02
DEPARTMENT HEADS**

**<u>INDEX</u>**

- Listing of Department Heads..................................................................... 1
- Department Head Ordinance..................................................................... 2
- Agricultural Commissioner/Agreement Renewal Process...................... 2
- Chief Probation Officer.............................................................................. 2
- County Counsel/Agreement Renewal Process........................................ 2



**STANISLAUS COUNTY
BOARD OF SUPERVISOR'S RESOLUTION
DEPARTMENT HEADS**

Stanislaus County Department Head positions established by Board Resolution are:

- Aging and Veterans Services Director
- Agricultural Commissioner & Sealer of Weights and Measures
- Animal Services Director
- Assessor
- Assistant Chief Executive Officer
- Auditor-Controller
- Behavioral Health Director
- Chief Executive Officer/Personnel Director
- Chief Information Officer
- Chief Probation Officer
- Child Support Services Director
- Clerk-Recorder
- Community Services Agency Director
- Cooperative Extension & Farm Advisor
- County Counsel
- County Librarian
- District Attorney
- Employment & Training Director
- Environmental Resources/Parks and Recreation Department Director
- Health Services Agency Managing Director
- Planning and Community Development Director
- Public Defender
- Public Health Officer
- Public Works Director and Building Inspection Official
- Sheriff-Coroner and Public Administrator
- Treasurer and Tax Collector

NOTE: The Director of Stanislaus Regional 9-1-1 is a stand-alone Department Head through the Joint Powers Agency.

**162**

STAN001023

**MSJ Exhibit 16 - 16**

### 3.16.060 **Department Heads**

Department Heads shall be appointed to the Unclassified Service in the following manner:

A. As provided elsewhere by law, ordinance or agreement:

1. All elected officials,
2. Chief Executive Officer,
3. Chief Probation Officer,
4. Director of Parks,
5. Director of Public Works/Road Commissioner/Surveyor/Building Official;
6. County Counsel
7. County Agricultural Commissioner and Sealer of Weights and Measures

B. All other Department Heads shall be appointed by the Board to the Unclassified Service by the Board of Supervisors upon the recommendation of the Chief Executive Officer. (Ordinance CS 557 § 31, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.17(f)).

**Agricultural Commissioner**—Agreement Renewal Process

Adopted April 9, 2002/Resolution # 2002-240

The Board of Supervisors appoints the Agricultural Commissioner to a four-year term.

**Chief Probation Officer**

Adopted November 5, 2002/Effective November 9, 2002/Resolution # 2002-848

The Presiding Judge of the Superior Court appoints and swears in the Chief Probation Officer who serves at the pleasure of the Court. The compensation, upon appointment, is set by the Board of Supervisors.

**County Counsel**—Agreement Renewal Process

Adopted May 6, 2003/Resolution # 2003-424

Approximately one year prior to the expiration of his/her current term, the County Counsel may apply for a new four-year contract. In closed session, the Board of Supervisors will conduct a performance evaluation to determine if the County Counsel's term will be renewed. If the Board so deems, the County Counsel will be re-appointed to a new four-year term beginning immediately upon the expiration of the current term.

**163**
STAN001024

**MSJ Exhibit 16 - 17**

# PERSONNEL MANUAL
## TAB 03
## POSITION CLASSIFICATIONS/APPOINTMENTS

### INDEX

- **Position Classifications** ........................................................................................... 1
- Allocation of Positions ................................................................................................ 1
- Purpose ........................................................................................................................ 1
- Unclassified Service Defined ....................................................................................... 1
- Appointment of Unclassified Management Positions .................................................. 2
- Classified Service Defined ........................................................................................... 3
- Reclassification or New Classification ........................................................................ 3
- Allocation Principles .................................................................................................... 3
- Classification Studies ................................................................................................... 3
- Class Specifications ..................................................................................................... 4
- Position Descriptions ................................................................................................... 4
- Use of Classification Titles .......................................................................................... 4
- Classifications Specifications Not Restrictive ............................................................. 4
- Confidential Designation .............................................................................................. 5
- **Appointments** ........................................................................................................... 9
- Employee Selection Policy ........................................................................................... 9
- Personnel Regulations .................................................................................................. 9
- Filling Vacancies ........................................................................................................ 10
- Double Filling of Positions ........................................................................................ 10
- Regular Full-time Appointment Probationary Period ................................................ 11
- Regular Part-time Appointments ................................................................................ 11
- Extra Help to Regular Appointment ........................................................................... 11
- Appointment from Classified Service ........................................................................ 12
- Trainee Appointments ................................................................................................ 12
- Trainee Level Appointment ........................................................................................ 12
- Regulations for Administering "Trainee" Appointments ........................................... 12
- Provisional Appointments .......................................................................................... 13
- Provisional Appointments Clarification ..................................................................... 14
- Clerk of the Board of Supervisors ............................................................................. 14
- In-Processing of Appointee ........................................................................................ 14
- **Hiring Extra Help Employees** ................................................................................ 15
- Extra Help Appointments ........................................................................................... 15
- Extra Help Authorized ................................................................................................ 15
- Extra Help Approval Required—Emergency Exception ............................................ 16

# 164

STAN001025

- Extra Help Budget Restrictions ............................................................... 16
- Extra Help Unclassified Service Positions ........................................................ 16
- Extra Help Appointments ................................................................ 16
- Retiree Appointment........................................................................ 16
- **Lateral Transfer Hiring Incentives Policy**....................................................... 17

**165**

STAN001026



### 3.12.010    Allocation of Positions

A. All positions in all departments and offices of the County service shall be allocated to classifications as established and set forth by the Board of Supervisors by ordinance or resolution. Such classifications and allocations of positions shall constitute the classification plan of the County.

B. At any regular meeting, the Board of Supervisors may create new classifications, divide, combine, alter or abolish existing class functions, allocate new positions to appropriate class functions, or reallocate/reclassify existing positions to other classifications by resolution or ordinance in the manner provided in this chapter. (Ordinance CS 557 § 24, 1994: Ordinance NS 979 § 1 (part), 1981: prior code § 2-186(1)(part)).

### 3.12.020    Purpose

The classification plan of the County shall mean the arrangement and allocation of positions under distinct classifications established by the Board of Supervisors. The purpose of the classification plan shall be to designate each kind of employment in County service which shall encompass within it all positions having duties and responsibilities sufficiently similar so that the same descriptive title and the same requirements and qualifications as to education, experience, knowledge, skills and abilities may be required of incumbents and so that the same schedule of compensation may be made to apply with equity. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-186(1)(a)).

### 3.12.030    Unclassified Service Defined

"Unclassified Service" means positions exempted from the Classified Service including, unless otherwise provided, all elected officials, department heads, assistant department heads, appointments to extra help, emergency, trainee positions or other limited-term positions and contracted positions compensated on an hourly flat-rate or fee-for-service basis unless designated classified by the Board. Unless otherwise provided, the Unclassified Service shall generally include positions responsible for the formulation or effective recommendation of policy and/or positions in a direct reporting relationship to elected officials. Employees assigned to the Unclassified Service are ineligible to gain permanent status and may be terminated without cause or notice at any time by the appointing authority. An employee filling a position assigned to the Unclassified Service who is removed therefrom, may have the right to return to the Classified Service as set forth in Section 3.08.270, Appointment from Classified Service. (Ordinance CS 557 § 25, 1994: Ordinance NS 979 § 1 (part), 1981: prior code § 2-186(1)(b)).

**166**
STAN001027

**MSJ Exhibit 16 - 20**



**STANISLAUS COUNTY**
**PERSONNEL MANUAL**
**APPOINTMENT OF UNCLASSIFIED MANAGEMENT POSITIONS**
**CHIEF EXECUTIVE OFFICE POLICY**
**APRIL 4, 1996**

## POLICY

Individuals appointed to these positions serve at the "will" of the appointing authority. They are not eligible to achieve permanent status and they may be released from employment, without cause or notice, at anytime by the appointing authority.

## PURPOSE

Over the years, departments have been required to fill these positions in the same way that they fill classified vacancies, through a competitive recruitment process. The County recognizes that a competitive process is an important recruitment tool. It also recognizes that as the appointing authority, you must have the ability to recruit and appoint key positions with the best people, in the most efficient way possible.

The Chief Executive Office encourages you to recruit for these positions competitively, when it best meets your needs and the needs of the organization. However, a competitive recruitment is not always the most effective way to fill a position. For example, you may have an employee successfully performing in an out-of-class assignment for an extended period of time. The department may have trained the individual to perform the duties and knows that they want to appoint the individual. Or, you may have a situation where an existing staff member has been performing the duties of a higher class. However, instead of reclassifying the position and due to department needs, the department acquires a new position description of the higher level duties that the employee has been performing. The department would then want to appoint that employee into the newly created unclassified, management position. This change would allow them to do so since the employees had proven themselves and know how to perform those duties.

There are many examples of reasons why a recruitment may not be the best way to fill a position. It is important, however, to remember the key issues when filling these vacancies:

1.  To utilize the best method to fill the position with the right person; and

2.  To do so in a manner that does not subject the Department Head or the County to unnecessary liability and potential litigation.

In filling these vacancies, departments will still be held accountable for meeting their affirmative action goals. These issues, as well as the departments needs should be reviewed before finalizing your decision on how to fill the position.

**This guideline addresses a change for the recruitment of unclassified management positions only.**

**For additional information on recruitments, please refer to Tab 5.**

**167**
STAN001028

### 3.12.040     <u>Classified Service Defined</u>

The Classified Service shall consist of all regular full-time and regular part-time positions in all departments and offices in the County service as set forth in the salary and position allocation resolution except those positions designated by the Board of Supervisors as being in the Unclassified Service. (Ordinance CS 557 § 26, 1994: Ordinance NS 979 § 1 (part), 1981: prior code § 2-186(1)(c)).

### 3.12.060     <u>Reclassification or New Classification</u>

An appointing authority may propose that a new position be reclassified to a different classification or that a new classification be created by submitting the significant facts in writing to the Personnel Director. The Personnel Director, upon receiving such a request, upon his own initiative, or in keeping with provisions of Memoranda of Understanding may conduct a classification study and recommend the allocation of positions to a new or different classification either because a study of the position demonstrated significant changes in the duties, responsibilities or conditions of employment, or because another classification is more appropriate. Any such recommendations shall be presented to the Chief Executive Officer who shall submit the request to the Board of Supervisors with his recommendation. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-186(2)(a)).

### 3.12.070     <u>Allocation Principles</u>

Allocation of a position to a classification shall be made by the Board of Supervisors upon the recommendation of the Personnel Director and the Chief Executive Officer based upon the principle that positions should be included in the same classification if:

A. They are sufficiently similar with respect to duties and responsibilities so that the same descriptive title may be used;

B. They require substantially similar minimum qualification as to education, experience, knowledge, skills and abilities required of incumbents;

C. Applicants may be selected by substantially similar procedures; and

D. The same compensation may be equitably applied. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-186(2)(b)).

### 3.12.080     <u>Classification Studies</u>

Classification studies shall include consideration of the duties and responsibilities of the position, qualifications required, the relationship of the position to others in the County system and whether proposed reclassifications are appropriate for a more consistent and equitable classification plan. In recommending changes in the classification plan, the creation of unnecessary or redundant classifications will be avoided in order to avoid an unnecessary proliferation of classifications. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-186(2)(c)).

**168**

STAN001029

### 3.12.090    Class Specifications

The Personnel Director shall prepare and maintain a written description of each classification in the County service and these descriptions shall constitute the official specifications of classifications in the County service. Each classification specification shall set forth the title of the classification, the principal duties, typical tasks, qualifications, desired knowledge, skills or abilities and such other pertinent information as may be considered appropriate. Class specifications shall be in a consistent format and shall be periodically reviewed to insure that they remain descriptive of the work performed by positions in the classification and that qualifications are directly related to the work required. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-187 (part)).

### 3.12.100    Position Descriptions

Appointing authorities may prepare descriptions of the work performed in specific positions within classifications with the prior approval of the Personnel Director as long as such position descriptions are not inconsistent with the provisions of applicable classification specifications. Such elaborations on the basic class description may be used in training, assigning tasks and establishing departmental performance evaluation standards. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-187(1)).

### 3.12.110    Use of Classification Titles

The title of the classification to which any position is allocated as set forth in the classification specification shall be used in all official personnel records and in all official personnel transactions of Stanislaus County. However, the use of these titles shall not preclude deputization of employees or their designation as officers in accordance with the law or the use of working titles for specific positions within classifications which may be more descriptive of particular assignments. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-189).

### 3.12.120    Classifications Specifications Not Restrictive

The classification specifications are descriptive and illustrative in nature and not restrictive. They are intended to indicate the kinds of positions allocated to various classifications and shall not be construed as declaring what the duties and responsibilities of any particular position shall be. The use of particular expressions or illustrations as to duties should not be interpreted to exclude others not mentioned that are of similar kind or quantity. In matters of classification or allocation, the specification for each classification should be considered in its entirety and in relation to others in the classification plan. Qualifications commonly required of all incumbents in all positions in the various classifications such as honesty, sobriety, industry and physical and mental capability to perform the required work should be deemed to be implied as requirements for all classifications even though they may not be specifically mentioned. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-188).

**169**

STAN001030

**MSJ Exhibit 16 - 23**



## 1. PURPOSE

To set forth the instructions and criteria necessary for a confidential designation.

## 2. POLICY SUMMARY

Confidential designations of selected positions protect the confidentiality of the County's bargaining position and strategy, both in general contract negotiations and in day-to-day dealing with County employee unions through processing grievances and other labor relations matters. The employees who occupy designated confidential positions serve as essential members of the County's management team and their loyalty is protected by exclusion from bargaining units that include other than confidential employees.

Consistency and control of confidential designations requires that they be deliberately restricted and not approved for the convenience of departments or for the benefit of employees.

## 3. DEFINITION

The term confidential employee designates only those employees who are required to regularly assist those County managers responsible for developing and effectuating County policies within the area of County labor relations. A "confidential employee" means an employee who normally participates or assists in making County policies affecting the County employees' wages, hours, and working conditions; or an employee who regularly has advance knowledge of decisions which affect labor relations; or who processes information relating to the County's confidential labor relations matters. Direct access to and processing of personnel documents affecting wages, hours and other terms and conditions of employment of County employees constitutes the basis for certain classifications to be designated Confidential.

## 4. GUIDELINES FOR CONFIDENTIAL DESIGNATION

The following factors are to be used by the Chief Executive Office in determining if certain positions should be designated as confidential.

A. The duties assigned to these positions include responsibility for providing secretarial support to managers who regularly participate in labor negotiations as a chief negotiator, or team member; processing paperwork relating to labor negotiations, notes, research, management proposals, contract costing, strategies and plans, strike contingency plans,

**170**

STAN001031

**MSJ Exhibit 16 - 24**

salary surveys, and problems within the department which are addressed during negotiations.

B. Responsibility for processing paperwork relating to the disposition of union grievances, Skelly Hearings, background investigations, and other documents relating to employee discipline.

C. Responsibility for the personnel/payroll function of a department or division on a full time basis.

D. Employees whose duties are essentially similar to those performed by classes in the Confidential Assistant series may be better served by an allocation to that classification. If a classification review reveals that the duties performed are more appropriately allocated to the Confidential Assistant series and consume approximately half of the employees work load, the position may be reclassified to the confidential assistant series.

E. Positions in the Payroll Section of the Auditor-Controller's Office who are responsible for the administration, maintenance, and planning of the County's Personnel/Payroll System shall be designated confidential. Such positions shall be limited to those with the ability to make on-line changes to employee salaries and benefits with the Personnel/Payroll System, or who are able to obtain confidential labor relations information through their direct access to the Personnel/Payroll System.

## 5. CONSIDERATION BEARING UPON GUIDELINES

The following questions and guidelines will facilitate the process of determining whether or not a particular position warrants confidential designation. Positions shall be designated "confidential" with respect to the duties performed by the incumbent as a regular part of their work assignment.

A. Does the department or division have a history of frequent union grievances, employee discipline problems and labor disputes?

B. How is the department organized? How many employees and bargaining units are in the division or department? How many confidential positions are currently in the department or division?

C. What is the physical location of the division or department? Are there several large divisions located at isolated facilities justifying the need for a confidential position at each site? Or, are the divisions located at the same site as the department's administrative and personnel function eliminating the need for additional confidential positions?

**171**
STAN001032

**MSJ Exhibit 16 - 25**

D. How is the work organized in relation to confidential labor relations material? Is the work organized in a pooled atmosphere where the confidential clerical employees complete all paperwork for various managers? Or, is the work channeled from one manager to one confidential position?

E. Can the confidential duties be reassigned to minimize the number of confidential positions?

F. Does the incumbent in the position merely act as a back up to another confidential position or the Department Secretary processing confidential paperwork only in their absence? Or, are the confidential duties assigned to the position performed on a regular basis?

6. **SPECIFICALLY EXCLUDED FROM THE "CONFIDENTIAL" DESIGNATION ARE:**

A. Employees who do not work for a management position including employees who work for persons responsible for furnishing to management factual or statistical data but who are not designated management.

B. Employees who merely substitute for or assist confidential employees, or open mail for management, or who merely handle or have occasional or indirect access to confidential County labor relations information, **shall not** be designated "confidential" on that basis alone. Managers should instead route labor relations matters directly through another available confidential employee.

C. Employees who regularly spend only a small portion of their time (less than 25%) on such duties shall not be considered confidential. This does not mean that an employee who spends more than 25% of their time on confidential duties will automatically be considered confidential. Generally, the lower the percentage time an employee spends on confidential duties the more significant those duties must be for the position to be designated confidential.

D. Employees who simply do time card entry with no other access to labor relations information.

7. **PROCEDURES**

A. Managers should obtain, complete and return a request form (Attachment 1) from the Chief Executive Office which includes:

1. The incumbents name, class title and reporting relationship;

2. The percentage of time the employee spends processing confidential labor relations material;

**172**
STAN001033

**MSJ Exhibit 16 - 26**

3. What the confidential labor relations duties consist of;

4. An explanation of why these duties cannot be handled by another (existing) confidential designee and;

5. The impact upon management if the request is denied.

B. Upon receipt and review of the initial request, the Chief Executive Office will distribute to the current incumbent a position description questionnaire (PDQ) which must be completed and returned within four (4) weeks.

C. Following a review of the PDQ, a desk audit may be conducted.

D. If the position is found to be confidential, the Chief Executive Office will initiate an amendment to the Salary and Position Allocation Resolution. The Chief Executive Office will also send Attachment #2 to the employee occupying the newly designated confidential position. The employee is required to sign this statement acknowledging:

1. That the understand the reasons for and the conditions attached to the designation, and

2. That the position, not the employee, is being granted confidential status, and

3. Return a copy to the Chief Executive Office.

E. If the request is denied, the department will be so notified.

**173**

STAN001034

**MSJ Exhibit 16 - 27**


### 3.08.100    Employee Selection Policy

A. All appointments to positions in the Classified Service shall be made pursuant to the policies established in this chapter and in accordance with merit principles. The intent of these policies is to insure that the job-related merit and fitness of the applicants and the needs of the County shall govern appointments.

B. Appointments in the Classified Service shall be made on the basis of Equal Employment Opportunity. It shall be a violation of this section to discriminate in employment decisions on the basis of race, religion, color, creed, national origin, political affiliation or belief, age, sex, or handicap except where a bona fide occupational qualification exists.

C. Consistent with the needs of the County, promotion of current employees pursuant to these provisions shall be encouraged.

D. It is the policy of the Board that appointments in the Unclassified Service be made in accordance with merit principles and that the services of the Personnel Department be utilized in selection of such employee. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.1).

### 3.08.110    Personnel Regulations

A. All County employees shall hold their positions subject to such rules and regulations as are provided for in this title or by resolution of the Board.

B. The Personnel Director may draft rules, procedures and forms necessary for the administration of County personnel and not in conflict with these provisions. Employees shall comply with all rules and procedures so prescribed and each Department Head shall enforce such rules, procedures and use of forms.

C. Department Heads are authorized to draft and enforce such further rules, policies, regulations and procedures for the governing of employees in their departments as are determined by the Personnel Director to be consistent with County Ordinances, Resolutions, or Memoranda of Understanding. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.2).

**174**

STAN001035

**MSJ Exhibit 16 - 28**

**3.08.280      Filling Vacancies**

Appointments shall be made using one or more of the following methods:

A. **Reemployment List**—Vacancies in a class shall be filled from a reemployment list when one exists.

B. **Eligible List**—Appointments may be made from eligible lists established for the class or for one with comparable qualifications. See Tab 5/Page 5.

C. **Reinstatement**—Former full-time County employees who resigned with a good record and were employed in the same or comparable class may be reinstated within one year of the date of separation. See Tab 20.

D. **Transfer**—An employee may transfer into a position in the same or comparable classification in a different department with the approval of the receiving Department Head and the Personnel Director. See Tab 20 for a detailed explanation and appropriate forms.

E. **Demotion**—The Personnel Director may approve the voluntary demotion of an employee to a vacant position in a lower class for which the employee possesses the minimum qualifications.

F. **Provisional**—In the event that no list of eligible applicants is available under the methods above, a provisional appointment may be made with the approval of the Personnel Director provided that the appointee possesses the minimum qualifications for the classification.

   **Provisional Clarification—June 24, 1998**

   Provisional appointments should be used on an exception basis only. They will only be approved if there is no existing list, and a recruitment is not feasible or practical. The intent behind limiting provisional appointments is to avoid pre-selection in recruitments.

G. **Lateral Transfers**—Upon request from a Department Head competition for an appointment may be limited to persons with permanent or probationary status employed in another public agency and originally hired in that agency through a competitive process in the same or comparable classification requiring similar minimum qualifications. (Ordinance NS 1021 § (part), 1981: prior code § 2-180.16).

   **See Tab 3 Page 17 for the complete Lateral Transfer Hiring Incentives Policy.**

**DOUBLE FILLING OF POSITIONS**—Personnel Policy

Provision is hereby made to provide overlap for training in highly skilled or technical areas where incumbents are leaving/retiring and their replacements need to have the benefit of their expertise.

**175**

STAN001036

**MSJ Exhibit 16 - 29**

The following guidelines would be applicable:

1. The requesting department would present a request justifying the double fill to the Chief Executive Office.

2. The Chief Executive Office would affirm the need as justifiable, or reject the request.

3. If approved, the requesting department would affirm that monies were available in the departmental budget.

4. The Chief Executive Officer would notify the Auditor-Controller that a double fill had been approved subject to existing department budget limitations.

5. The double fill would last no more than **three weeks** and would cease automatically when the training is completed. Any double fill beyond three weeks requires Board of Supervisor approval before making the appointment.

### 3.16.010    Regular Full-time Appointment Probationary Period

Unless otherwise provided, all appointments shall be made by the appropriate appointing authority. Appointments filling regular authorized positions in the Classified Service shall be considered probationary appointments. A permanent employee who is promoted shall serve a probationary period in the new classification. Such an employee shall be restored to a position in former classification position in the department from which they promoted if rejected during the probationary period unless the employee is terminated for good cause. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.17(a)).

### 3.16.020    Regular Part-time Appointments

"Regular part-time appointments" means appointment from an eligible list to the Classified Service to fill a budgeted part-time or seasonally recurring position allocated in the salary and position allocation resolution. Compensation and benefits for such positions shall be determined by Board resolutions. A probationary period equivalent to two thousand eighty hours of work shall be served and may be extended up to an additional one thousand forty hours. The acceptance or refusal to accept part-time appointments shall not remove a name from any regular full-time eligible list nor be a bar to subsequent full-time employment. (Ordinance CS 557 § 28, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.17(b)).

### 3.16.025    Extra Help to Regular Appointment

Time spent in an extra help appointment immediately prior to a probationary appointment in the same or comparable classification may be applied in meeting the salary step increase and probationary requirement upon approval by the appointing authority and the Chief Executive Officer. (Ordinance CS 557 § 29, 1994).

**176**

STAN001037

**MSJ Exhibit 16 - 30**

**3.08.270     Appointment from Classified Service**

In the event that an employee in the Classified Service is appointed to a position in the Unclassified Service and is removed therefrom, the employee shall be restored to the Classified Service in their former classification and department unless the employee is terminated for cause or a vacancy in the former classification and department no longer exists. (Ordinance NS 1021 § 1 (part), 1981: prior code § 20180.15).

**3.16.030     Trainee Appointments**

A. Regular full-time and regular part-time positions may be filled by trainee appointment from amongst those persons who possess or will gain during the period of their trainee appointment the minimum qualifications for regular appointment. A trainee who fails to so qualify will be terminated upon or before the expiration of the appointment. Duration of trainee appointments may be for up to a maximum of two years, with the approval of the Personnel Director.

B. The intent of this provision is to provide increased employment opportunities in County service in furtherance of position employee development, affirmative action and more efficient expenditure of tax dollars. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.17(c)).

NOTE: The Board of Supervisors may create a specific trainee classification that is not subject to these guidelines. Example: Deputy Sheriff-Coroner Trainee—Board of Supervisor's Resolution #2001-189/Adopted March 13, 2001.

**TRAINEE LEVEL APPOINTMENT**—Board of Supervisor's Resolution—July 26, 1988
S-35-J-30

Provision is hereby made for trainee level positions in the Unclassified Service of the County. Such positions may be utilized temporarily in lieu of filling regular authorized full-time and/or regular part-time vacancies in either the Classified or the Unclassified Service.

Trainee level appointment shall be compensated at a rate of 15% below the wage rate established by ordinance or resolution for the appropriate regular position. Trainee responsibilities shall be those outlined in substance on the appropriate position job description recognizing, however, that employee development and skills acquisition are involved.

**REGULATIONS FOR ADMINISTERING "TRAINEE" APPOINTMENTS**

1. "Trainees" are part of the Unclassified Service of the County.

2. "Trainee" appointments are not to be considered promotions for salary administration purposes under Section 3.24.040.

**177**
STAN001038

**MSJ Exhibit 16 - 31**

3. All "Trainees" will be appointed to the first step of the salary range for the appropriate position, and will be compensated 15% below the range established for the classification involved.
   This could mean either an increase or possible temporary decrease in salary through voluntary demotion.

4. "Trainee" appointments are not to last longer than one year. However, appointments are extendible to a maximum of two years in cases where licensing or other minimum qualifications are involved.

5. "Trainees" are eligible to receive step advancements upon Department Head recommendation and approval of the Chief Executive Office, while serving in the trainee status. (Board Resolution July 1988)

6. Upon completion of the training period, the individual may be upgraded to a probationary appointment at step 1 of the salary range. (An approximate 15% increase in salary.)

7. A "Trainee" who fails to so qualify will be terminated upon or before expiration of the appointment.

8. If an employee (who has permanent status) is appointed from a lower classification to a higher classification as a "Trainee", and is not successful in completing the training, unless for cause, that employee will be returned to their former position at the salary rate they would have been receiving had they not been appointed to a "Trainee" position.

9. For fringe benefit administration purposes, "Trainees" will be considered covered by the bargaining unit agreement which applies to the regular classification involved.

10. "Trainee" appointments will not be approved in positions designated management or including supervisory responsibility. The purpose of "Trainee" appointments is to provide increased employment opportunities, to further positive employment development and to afford the employee an opportunity to gain minimum qualifications through on-the-job-training.

### 3.16.050    Provisional Appointments

In the absence of an eligible list for a class, a provisional appointment may be made with the approval of the Chief Executive Officer and the Personnel Director, provided that the appointee meets the minimum qualifications for the class. A provisional appointment may continue until an applicant from an appropriate eligible list is selected, but in no event shall such appointment continue longer than sixty days following the establishment of an appropriate eligible list and in no event longer than twelve months from the date of appointment, unless an extension of time, not to exceed an additional six months, is approved. Time spent in a provisional appointment in the same or comparable classification may be applied in meeting salary step increase and probationary period requirements upon approval of the appointing authority and the Personnel Director. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.17(e)).

**178**
STAN001039

**MSJ Exhibit 16 - 32**

**PROVISIONAL APPOINTMENTS**—Clarification June 24, 1998

Provisional appointments should be used on an exception basis only. They will only be approved if there is no existing list, and a recruitment is not feasible or practical. The intent behind limiting provisional appointments is to avoid pre-selection in recruitments.

### 3.16.061 Clerk of the Board of Supervisors

The appointment of the position of Clerk of the Board of Supervisors shall be made by the Board of Supervisors. (Ordinance CS 4 § 1, 1983).

### 3.16.070 In-Processing of Appointee

On or before the effective date of appointment, new employees shall complete such documents, health screening and orientation as may be established. With approval of the Personnel Director, this in-processing may be completed as soon after appointment as possible. (Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.17(g)).

**APPOINTMENT ABOVE THE FIRST STEP**—See Tab 4, Page 14.

**179**

STAN001040

**MSJ Exhibit 16 - 33**


**3.16.040      Extra Help Appointments**

A.  "Extra help appointments" means employment required because of temporary, limited term or seasonal workload needs for which regular full-time and regular part-time positions are not provided in the salary and position allocation resolution.  Compensation is set on a per diem or hourly basis with such benefits as may be adopted by Board resolution.  Extra help appointments shall be made from an appropriate eligible list and for one of the following purposes:

   1.  To fill encumbered vacant positions during the period of a regular employee's sick leave, leave of absence or workers' compensation disability leave;

   2.  Perform other work considered necessary by the Department Head for a period not to exceed one year.

B.  The acceptance or refusal to accept extra help appointments shall not remove an applicant's name from an eligible list for regular full-time or regular part-time nor be a bar to subsequent regular full-time or regular part-time appointment. Such extra help appointments shall be considered unclassified, except that permanent employees accepting extra help promotional appointments shall be restored to their position in the class from which they promoted unless terminated or demoted for cause. Time spent in an extra help appointment immediately prior to a probationary appointment in the same or comparable classification may be applied in meeting the salary step increase and probationary requirement upon approval by the appointing authority and the Chief Executive Officer. (Ordinance CS 557 § 30, 1994: Ordinance NS 1021 § 1 (part), 1981: prior code § 2-180.17(d)).

**3.64.010      Authorized**

There are further provided for each and every department such extra employees as the Chief Executive Officer or his or her designee may from time to time authorize the department to temporarily employ in order to fulfill such duties as may unexpectedly arise, provided financial provision for such employment has been made in the budget by the Board of Supervisors.  Such extra help will not be entitled to step advances, vacation or sick leave. (Ordinance CS 373 § 7, 1990: Ordinance NS 998 § 1 (part), 1981: prior code § 2-220 (part)).

**Except as otherwise provided by Memorandum of Understanding provision or Board Resolution.**

**180**

STAN001041

**MSJ Exhibit 16 - 34**

### 3.64.020    Approval Required--Emergency Exception

Requests to employ extra help must be approved, in writing, by the Chief Executive Officer or his or her designee prior to the effective date of employment; provided, however, that in the event of emergency, the District Attorney, Sheriff, Director of Public Works and Stanislaus Medical Center are authorized to employ such emergency labor as needed without first obtaining the written consent of the Chief Executive Officer or his or her designee, provided such emergency employment is reported to the Chief Executive Officer or his or her designee on the first working day after such emergency employment. (Ordinance CS 373 § 8, 1990: Ordinance NS 998 § 1 (part), 1981: prior code § 2-220 (part)).

### 3.64.030    Budget Restrictions

The number of positions, as specified in the final budget, shall not be exceeded by any County department without securing prior written approval of the Chief Executive Officer; provided, that such approval may be granted only if the Board of Supervisors has allocated sufficient funds in the budget to cover the cost of such additional positions.  Additional positions requiring the expenditure of funds over the amount which has been budgeted shall require the formal approval, by resolution, of the Board of Supervisors. (Ordinance NS 998 § 1 (part), 1981: prior code § 2-220 (part)).

### 3.64.040    Unclassified Service Positions

Provision is made in the Unclassified Service of the County for extra help employment.  Extra help employment shall mean time-limited employment for which regular employees are not available because of peak workload periods, temporary absence of regular employees, seasonal requirements or other situations. (Ordinance NS 998 § 1 (part), 1981: prior code § 2-220(a)).

### 3.64.050    Appointment

Extra help appointments shall be made by appointing authorities following approval by the Chief Executive Officer.  Extra help appointments shall be made only from among those individuals certified to the appointing authority by the Personnel Director. (Ordinance NS 998 § 1 (part), 1981: prior code § 2-220(b)).

### RETIREE APPOINTMENT—Board Resolution

Retirees may work up to **960 hours** in any one calendar year without jeopardizing retirement benefits.

# 181

STAN001042

**MSJ Exhibit 16 - 35**



**STANISLAUS COUNTY**
**BOARD OF SUPERVISOR'S RESOLUTION**
**APPROVED JANUARY 8, 2008/RESOLUTION # 2008-019**
**LATERAL TRANSFER HIRING INCENTIVES POLICY**

## PURPOSE

The purpose of the Lateral Transfer Hiring Incentives Policy is to assist Departments in the ability to attract well-qualified candidates from other public organizations for hard-to-recruit classifications. The County recognizes the need to have a competitive salary and benefits package available to assist Departments in filling such vacancies. The successful recruitment of lateral transfers from other public agencies significantly reduces the time and expense necessary to train new County employees to perform essential County services.

This policy is intended to address common issues that may prevent Stanislaus County from attracting experienced lateral transfer candidates for hard-to-recruit County positions, including a lateral transfer candidate's loss of leave accruals and permanent classified status.

## LATERAL HIRING INCENTIVES POLICY

Stanislaus County Personnel Policy defines lateral transfers as persons with permanent or probationary status employed in another public agency and originally hired in that agency through a competitive process in the same or comparable classification requiring similar minimum qualifications. (Ordinance NS 1021 § (part), 1981: prior code § 2-180.16). Personnel Policies on filling of vacancies allows Departments upon request from a Department Head to fill a vacancy with a lateral transfer recruitment process (3.08.280). Additionally, the candidate must be currently employed with another governmental organization at the time of the conditional offer of employment.

Hard-to-recruit is defined as classifications with long term vacancy rates despite repeated recruitment efforts to fill vacant positions. Hard-to-recruit positions may also be identified by a documented shortage in the labor market for skilled positions. Hard-to-recruit classifications may change over time based on recruitment efforts and changes in labor market conditions. The Chief Executive Office is responsible for setting and maintaining hard to recruit classifications. Not all lateral transfer opportunities may be considered hard-to-recruit for purposes of administering this policy.

Utilizing the following hard-to-recruit lateral incentives requires Department Head and Chief Executive Office approval prior to any lateral incentive offer to a prospective candidate. Upon hiring a lateral transfer utilizing the hard-to-recruit incentives, the Department must verify and confirm through documentation the candidate's leave accruals with the candidate's current employer.

**182**
STAN001043

**MSJ Exhibit 16 - 36**

## LATERAL TRANSFER HIRING INCENTIVES

### 1. Vacation Accruals

Current County policy provides that lateral transfer candidates are treated the same as all new entry level County employees for purposes of determining vacation leave accruals. This incentive would allow for Department Heads with prior approval of the Chief Executive Office to offer a lateral transfer to start County employment with a vacation accrual rate higher than entry level employees. This policy would not front load any vacation leave time for lateral candidates, but would provide the ability to recognize that a lateral candidate is earning vacation leave at a higher rate than entry level employees in their current position. Lateral candidates may be placed within Stanislaus County's existing vacation accrual schedule closest to their current vacation accrual rate, but they may not exceed the vacation accrual rates they are currently earning.

For example, a lateral candidate has 10 years of experience in another County and is earning 160 hours of vacation at the time they transfer employment to Stanislaus County. The lateral candidate's vacation bank would start at zero, the same as all new County employees, however the lateral candidate would begin to accrue vacation leave at a higher rate than new employees. The lateral candidate's accrual rate will be matched as close as possible to the County's applicable vacation rate schedule, but may not exceed the candidate's current 160 hours of vacation leave benefit. This section of the hiring incentive policy may also apply to unclassified management positions identified as hard-to-recruit.

### 2. Sick leave Accruals

This incentive would allow for Department Heads with prior approval from the Chief Executive Office to offer a lateral transfer to front load the equivalent of six months of sick leave accruals (48 hours) at the start of the first pay period following the date of hire. The lateral transfer would not accrue any additional sick leave until they have completed six months of service. This incentive is intended to provide some continuity of sick leave benefits for candidates who are considering transferring employment to Stanislaus County and losing an existing bank of accrued sick leave benefits.

### 3. Probationary Period

Current County policy provides that lateral transfer candidates are treated the same as all new entry level County employees and are required to serve a minimum 12 month probationary period to qualify for permanent status. This incentive would allow for Department Heads to grant a lateral transfer permanent status upon completion of six months of satisfactory employment with Stanislaus County, as evidenced by a documented performance evaluation. This provision may be used when the candidate has already gained permanent status in the same classification with his/her current employer. If the candidate were on probation with his/her current organization, the County's initial probationary period of 12 months would apply.

**183**

STAN001044

**MSJ Exhibit 16 - 37**

# PERSONNEL MANUAL
## TAB 04
## SALARY COMPENSATION

### <u>INDEX</u>

- **Salary and Compensation Provisions** ................................................................ 1
- Salary Schedule Adoption ................................................................ 1
- Principles of Setting Salary Levels ................................................................ 1
- Conversion to Hourly Basis ................................................................ 1
- Pay Periods ................................................................ 1
- Attendance Report ................................................................ 2
- Biweekly Installments of Yearly Salary ................................................................ 2
- Payment Procedure ................................................................ 2
- Commencement and Termination Dates ................................................................ 2
- Partial Pay Period Worked ................................................................ 2
- Voter Registrars ................................................................ 3
- Judges Sitting in Relief ................................................................ 3
- Jury Duty Pay Remittance ................................................................ 3
- Other County Employment ................................................................ 3
- Compensation Not Fixed ................................................................ 4
- Government Code Section 31641.04 adopted ................................................................ 4
- Salary Bands for Non-Elected Management ................................................................ 5
- Salary Bands for Confidential Employees ................................................................ 7
- Salary Upon New Appointment/Promotion ................................................................ 9
- PeopleSoft Changes ................................................................ 10
- Definition of Base Pay ................................................................ 10
- Health Insurance Changes ................................................................ 10
- Paycheck Transition ................................................................ 10
- Step Increases for Represented Employees ................................................................ 11
- Uniform Allowance Payments ................................................................ 11
- January 1, 2003 Union Negotiated Benefit Administrative Changes ................................................................ 11
- New Hire Effective Date ................................................................ 11
- Termination Effective Date ................................................................ 11
- Returning from Leave of Absence ................................................................ 11
- Project Pay/Special Assignment Provision/Represented Employees ................................................................ 12
- Assignment Pay for Confidential Employees ................................................................ 12
- **Bilingual Pay** ................................................................ 13
- Bilingual Pay Guidelines ................................................................ 13
- **Salary Plan** ................................................................ 14
- Administration ................................................................ 14
- New Employees ................................................................ 14

**184**

STAN001045

- Appointment Above the First Step/Justification Memo ...................................... 14
- Increases Within Range ................................................................................... 15
- Special Merit Increase for Represented Employees ............................................ 16
- Special Merit Increase for Managers and Confidential Employees..................... 16
- Salary on Unpaid Leave of Absence.................................................................. 18
- Salary on Probationary Release ....................................................................... 18
- Salary on Promotion ....................................................................................... 18
- Exception to 5% Minimum on Promotion........................................................... 18
- Temporary Out of Class Assignment................................................................. 19
- Salary Upon Return from "Acting" or "Out of Class Assignment"....................... 20
- Salary on Demotion ........................................................................................ 20
- Salary on Transfer.......................................................................................... 20
- Salary on Range Change.................................................................................. 20
- Salary on Position Reclassification.................................................................. 21
- Salary When Adjustment Occurs on Salary Anniversary Date .......................... 21
- Board Authority to Specify Salary.................................................................... 21
- Board of Supervisors Compensation/Administrative Code................................. 22
- Y Rates........................................................................................................... 23
- **Extra Help Salary Provisions**........................................................................ 24
- Compensation/Basis and Benefits ................................................................... 24
- Compensation Rate ......................................................................................... 24
- Step Increases................................................................................................. 24
- Extra Help Additional Compensation............................................................... 24
- Extra Help Employee Step Increases................................................................ 25
- Clarification of Break in Service for Part Time Employees ............................... 25


**The following may not be totally inclusive of County policy due to exceptions which may be contained in specific Memorandum of Understanding provisions. Please refer to the appropriate Memorandum of Understanding when seeking information from this section.**

### 3.20.010    Salary Schedule Adoption

Except as otherwise provided by law or this chapter, officers and employees shall receive the compensation provided in the basic salary schedule and compensation schedule adopted by the Board of Supervisors by ordinance or resolution for the respective classifications of positions in which they are employed, in accordance with the allocation of such classifications to ranges of the basic salary schedule and in accordance with the terms of employment set forth in this chapter. (Prior code § 2-181 (part)).

### 3.20.020    Principles of Setting Salary Levels

The salary of each class shall be consistent with the duties, responsibilities, and difficulty of the work involved and is and shall be based on the principle that like salaries shall be paid for comparable duties and responsibilities, and that County salary schedules shall bear a reasonable relationship to prevailing rates of pay in other public jurisdictions and in local private employment. (Prior code § 2-181 (part)).

### 3.20.030    Conversion to Hourly Basis

Any Department Head, with the consent of the Chief Executive Officer, may place an employee on an hourly pay basis by converting the biweekly salaries established in the basic salary schedule to an hourly basis according to the schedule set forth in the salary and position allocation resolution of the Board. (Ordinance CS 557 § 32, 1994: Prior code § 2-182).

### 3.20.040    Pay Periods

Employees shall be compensated on a biweekly basis. Such pay shall include all supplemental and overtime pay due the employee in accordance with the time schedule of the Auditor-Controller. (Ordinance CS 557 § 33, 1994: Ordinance CS 268 § 1, 1987: prior code § 2-183(a) (part)).

**Currently employees are paid every other Wednesday, however, if the payday falls on a County recognized holiday, paychecks will be distributed one workday prior.**

**186**

STAN001047

**MSJ Exhibit 16 - 40**

**3.20.050**     **Attendance Report**

The attendance report and payroll shall be certified by the Department Head or his designated representative that the employees listed have actually been employed in his or her office and that their attendance is correctly reported on the report. The report shall then be sent to the Auditor-Controller of the County, examined determine that the employees listed have been appointed, employed, promoted, demoted or their salaries increased or decreased in accordance with the provisions of this title. If found to be in order, it shall be approved by the Auditor-Controller of the County before any salaries are paid. (Ordinance CS 557 § 34, 1994: prior code § 2-183(a)(part)).

**3.20.060**     **Biweekly Installments of Yearly Salary**

Whenever compensation is fixed for any position at a rate per year, said compensation shall be paid to the person holding such position in biweekly installments as nearly equal as may be possible. (Ordinance CS 557 § 35, 1994: prior code § 2-183(b)).

**3.20.070**     **Payment Procedure**

All salaries shall be paid from the appropriate fund on the warrant of the Auditor-Controller and shall be in full payment for all services rendered, unless otherwise specifically provided. (Prior code § 2-183(c)).

**3.20.080**     **Commencement and Termination Dates**

When an employee commences service on the first working day of any calendar month which is not the first calendar day thereof, for purposes of determining the first day of such employee's probationary period and determining his eligibility for vacation, sick leave, and increases in compensation, he shall be deemed to have served all preceding calendar days in said month. If an employee terminates actual service on the last working day of any calendar month which is not the last calendar day thereof, he shall be deemed to have worked all succeeding calendar days in said month. (Prior code § 2-183(d)).

**3.20.090**     **Partial Pay Period Worked**

Any person employed in a position in which he/she draws a biweekly salary and who works less than any full pay period, except when on earned vacation or paid sick leave, shall receive as compensation for such pay period only an amount equal to that portion of his/her established biweekly salary as the number of days worked bears to the number of actual working days in such employee's normal work schedule for such pay period. (Ordinance CS 557 § 36, 1994: prior code § 2-183(e)).

**187**
STAN001048

**MSJ Exhibit 16 - 41**

### 3.20.100     Voter Registrars

The County Clerk is authorized and allowed to enlist the support and cooperation of interested citizens and organizations and to deputize, as registrars, as many interested citizens and members of such organizations as he deems necessary to maintain voter registration at a high level. The County Clerk is authorized and allowed to pay to such interested citizens and to the secretaries or treasurers of such organizations such amount as the Board of Supervisors may fix by resolution for each elector legally registered by them outside the office of the County Clerk. (Ordinance NS 979 § 1 (part), 1981: prior code § 2-184).

### 3.20.110     Judges Sitting in Relief

When any judge sits in any justice court within the County other than his own as a relief for the judge of that court when the latter is unable by reason of disability, vacation, disqualification, or service in Municipal Court, to perform his regular duties and the judge so sitting is also at the same time serving his own court, he shall receive in addition to his regular salary such additional compensation as the Board of Supervisors may fix by resolution. A claim for reimbursement for an expense incurred pursuant to this section shall be presented as provided in Government Code Sections 915 and 915.2 not later than one year after the claim first arose or accrued. (Ordinance NS 979 § 1 (part), 1981: prior code 2-185).

### 3.20.120     Jury Duty Pay Remittance

No deduction shall be made from the salary of an employee while on jury duty if he has waived or remitted to the County the fee for jury duty. If he has not so waived or remitted the jury fee, he shall be paid only for the time actually worked in his regular position. An employee accepted for jury duty shall immediately notify his Department Head, in writing, whether or not he waives or remits his jury fee to the County. (Ordinance CS 373 § 5, 1990: prior code § 2-209).

### 3.20.130     Other County Employment

A. No person employed in a full-time position shall be permitted to work for compensation for the County in any capacity other than his regular position. Exceptions hereto may be authorized by resolution of the Board of Supervisor upon a finding that the public interest requires employment of a County employee for the rendering of a special service or services and the payment of compensation therefor.

B. A person employed in a part-time position may work for compensation for the County in another capacity provided the total time for such position does not require more time than required for full-time position established for such type of work.

C. Notwithstanding the provisions of Subsection A of this section, a person employed in a full-time position shall be permitted to receive compensation from the County for providing foster care to a child duly placed with such person by an agency of the County. (Prior code § 2-216).

**3.20.140**       <u>**Compensation Not Fixed**</u>

In the event that the compensation of any officer, deputy, assistant or employee of the County has not been fixed or established by the Board of Supervisors, as authorized by law, then such officer, deputy, assistant or employee shall receive such compensation as may be provided by law, ordinance, or resolution now in effect, or hereafter adopted relating to his compensation. (Prior code § 2-227).

**3.20.150**       <u>**Government Code Section 31641.04 adopted**</u>

The provision of Section 31641.04 of the Government Code, are made applicable to the County. The Board intends that Section 31641.04 of the Government Code shall be applicable in Stanislaus County until this section is repealed, and that this Board of Supervisors may, from time to time as conditions may warrant, adopt a resolution to Section 31641.04 of the Government Code without first readopting this section. (Ordinance CS 147 § 1, 1985).

**189**

STAN001050



The Board of Supervisors approved and modified the Management Compensation Program to a Performance Based System.

## POLICY ISSUES

1. Approved the creation of consolidated management designations and eight (8) tiers.

2. Approved eight (8) salary bands.

3. Approved a performance based compensation component that could add up to 5% to the base salary if it falls within the salary band. This would be reviewed on a 12-month basis or more often if a special "merit" increase is recommended.

4. Approved a performance based award of up to 2.5% of the annual base pay for exceptional performance.

5. Amended the Salary and Position Allocation to assign all Unclassified, management staff to one of the eight approved salary bands.

6. Created the following new classifications, assigned to the Unclassified, management service:

   - Manager I
   - Manager II
   - Manager III
   - Manager IV

7. Approved a system where each management employee receives feedback from a team of internal and external customers and prepares an annual development plan based on the feedback.

8. Approved making the appropriate title changes in the Unclassified, management classifications.

**190**
STAN001051

**MSJ Exhibit 16 - 44**

## NON-ELECTED MANAGEMENT BANDING METHODOLOGY

1. Consolidated management/designation system. Created eight bands based upon a balancing of current and internal salary relationships and adjusted for external comparisons with eight surveyed counties.

2. Integrated Department Head and management bands to create a comprehensive management compensation system.

3. Deleted fifty-eight (58) classifications.

**191**
STAN001052

**MSJ Exhibit 16 - 45**



The Board of Supervisors approved and modified Confidential Employees Compensation Program to a Performance Based System.

## POLICY ISSUES

1. Approved consolidating the classification structure from twenty-four (24) classifications to five (5) classifications in five (5) salary bands.

2. Approved a performance-based compensation that could add up to 5% to the base salary if it falls within the salary band.

3. Approved a performance bonus award up to 2.5% of the annual base pay for exceptional performance.

4. Approved providing operating departments with greater flexibility to acknowledge and reward exceptional performance.

5. Approved for lead pay of 2.% when a confidential employee supervises another employee in the same band.

6. Approved 1.5% confidential assignment pay when an employee is assigned a temporary project that falls within confidential designation or when a position does not fit within one of the current salary bands. The 1.5% confidential assignment pay is provided in lieu of any other benefits.

7. Approved a system where each confidential employee receives feedback from a team of internal and external customers and prepares an annual development plan based on the feedback.

8. Created the following new classifications, assigned to the Unclassified, confidential service:

   - Confidential Assistant I
   - Confidential Assistant II
   - Confidential Assistant III
   - Confidential Assistant IV
   - Confidential Assistant V

**192**
STAN001053

**MSJ Exhibit 16 - 46**

9. Amended the Salary and Position Allocation to assign all remaining confidential positions (Bargaining Unit 2) to the appropriate classifications in Unclassified Service and assigned them to one of the five salary bands.

10. Made the appropriate title changes to the Unclassified, confidential classifications.

## CONFIDENTIAL BANDING METHODOLOGY

1. Based the five bands on a grouping of positions with similar levels of responsibility and salary.

2. Compensation of each band was based upon a salary study of eight surveyed counties with minor adjustments to create an average growth potential within each band.

*Personnel Manual/Salary Compensation—Tab 4*

*Page 8*
*Revised 4/04*

**193**

STAN001054

**MSJ Exhibit 16 - 47**

Below are the revised guidelines for New Appointments and Promotions under banding and the five-step system. An important change to this matrix is the **required justification memo** from the Department Head to be sent with the Personnel Action Form after appointment above the minimum of the band or promotion above the standard 5%. Just like the five-step system, appointments/promotions above the minimum of the band should be the exception not the rule. When writing your justification memos, remember to use the guidelines in **Tab 4 Page 14**, for Appointment Above the First Step.

| | BANDING | FIVE STEP SYSTEM |
|---|---|---|
| **NEW APPOINTMENT** | Minimum of Band ↑ Department Head approval. | **First step** ↑ Department Head approval. |
| | Up to 25% of Band ↑ Justification memo from Department Head sent with Personnel Action Form (PAF) after appointment. | **Second-Fourth** step ↑ Justification memo from Department Head sent with Personnel Action Form (PAF) after appointment. |
| | 26-50% of Band ↑ CEO advance approval. | **Fifth step** ↑ BOS approval. |
| | 51-100% of Band ↑ BOS approval. | |
| **PROMOTION** | 5% above current salary. | 5% above current salary, within six (6) cents. Special Merit Increase. |
| | The Department Head has discretion for County employees promoting into an initial band or to a new higher level band to use the same guidelines listed above. CEO Memo October 12, 1999. | |

**194**

STAN001055

**MSJ Exhibit 16 - 48**



# BOARD OF SUPERVISORS RESOLUTION
## ADOPTED DECEMBER 14, 1999/RESOLUTION # 1999-965
## EFFECTIVE DECEMBER 19, 1998/SYSTEM CONVERSION DATE
## PEOPLE SOFT CHANGES
## AGREEMENT WITH EMPLOYEE ORGANIZATIONS

## DEFINITION OF BASE PAY

The conversion to the new PeopleSoft Human Resources/Payroll System required amending certain existing personnel practices. The changes effecting represented employees were negotiated with the employee organizations and recommended for implementation as provided in the appropriate Memorandum of Understanding. Effective with the December 19, 1998 system conversion date the following definition of base pay applies:

The intent is to clarify the meaning of base pay for the computation of special pays, assignment pay and deferred compensation benefits which are paid off of the "base" salary. This is not a change in current practice or definition.

A standard base pay must be defined in the new PeopleSoft system. **Base pay is that time paid the employee, or the employee works in order to calculate additional compensation.** Included in the base pay definition is paid leave time including: paid compensatory time, vacation, sick leave, bereavement leave, jury duty, paid military leave, 4850 disability time, donated time used, SDI when supplemented with other leave time, holiday time (including old holiday time), continuing education days, and attorney professional leave.

Additional compensation, is included in employee overtime rates and considered as final compensation for retirement, consistent with the Ventura decision.

## HEALTH INSURANCE CHANGES

### Paycheck Transition

Because the last pay date of the plan year 1998 is December 30, 1998, **the County has agreed to pay for medical health insurance for the last two days of the year.** This means that your paycheck will show a modest increase that pay date if you have an insurance deduction. In addition, the cafeteria allowance and insurance premiums will be prorated for those two days.

Due to the transition into the PeopleSoft system and the new rates for multiple health care plans beginning January 1, 1999, there will also be a change in the paycheck on January 13, 1999. **If Blue Cross or NHP HMO have been selected, there will be no cost to the employee. Other deductions may vary depending on individual circumstances.** In 1999, medical insurance will be separate from the dental, vision and supplemental life insurance.

*Personnel Manual/Salary Compensation—Tab 4*     *Page 10*
                 *Revised 4/04*

**195**

STAN001056

**MSJ Exhibit 16 - 49**

**STEP INCREASES FOR REPRESENTED EMPLOYEES**

Step increases are effective one year from the date of hire or promotion, rather than being tied to the first of the month. In addition, if the County department fails to complete the necessary forms to either approve or deny the step advancement within 31 days of the date the individual would be eligible, the increase will be implemented by the Chief Executive Office retroactive to the date the step increase was due. This is the current practice with the Registered Nurses bargaining unit, and the four bargaining units represented by SCEA.

**UNIFORM ALLOWANCE PAYMENTS**

Eligible employees will receive a uniform allowance the first pay period of each month.

**EFFECTIVE JANUARY 1, 2003, THE UNIONS NEGOTIATED THE FOLLOWING BENEFIT ADMINISTRATIVE CHANGES:**

**New Hires**

- Health Insurance benefits are effective the **first** of the month, following date of hire.

- Deductions will be taken, and credits will be given on the first paycheck the employee receives in their first month of coverage, and semi-monthly thereafter.

- If there is a third paycheck in the month, no deductions or credits will appear.

- If the employee does not receive two paychecks in their first month of coverage, then deductions and credits for benefits will be doubled on their first paycheck.

**Terminations**

- Health Insurance benefits will terminate on the **last** day of the month of the event of termination (retirement, unpaid LOA or FMLA exhausting).

- The employee must work at least **one** day in the month to get coverage for the month.

- COBRA, if elected, will be effective the **first** of the month following date of termination.

**Returning from Leave of Absence**

- If the employee's health insurance was canceled due to an unpaid Leave of Absence, all health insurance benefits will be re-instated effective the **first** of the month following the return to work date.

Please refer to the Employee Benefits Policy and Procedures Manual regarding current health insurance effective date procedures. The link to the Employee Benefits Manual is: http://www.co.stanislaus.ca.us/riskmgt/EB%20Forms/Manual.pdf

**196**

STAN001057

**MSJ Exhibit 16 - 50**



**STANISLAUS COUNTY**
**BOARD OF SUPERVISORS RESOLUTION**
**ADOPTED OCTOBER 26, 1999/RESOLUTION # 1999-822**
**PROJECT PAY/SPECIAL ASSIGNMENT PROVISION**
**FOR REPRESENTED EMPLOYEES**

## POLICY

Allow departments the flexibility to compensate employees for special projects or assignments above their current job classification. Project pay will be on a case-by-case basis as necessary. Funds should come from the department's existing budgets and not require additional allocations.

## PURPOSE

To ensure equity among departments the following criteria will be established when approving assignment pay:

- Assignment or Project should be approved for a specific duration not to exceed six (6) months, unless extended in writing. This should be done in advance of the expiration date.

- The duties are in addition to the existing workload but not equivalent to the duties assigned to an existing higher classification.

- Project may be seasonal throughout the year.

- Project Pay can be authorized up to 5% in 1% increments.

- All Project Pay will be recommended by the Department Head for approval by the Chief Executive Officer in advance of the assignment.

- If the project is only assigned a portion of the work week, the compensation should be prorated accordingly.

## ASSIGNMENT PAY FOR CONFIDENTIAL EMPLOYEES

**BOARD OF SUPERVISORS RESOLUTION**—Approved December 4, 2001/Resolution #2001-934

The Board's approval of assignment pay for confidential employees is consistent with the policy adopted for management employees in May 1997 and will formalize an existing practice. The Board previously approved project assignment pay for represented employees in October 1999 and including confidential employees now makes the policy consistent.

**197**

STAN001058

**MSJ Exhibit 16 - 51**



**3.20.160** <u>Bilingual Pay</u>

The Personnel Director will review a request by a department for bilingual pay for a position. The Personnel Director shall be authorized to approve bilingual pay. (Ordinance CS 373 § 1, 1990).

**BILINGUAL PAY GUIDELINES FOR EXTRA-HELP**
**BOARD OF SUPERVISORS RESOLUTION**
**ADOPTED MAY 8, 2007/RESOLUTION #2007-350**

Represented employees in the County have negotiated additional compensation for qualified bilingual employees required to utilize bilingual skills in the workplace. The Board approved that bilingual certification pay be made available for qualified Extra-Help employees consistent with the procedures and compensation ($.69 per hour) provided in the MOU between the County and AFSCME Local #10. This additional compensation will provide County Departments increased flexibility in recruiting bilingual Extra-Help employees to support the diverse needs of our community.

**Bilingual pay provisions do not apply to management employees as well as to certain represented bargaining units.**

The Chief Executive Officer will review the request and may require qualifying language tests. In recommending positions, it is important to remember that a position need not be designated simply because the incumbent is bilingual and occasionally uses their skills in the normal course of work. Positions approved for bilingual pay will generally be those rendering services linking the County with clients who are largely monolingual in a language other than English. Employees who use bilingual skills will be expected to continue to perform other assigned job duties in a manner acceptable to department management whether or not their positions receive bilingual pay.

Persons certified and receiving bilingual compensation may be subject to serve a seven-day period of on-call status per month to serve as interpreters without additional compensation unless called back to work. The parties agree that designation of such positions shall not be subject to the grievance procedure.

**198**
STAN001059

**MSJ Exhibit 16 - 52**



### 3.24.010     Administration

The salary plan shall be administered in accordance with this chapter. (Prior code § 2-219 (part)).

### 3.24.020     New Employees

A. Except as otherwise provided in this section, new employees shall be appointed at the first step of the salary range in effect for the particular class of position to which the appointment is made. The Personnel Director with concurrence by the Chief Executive Officer upon recommendation of the respective Department Head may, however, provide that a particular position be filled up to the fourth step within the salary range. Fifth step appointments must still require Board approval.

B. Requests for appointment above the first step shall be channeled through the Personnel Office for review and recommendation by the Personnel Director relative to the proposed compensation to be paid the person in question and shall receive the concurrence of the Chief Executive Officer. Such action, as described in Subsection A of this section, must be completed prior to the effective date of employment of the person in question.

C. When the Personnel Director with the concurrence of the Chief Executive Officer authorizes the filling of a position at a step which is higher than the first step of the salary range, the Personnel Director may advance incumbents of positions in the same class earning less than the step in the particular salary range at which the new employee enters to the same or a higher step and may also fix new salary anniversary dates for such incumbent employees. (Ordinance CS 373 § § 2-4, 1990: prior code § 2-219(a)).

**APPOINTMENT ABOVE THE FIRST STEP**—Personnel Regulation

The County Code provides that employees may be hired at a salary above the first step upon approval by the Chief Executive Officer or in the case of 5th step appointments, with the approval of the Board of Supervisors, upon a department head's written recommendation.

Concurrence/non-concurrence will be based on a review of the **justification memo** submitted by the Department Head addressing three questions:

1. Why will the candidate not accept appointment at the first step? Include reference to relative fringe benefits and salary history.

2. What exceptional skills, qualifications, experience, etc. will this candidate bring to the County that other applicants do not possess? (In other words - what makes the extra expenditure appropriate?).

3. What recruitment difficulties affect the filling of this position? (Personnel will help with this question.)

## APPOINTMENT ABOVE THE FIRST STEP— See chart on Page 9.

### Banding

- New appointments up to the 25% level in a banded position require a justification memo from the Department Head. The justification memo can be completed after appointing the individual but must be completed before the Personnel Action Form is sent to the Human Resources Unit. No advance approval is required if these criteria are met.

- Appointments at the 26-50% level of the band require advance approval from the Chief Executive Officer. The justification memo must accompany the Personnel Action Form.

- Appointments at the 51% level of the band or higher require advance approval from the Board of Supervisors.

### Step System

- Appointments at the second through fourth step require a justification memo from the Department Head. The justification memo can be completed after appointing the individual but must be completed before the Personnel Action Form is sent to the Human Resources Unit. No advance approval is required if these criteria are met.

- Appointments at the fifth step require advance approval from the Board of Supervisors.

### 3.24.030    Increases Within Range

A. Salary advancement shall not be automatic, but shall be given only on the affirmative recommendation of the Department Head in the case of employees and the affirmative recommendation of the Board of Supervisors in the case of officers and such recommendations may be made only on the basis of a rating of satisfactory or above as indicated on the overall rating as shown on the last performance rating of the employee or officer filed in the Chief Executive Office.

B. Employees shall be eligible for advancement to the second step of their salary range on their salary anniversary date after one year of satisfactory continuous service on the first step. Eligibility for advancement to subsequent salary steps will thereafter be based on one year of satisfactory continuous service at the prior step until the employee reaches the maximum salary step of the appropriate salary range.

**200**
STAN001061

**MSJ Exhibit 16 - 54**

Notwithstanding the provision of this section, the Department Head with approval by the Chief Executive Officer may grant a **special merit increase** within the salary range for employees with outstanding performance. A special merit increase shall be granted not more than once a year.

**SPECIAL MERIT INCREASE**—Personnel Policy for represented employees:

This provision shall be used to recognize outstanding service by an employee. Written justification supporting outstanding performance must accompany special merit increase recommendations. The granting of a special merit increase shall not change an employee's salary anniversary date. Only one special merit increase may be given in a twelve-month period and the special merit increase is in addition to the employee's regular step increase. This provision does not apply to individuals on the fifth step of the salary range.

**SPECIAL MERIT INCREASE**—Clarification June 24, 1998 for represented employees:

A special merit increase is advancement by **one step.** The intent is to allow departments to reward employees for outstanding performance, while remaining within the policy guidelines. This offers a systematic approach to performance rewards, until such time as a pay for performance system is implemented for represented employees.

**SPECIAL MERIT INCREASE**—Personnel Policy adopted by the BOS on January 25, 2000/Resolution # 2000-47 for managers and confidential employees:

**POLICY**

Align the Special Merit Criteria with the Board's approved guidelines for the Performance Based Pay system. The Board approved amending the Performance Based Pay program to allow the chief executive officer to approve special merit increases based on significant progress toward development plan goals with appropriate supporting documentation

**PURPOSE**

In May 1997, the Board approved the modification of the compensation system for managers to become a performance based system. In September 1998 the Confidential Employee compensation system was modified in a similar manner. The Performance Based Pay System outlined criteria for reviewing performance and awarding salary increases. This system includes a 360 degree evaluation process which requires each Manager and Confidential employee to develop a team for their evaluation to include their customer, supervisor, peer and self evaluation. Each employee is required to complete a Development Plan based on the evaluation outlining their individual goals for the coming year. Any compensation change is based on both the evaluation and the completion of this Development Plan.

**201**
STAN001062

**MSJ Exhibit 16 - 55**

At the current time, Special Merit Increases are approved by the Chief Executive Officer to recognize outstanding service by an employee. The Personnel Policy and County Code require that supporting documentation accompany any increase. This documentation should state what the employee has done which exemplifies "outstanding" performance. Current practice under the Pay for Performance program requires a second 360 degree performance evaluation.

To ensure that the guidelines for Special Merit Increases are being measured equally throughout the organization, and to ensure these increases are being awarded based on merit and not as a means to increase compensation, it is recommended that the Chief Executive Officer continue to approve all Special Merit Increases.

It is recommended that requests for special merit increases be allowed without a separate 360 degree evaluation. A formal review of performance can be documented by showing accomplishment of "significant progress" toward the achievement of the goals outlined in the employee's Annual Development Plan. These Plans are a required element of each Performance Based Pay evaluation and identify the goals each employee is required to strive toward meeting in the year following their evaluation. "Significant progress" is typically measured at a period of 3 to 6 months of work toward the Development Plan.

**See Tab 19 for more information on Pay for Performance.**

**3.24.030      Increases Within Range—continued**

C. Every employee in the Classified Service shall have a salary anniversary date which shall be the first day of the month following the month in which the employee completed his/her first year of service in a particular class of position, except that if an employee completes the first year of service on the first normal working day of a month, his or her salary anniversary date shall be the first day of that month.

Thirty days prior to each employee's salary anniversary date and annually thereafter until the employee reaches the maximum salary step of the appropriate salary range, the Chief Executive Office shall advise the Department Head, in writing, that the employee will be eligible for salary increase, and the Department Head shall advise the Chief Executive Office, in writing prior to the employee's anniversary date, whether or not he/she recommends that the employee be advanced to the next higher step of the range. The Chief Executive Office shall notify the Auditor-Controller, in writing, of all anniversary increases and such notification shall constitute authorization for the Auditor to make payment to the employee at a higher rate. Should an employee's anniversary date be overlooked through error or oversight, and upon discovery of the error or oversight the employee be recommended for the anniversary increase, the Auditor-Controller shall honor a supplemental payroll compensating the employee for the additional salary he/she should have received dating from his/her anniversary date.

D. The granting of any leave of absence without pay or other time off without pay exceeding fifteen calendar days shall cause the employee's anniversary date to be postponed a number of months equal to the nearest number of months for which the leave is granted based on the number of calendar days in such leave. Any employee whose salary anniversary date is postponed as provided in this section shall assume a new anniversary date which shall be determined according to Subsection C of this section.

### SALARY ON UNPAID LEAVE OF ABSENCE

If an employee is on an **unpaid leave of absence for more than 15 calendar days**, even if the leave is split between two calendar months, i.e. January and February, the employee's salary anniversary date shall be postponed one full calendar month. For example, if an employee is on an unpaid leave sixteen consecutive calendar days during the months of January and February and the employees salary anniversary date is May 1, it will be extended to June 1.

**3.24.030**    **Increases Within Range/Salary on Probationary Release**

Employees released during their probationary period from a position to which he or she had been demoted, promoted or transferred shall have their salary returned to the same step on the appropriate salary range as had been held prior to the promotion, demotion or transfer. The employee's salary anniversary date, if applicable, shall be adjusted by the equivalent number of months during which the employee did not hold the classification to which he or she is returning. (Ordinance CS 557 § 37, 1994: Ordinance CS 373 § 5, 1990; Ordinance CS 107 § § 3, 4, 1985; Ordinance NS 1021 § 2 (part), 1981; prior code § 2-219(b)).

**3.24.040**    **Salary on Promotion**

Any employee who is appointed to a position in a class allocated to a higher salary range than the class of position which he formerly occupied shall receive the nearest higher monthly salary in the new salary range, which salary shall not be less than five percent more than his former salary. Provided, however, that in no case shall the increased salary be more than the top step in the new range. Increases shall be effective upon the date on which the appointment is made. For purposes of further annual increases within the salary range, the employee's anniversary date will be changed to the date when the promotion was effective. (Prior code § 2-219(c)).

### SALARY UPON NEW APPOINTMENT/PROMOTION GUIDELINES-- June 15, 1999

Please refer to the chart on **Page 9 of Tab 4.**

### EXCEPTION TO 5% MINIMUM ON PROMOTION—MOU Provision/Board Resolution

An exception shall exist to the 5% minimum increase on promotion if the step to which the employee is promoted is six (6) cents or less per hour under the minimum 5% increase.

**203**

STAN001064

**EXCEPTION TO 5% MINIMUM ON PROMOTION**—Clarification June 24, 1998

When an employee is promoted to a higher classification, he/she will receive the nearest higher salary in the new salary range, which will not be less than 5%. The exception is when the next higher salary is within six (6) cents of the 5%. Departments cannot promote employees to any other step of the new salary range except for that which falls within the above guidelines. Exceptions can be made for at will, Unclassified employees.

**TEMPORARY OUT OF CLASS ASSIGNMENT**—MOU and Personnel Policy

The parties agree that when an employee receives a formal, written assignment by a Department Head to perform the work characteristic of a higher classification, and such work is satisfactorily performed for the majority of work days in a calendar month or for a period of twelve consecutive working days, the employee shall be paid for such out of class work at the appropriate promotional pay rate of the higher classification (a 5% minimum). Benefits remain the same.

The intent of this section is to insure that employees are fairly compensated when the needs of the County require a formal out of class assignment. It is recognized that department heads have sole discretion in selecting employees for any such assignments and that the out of class work involved is to be consistently and substantially in the higher classification.

Please comply with the following guidelines in implementing this section. The intent of this section is to provide a mechanism to maintain the efficient operation of the department.

Such circumstances would arise pending completion of a recruitment for a vacant position or when the incumbent in an authorized position is absent because of long-term paid sick leave or approved leave of absence. Such assignment should never be made unless the following elements are present:

1. The specific work involved must be performed in order to insure the fulfillment of the responsibilities of the department.

2. No more cost effective method is available. Other methods might include division of the workload among several employees or postponing deadlines or other actions.

3. Requests for temporary "out of class" assignments should be approved by the Chief Executive Officer or his designee in writing prior to the start of the assignment. Assignments must be made in writing by the Department Head to the employee after Chief Executive Officer or his designee approval.

4. The candidate for such assignment must meet the minimum qualifications for the higher paid classification.

5. These provisions may be applied in the manner indicated above to management and confidential employees.

*Personnel Manual/Salary Compensation—Tab 4*

**204**
STAN001065

**TEMPORARY OUT OF CLASS ASSIGNMENT**—Clarification June 24, 1998

Out of class assignments should be used sparingly by departments. The intent of limiting the out of class assignments is to avoid pre-selection in recruitments. Additionally, many good candidates do not apply because they believe the person in the out of class assignment will get the job anyhow. This limits the qualified candidate pool.

When a department has a vacancy due to turnover, a recruitment should be started as soon as possible to fill the position. In the interim, managers in that department should pick up the resulting additional workload. It is unfair to employees to have them perform the work without compensation. If there is a special skill that only one person possesses in the department, an out of class assignment may be approved. In all cases, the out of class assignment must be approved before the work prior to the start of the assignment. Out of class assignments will still be approved for long-term paid sick leave or leaves of absence.

**SALARY UPON RETURN FROM "ACTING" OR "OUT-OF-CLASS ASSIGNMENT"—**

Personnel Policy

Employees temporarily promoted into an "acting" or "out-of-class assignment" upon return to the classification held prior to such promotion, shall return to the same salary step previously held. Time spent in the "acting" or "out-of-class assignment" shall be counted as time served, towards the advancement to the next step in the salary range, in the employee's regular classification, upon department head recommendation.

**3.24.050      Salary on Demotion**

Any employee who is demoted to a class of position having a salary range lower than the class of position from which he/she was demoted shall have his/her salary reduced to the salary in the range for the class of position to which he/she has been demoted next lower than the salary he/she received before demotion. For purposes of further annual increases within the salary range, the employee's anniversary date will be changed to the date when the demotion was effective. (Ordinance CS 557 § 38, 1994: prior code § 2-219(d)).

**3.24.060      Salary on Transfer**

Any employee who is transferred from one position to another in the same class or to another in a class having the same salary range shall be compensated at the same step in the salary range as he previously received. For purposes of further annual increase within the salary range, his anniversary date shall remain the same as it was before transfer. (Prior code § 2-219(e)).

**3.24.070      Salary on Range Change**

The salary of an employee in a classification which is adjusted to a higher salary range shall be determined as follows:

**205**

STAN001066

**MSJ Exhibit 16 - 59**