1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DOUGLAS MANER,                          No.  1:14-cv-01014-DAD-MJS

12                  Plaintiff,

13        v.                                 ORDER GRANTING SUMMARY
                                             JUDGMENT AND DIRECTING CLERK OF
14   COUNTY OF STANISLAUS, BIRGIT            COURT TO CLOSE CASE
     FLADAGER, and DOES 1 through 20,
15   inclusive,                              (Doc. Nos. 26, 27)

16                  Defendants.

17

18        This case was originally filed in Stanislaus County Superior Court on April 10, 2014, and

19   was removed here pursuant to federal question jurisdiction under 28 U.S.C. § 1441(a) and (c) on

20   June 26, 2014.  (Doc. No. 1.)  The complaint alleges two causes of action for First Amendment

21   retaliation under 42 U.S.C. § 1983 against all defendants under two separate theories, essentially

22   claiming plaintiff was retaliated against both for the exercise of his free speech rights and his

23   associational rights.  (*Id.* at 12–13.)  The complaint also alleges a cause of action under 42 U.S.C.

24   § 1983 claiming plaintiff was denied due process because he possessed a property interest in his

25   job and was given constitutionally deficient process prior to being demoted or disciplined.  (*Id.* at

26   13–14.)  The complaint also contains a fourth cause of action based on California Labor Code

27   §§ 1101 and 1102.  (*Id.* at 14–15.)  On February 24, 2016, each defendant filed a motion for

28   summary judgment in their favor as to all of plaintiff's claims.  (Doc. Nos. 26-1, 27-1.)  Plaintiff

                                             1

filed an opposition to these motions[1] on March 29, 2016.  (Doc. No. 40.)  Defendants filed replies.  (Doc. Nos. 45, 46.)  On May 3, 2016, the motion came on for hearing before the court. At that hearing attorney Peter Bradley appeared for plaintiff and attorney Morin Jacob appeared on behalf of the defendants.

**BACKGROUND**

In his complaint, plaintiff alleges as follows.  Plaintiff is a former deputy district attorney for Stanislaus County and was retaliated against for exercising his First Amendment right to support a political candidate for the office of district attorney.  Plaintiff alleges that, leading up to the June 2006 district attorney's election in Stanislaus County, he supported Judge Michael Cummins against the current district attorney and defendant here, Birgit Fladager, who at the time was another prosecutor in the Stanislaus County District Attorney's Office.  According to plaintiff, when Fladager was elected district attorney she retaliated against him for his support of Cummins, by disciplining him unnecessarily and demoting him, ultimately causing him to quit his job.

Most of the facts are not seriously disputed by the parties.  Rather, the parties' dispute centers around the reasonable inferences to be drawn from those facts.  Plaintiff began working at the Stanislaus County District Attorney's Office in 1991, and worked there until October 2013. During that time, he was a deputy district attorney, and was promoted to the deputy district attorney V position, or the highest level of non-management attorney.  Despite receiving praise and commendations for his trial skills throughout much of his tenure with the office (he was regularly given an overall rating of either "exceptional" or "satisfactory" on annual performance evaluations), he also received regular complaints concerning his behavior.  Initially, most of these complaints focused on plaintiff's treatment of the clerical staff.[2]  These complaints resulted in

---

[1]  Though filed as two motions, the defendants' summary judgment motions essentially make the same arguments.  Because the court need not reach any of the arguments which differ between the two motions, they are addressed together below.

[2]  Plaintiff believes the clerical staff was biased against him from the beginning, and as the years wore on, more senior clerical staff taught new employees to dislike him as well.  Obviously, clerical staff bias against plaintiff does not implicate his First Amendment rights.

1    numerous instances of plaintiff being counseled about his behavior prior to June 2006.  While

2    most of these complaints came from clerical staff, not all did, and complaints about plaintiff are

3    evident in his personnel file coming from members of the bench, witnesses, the defense bar, and

4    law enforcement at various times during his career prior to June 2006.

5         While the parties dispute various aspects of plaintiff's involvement in Cummins's

6    campaign prior to the June 2006 election, it is clear plaintiff was to some extent involved in the

7    race.  Plaintiff wrote a letter to the editor which was published in the *Modesto Bee* supporting one

8    of Cummins's positions in the election.  Plaintiff donated money to Cummins's campaign and

9    was featured on his campaign website.  Further, plaintiff has presented evidence in connection

10   with the pending motion that numerous members of management at the district attorney's office,

11   including Fladager herself, were aware that he supported Cummins by the time of the election.

12   (*See* Doc. No. 31 at 155–56.)

13        Following the June 2006 election, an increasing number of complaints were received by

14   the district attorney's office about plaintiff, originating from sources both inside and outside that

15   office.  Between September 2006 and January 2007, complaints were received that, among other

16   instances of misconduct, plaintiff had:  1) entered a men's restroom and urinated near a female

17   employee who was painting the room's interior; 2) abruptly shut the door to a copy room while

18   two clerical employees were conversing on either side of the door; 3) refused orders to evacuate

19   the office during a fire drill; 4) was rude to a judge on the record; and 5) read another attorney's

20   confidential case notes to a third party.[3]  Most notably during this period, the District Attorney's

21   Office also received a complaint from the local gang task force with which plaintiff was working

22   in conjunction with his assignment prosecuting gang-related cases.  Because of this last

23   complaint, defendant Fladager and other managerial-level officials in the District Attorney's

24   Office decided to move plaintiff out of his position prosecuting gang-related cases in March 2007,

25   and into one in the issuance department, where he would draft criminal complaints.  They also

26

27   _____

      [3]  Plaintiff does not generally dispute these complaints were received, though he at times disputes
28   either whether the complained of misconduct occurred or whether he believes his behavior was
      actually so bad as to warrant these complaints being made.

                                                          3

1    initiated an administrative investigation into plaintiff's behavior, ultimately resulting in a

2    recommendation from human resources to suspend him for five days, a punishment leveled in

3    August 2007.  Plaintiff appealed that suspension throughout 2008 and 2009 and it was ultimately

4    downgraded to a letter of reprimand in March 2009.

5        Following this investigation, from 2007 to 2011, plaintiff was not subjected to any new

6    disciplinary proceedings or administrative investigations.  In the spring of 2011, plaintiff was

7    again the subject of complaints about his behavior from two separate law enforcement officers

8    arising from separate incidents.  Following an administrative investigation into these complaints,

9    plaintiff was issued a letter of reprimand, ordered to write an apology to one of the officers, and

10   ordered to attend counseling.

11       Subsequently, during 2012 and 2013, numerous additional complaints were received by

12   the District Attorney's Office regarding plaintiff.  Many of them stemmed from his interactions

13   with a crime victim's next of kin, who felt she was being treated rudely or alternatively was being

14   ignored.  Also included in this spate of complaints were several serious criticisms of plaintiff

15   from several judges in the Juvenile Division of the Stanislaus County Superior Court, to which he

16   had been assigned in spring 2012.  These complaints included allegations that plaintiff was

17   routinely late to court, had made disparaging comments about a judge in her courtroom, and had

18   made disparaging comments about a court clerk's appearance.  Again, while plaintiff disputes

19   some elements of these complaints, such as whether he was really late to court with any

20   frequency and whether the comments he made were taken out of context and/or misunderstood,

21   he does not deny the complaints were made.

22       Following the receipts of these latter complaints, another administrative investigation was

23   conducted, and Fladager and the other managers of the office sought to terminate defendant.

24   During a June 2013 *Skelly* conference[4] about this investigation and proposed discipline and at

---

[4]  A "*Skelly* conference" or "*Skelly* hearing" derives its name from a California Supreme Court
decision holding that permanent employees of the state of California have a property interest in
the continuation of their employment of which they cannot be deprived without due process.  *See
Skelly v. State Personnel Board*, 15 Cal. 3d 194, 206 (1975); *see also Merino v. El Dorado Hills
Cty. Water Dist.*, No. CIV. S-10-2152-LKK-DAD, 2011 WL 5118604, at * 5 (E.D. Cal. Oct. 27,
2011).  In *Skelly*, the California Supreme Court held that minimal procedural due process

1  which Fladager served as the *Skelly* officer, plaintiff raised for the first time his concern that he

2  was being retaliated against for his support of Cummins in the 2006 election for the office of

3  District Attorney.  This *Skelly* conference was therefore postponed, and a separate *Skelly*

4  conference was conducted later by Sheriff Adam Christianson.  Sheriff Christianson reduced

5  plaintiff's termination to a thirty-day suspension, a written reprimand, and an order to be placed

6  on a performance improvement plan.  While plaintiff was serving his thirty-day suspension, he

7  learned he would be transferred upon his return to a position doing "collateral support," work

8  which he contends is non-legal.  After learning of this, plaintiff voluntarily withdrew the appeal

9  of his suspension, submitted a letter of resignation, opened his own law firm, and filed this suit.

10                                              **LEGAL STANDARDS**

11        Summary judgment is appropriate when the moving party "shows that there is no genuine

12  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

13  Civ. P. 56(a).

14        In summary judgment practice, the moving party "initially bears the burden of proving the

15  absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

16  (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

17  may accomplish this by "citing to particular parts of materials in the record, including

18  depositions, documents, electronically stored information, affidavits or declarations, stipulations

19  (including those made for purposes of the motion only), admissions, interrogatory answers, or

20  other materials" or by showing that such materials "do not establish the absence or presence of a

21  genuine dispute, or that the adverse party cannot produce admissible evidence to support the

22  fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at

23  trial, "the moving party need only prove that there is an absence of evidence to support the

24  nonmoving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325.).  *See*

25  requirements necessitate an individual receiving "notice of the proposed action, the reasons

26  therefor, a copy of the charges and materials upon which the action is based, and the right to
respond, either orally or in writing, to the authority initially imposing discipline."  15 Cal. 3d at

27  215.  The required hearing need not be a full-scale evidentiary hearing.  *Id.*  ("It is clear that due
process does not require the state to provide the employee with a full trial-type evidentiary

28  hearing prior to the initial taking of punitive action.").

1   *also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate

2   time for discovery and upon motion, against a party who fails to make a showing sufficient to

3   establish the existence of an element essential to that party's case, and on which that party will

4   bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof

5   concerning an essential element of the nonmoving party's case necessarily renders all other facts

6   immaterial."  *Id.*  In such a circumstance, summary judgment should be granted, "so long as

7   whatever is before the district court demonstrates that the standard for entry of summary

8   judgment . . . is satisfied."  *Id.* at 323.

9       If the moving party meets its initial responsibility, the burden then shifts to the opposing

10   party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

11   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

12   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

13   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

14   admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R.

15   Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of America, NT & SA*, 285 F.3d

16   764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a

17   motion for summary judgment.").  The opposing party must demonstrate that the fact in

18   contention is material, i.e., a fact that might affect the outcome of the suit under the governing

19   law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v.*

20   *Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

21   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

22   party.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

23       In the endeavor to establish the existence of a factual dispute, the opposing party need not

24   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

25   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

26   trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

27   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

28   *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Costa County Transit Authority*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## ANALYSIS

### 1.    First Amendment Retaliation Claims

Since both of plaintiff's First Amendment theories rely on essentially the same legal principle—i.e., that he was retaliated against by his employer for engaging in protected First Amendment conduct—they will be analyzed together.

When analyzing a claim of First Amendment retaliation against an employee, the Ninth Circuit has said a plaintiff must initially show the following:  "(1) he was subjected to an adverse employment action . . . , (2) he engaged in speech that was constitutionally protected because it touched on a matter of public concern and (3) the protected expression was a substantial motivating factor for the adverse action."  *Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 976 (9th Cir. 2002) (citing *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000)).  If this initial showing is made, the burden then switches to defendant to demonstrate either of the following:  (1) under the balancing test established by *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), defendant's legitimate administrative analysis outweighed plaintiff's First Amendment rights; or (2) under the mixed motive analysis in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), defendant would have reached the same decision even in the absence of the plaintiff's protected conduct. *Id.* at 976–77.  The most recent formulation of this test by the Ninth Circuit has been stated as

1  follows:

> First, we consider whether the plaintiff has engaged in protected speech activities, which requires the plaintiff to show that the plaintiff: (1) spoke on a matter of public concern; and (2) spoke as a private citizen and not within the scope of her official duties as a public employee. If the plaintiff makes these two showings, we ask whether the plaintiff has further shown that she (3) suffered an adverse employment action, for which the plaintiff's protected speech was a substantial or motivating factor. If the plaintiff meets her burden on these first three steps, thereby stating a *prima facie* claim of First Amendment retaliation, then the burden shifts to the government to escape liability by establishing either that: (4) the state's legitimate administrative interests outweigh the employee's First Amendment rights; or (5) the state would have taken the adverse employment action even absent the protected speech.

*Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012).

a.  Plaintiff Engaged in Protected Speech

The First Amendment protects government employees against their employer's retaliation when they discuss matters which can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). The employee must be speaking both as a citizen and on a matter of public concern in order to state a First Amendment retaliation cause of action. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Concerning whether a government employee speaks as a citizen or in their official capacity, what is dispositive is whether the speech at issue was made in part because it was what the employee "was employed to do." *Id.* at 421–22 ("When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee."). If the speech in question is part of how the employee routinely discharges her job duties, then there is no protection for the speech under the First Amendment. *Id.*

Second, in determining whether the employee is discussing a matter of public concern, the Supreme Court has stated courts must look at "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. *See also Rankin v. McPherson*, 483 U.S. 378, 384–85 (1987). "Public employee speech is 'of public concern' if it helps citizens 'to make informed decisions about the operation of their government.'" *Roe v. City & Cty. of San Francisco*, 109 F.3d 578, 585 (9th Cir. 1997) (quoting *McKinley v. City of Eloy*,

705 F.2d 1110, 1114 (9th Cir. 1983)).  *See also Eng v. Colley*, 552 F.3d 1062, 1071 (9th Cir. 2009) ("Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." )  Certain subjects are seen as inherently being of public concern.  *See Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F.2d 1401, 1405 (9th Cir. 1988) (noting the Supreme Court in *Connick* characterized allegations of racial discrimination as a "matter inherently of public concern") *overruled on other grounds as stated in Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 925 (9th Cir. 2013).  The court is to look toward "the point of the speech" in assessing whether it addresses a matter of public concern.  *Id.* at 1405–06.  "An employee's motivation and the audience chosen for the speech also are relevant to the public-concern inquiry."  *Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999).  Ultimately, "the content of the communication must be of broader societal concern," and the court's "focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance."  *Roe*, 109 F.3d at 585 (citing *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir. 1985)).  *See also Desrochers v. City of San Bernardino*, 572 F.3d 703, 713–16 (9th Cir. 2009).  It is plaintiff's burden to show the speech addressed an issue of public concern, and this inquiry is a matter of law, not fact.  *Desrochers v. City of San Bernardino*, 572 F.3d 703, 713–16 (9th Cir. 2009).

Defendants assert that any speech plaintiff engaged in was not conducted as a private citizen, did not relate to a matter of public concern, and therefore does not fall under the protection of the First Amendment.  Plaintiff primarily relies on one explicit act of speech, a 2006 letter to the editor published in the *Modesto Bee*, and his known association with a political candidate, Judge Michael Cummins, as the basis for the alleged retaliation.[5]  The parties do not dispute the text of plaintiff's letter to the *Modesto Bee*.  (Doc. No. 26-4 at ¶ 4.)  Defendants,

---

[5]  The court notes that there is also evidence plaintiff donated money to Cummins's campaign, which is itself an act of speech.  *See Fed. Election Comm'n v. Colo. Republ. Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association.").

1    however, note the letter's byline identifies plaintiff as a prosecutor from Oakdale (a city within

2    Stanislaus County), and state the letter "addresses highly-technical, inner-workings of a DA's

3    office and contains information only an employee of the DA's office would know." (Doc. No.

4    27-1 at 20.)  According to defendants, this "necessarily indicates he [plaintiff] is writing as a

5    prosecutor for County [sic], not as a private citizen." (Doc. No. 26-1 at 27; Doc. No. 27-1 at 20.)

6    According to plaintiff, his letter to the newspaper editor "concerned a topic discussed by the

7    *Modesto Bee* and which was the key issue in the DA election," and is therefore a matter of public

8    concern. (Doc. No. 40 at 32.)

9         Defendants' initial argument that plaintiff was not speaking as a private citizen but rather

10   pursuant to his employment with Stanislaus County is unpersuasive.  Defendants rely on the

11   undisputed fact that plaintiff's letter identified him as a "prosecutor" from Oakdale.  Under

12   *Garcetti*, however, the crucial inquiry is about whether the speech at issue was part of plaintiff's

13   routine employment duties.  No evidence is before the court suggesting that part of plaintiff's job

14   duties in his position in 2006 involved writing letters to the editor of the local newspaper.

15   Plaintiff was a line prosecutor and there is no evidence suggesting that he was involved in media-

16   relations for the District Attorney's Office.  Defendants do not suggest otherwise.  Even if

17   plaintiff were to have been occasionally authorized to give press statements on particular cases—

18   something the court merely surmises is possible, as there is no evidence of it—plaintiff's letter to

19   the editor here concerned a specific office practice which was indisputably at issue in the 2006

20   election for District Attorney, and particularly Judge Cummins's categorization of that practice.

21   There is no indication this type of commentary was required of plaintiff in his regular job duties.

22   Without such evidence, defendants cannot persuasively claim, in light of the decision in *Garcetti*,

23   that plaintiff's speech was not that of a private citizen.

24        This does not end the inquiry, however, as the court must still look to the entire record to

25   ascertain whether the speech in question was on a matter of "public concern."  Plaintiff bears the

26   burden of establishing this is the case and he has satisfied that burden here.  As Cummins testified

27   in his deposition, the election race between himself and Fladager was contentious.  (Doc. No. 31

28   at 100.)  A particular issue of dispute was the murder conviction rate in the District Attorney's

1    Office, and Cummins had asserted the "true" conviction rate was only fifty-five percent.  (Doc.

2    No. 31 at 103–04.)  Cummins also testified the *Modesto Bee* had sided with Fladager in the race,

3    and published an article suggesting that his claims about the true conviction rate for murders were

4    deceptive.  (Doc. No. 31 at 108–10.)  Fladager similarly acknowledged the controversy in her

5    deposition, describing the issue of the "true" conviction rate as Cummins's only issue in the race

6    for the office of District Attorney.  (Doc. No. 31 at 151–52.)  Plaintiff also testified that his

7    purpose behind writing the letter was both to praise Cummins in connection with the race and to

8    explain away the *Modesto Bee*'s assertion that Cummins was being deceptive about the Stanislaus

9    County District Attorney's Office murder conviction rate.  (Doc. No. 31 at 340–45.)  It is clear

10   plaintiff's letter to the editor was related to a matter of public concern since it addressed a

11   contentious issue in a local political election.

12                              b.   Adverse Employment Action was Taken Against Plaintiff

13           Further, the evidence before the court on summary judgment makes it clear that adverse

14   employment actions were taken against plaintiff.  Defendants argue plaintiff's claims are based

15   on a theory of constructive discharge, since he was not ultimately fired but rather resigned instead

16   of returning from his suspension.  Defendants argue that in order to establish constructive

17   discharge, plaintiff must demonstrate "his working conditions at the time of his resignation were

18   so intolerable that a reasonable person in his position would have been compelled to resign."

19   (Doc. No. 27-1 at 22.)  However, the decisions defendants cite for this proposition were rendered

20   based on statutory labor law or state common law, not in the context of alleged violations of the

21   First Amendment under 42 U.S.C. § 1983.  *See Poland v. Chertoff*, 494 F.3d 1174, 1185 (9th Cir.

22   2007); *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996); *King v. AC & R

23   Advert.*, 65 F.3d 764, 766 (9th Cir. 1995); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1461

24   (9th Cir. 1994); *London-Marable v. Boeing Co.*, 357 Fed. App'x 61, 63 (9th Cir. 2009); *Metzger

25   v. Martinez*, 48 Fed. App'x 660, 665 (9th Cir. 2002).[6]

26   _____

27   [6]  Alternately, defendants claim an employment action is not adverse if it is not yet final, citing
     *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).  Again, *Brooks* did not arise in
28   the context of an action alleging First Amendment retaliation claims.

                                                        11

Defendants point to the decision in *Huskey v. City of San Jose*, 204 F.3d 893 (9th Cir. 2000) in support of their argument.  In that case, the Ninth Circuit found that the plaintiff-employee had "failed to introduce evidence demonstrating a nexus between his statements to Gallo and any adverse employment action he may have suffered."  *Id.* at 899.  In addressing the § 1983 claim before it the court in *Huskey* did apply the "constructive discharge" analysis, but did so in the context of an alleged due process violation—i.e., that the employee was deprived of a property interest in his job without due process of law.  Because of the differing nature of the constitutional claims at issue, the court concludes that the decision in Huskey is not dispositive of the issue presented in this case.  This is especially true in light of the decisions discussed below.

As plaintiff argues, where First Amendment violations are alleged, an adverse employment action need not require much adversity in order to be actionable.  As the Supreme Court has stated:

> Since the government however, may not seek to achieve an unlawful end either directly or indirectly, the inducement afforded by placing conditions on a benefit need not be particularly great in order to find that rights have been violated.  Rights are infringed both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason.

*Elrod v. Burns*, 427 U.S. 347, 359 n.13 (1976).  *See also Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990) (overturning a holding that only an employment decision that was the "substantial equivalent of a dismissal" would violate a public employee's rights under the First Amendment).  "The denial of even a 'trivial' benefit may form the basis for a First Amendment claim where the aim is to punish protected speech."  *Ulrich*, 308 F.3d at 977.  The Ninth Circuit has adopted a "reasonably likely to deter" test concerning whether an employer's action was adverse.  *See Coszalter v. City of Salem*, 320 F.3d 968, 975–76 (9th Cir. 2003) ("To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind.  Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden.");  *see also Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1061 (9th Cir. 2013) (holding that a deprivation of a five percent increase in salary for a period of approximately three months was sufficient adverse action).

1    Here, the parties do not dispute numerous facts indicative of adverse employment actions

2    taken against plaintiff.  The parties do not dispute plaintiff was transferred out of more desirable

3    positions and into less desirable assignments; that he was suspended without pay; that he was

4    compelled to write letters of apology; that he was moved into a less desirable office; and that he

5    received both oral and written reprimands.  While some of these—such as being moved to a less

6    desirable office—may not have been reasonably likely to deter First Amendment activity,

7    suspensions and work assignment transfers are certainly adverse employment actions that a jury

8    could find were reasonably likely to deter an employee from engaging in protected activity.

9                    c.   Insufficient Evidence Establishing the Adverse Employment Actions were

10                        Substantially Motivated by the Protected Conduct

11   Having shown that he was the subject of adverse employment actions and engaged in

12   protected First Amendment activity sufficiently to resist summary judgment, plaintiff also bears

13   the burden of demonstrating these adverse employment actions were substantially motivated by

14   his protected speech.  *Karl*, 678 F.3d at 1068.  Plaintiff bears the burden of proof on this issue at

15   trial.  Defendants contend that they are entitled to summary judgment in their favor because

16   plaintiff is unable to meet that burden.  Defendants argue there is "no evidence that conclusively

17   shows"[7] defendant Fladager knew of plaintiff's association with or speech in support of

18   Cummins, and that only Chief Deputy District Attorney Gerald Begen knew that plaintiff

19   supported Cummins for District Attorney in 2006.  (Doc. Nos. 26-1 at 29; 27-1 at 28.)  According

20   _____

21   [7]   As noted at the outset, when the non-moving party bears the burden of proof at trial, "the
     moving party need only prove that there is an absence of evidence to support the nonmoving

22   party's case."  *Oracle Corp*., 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325.).  *See also* Fed. R.
     Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for

23   discovery and upon motion, against a party who fails to make a showing sufficient to establish the
     existence of an element essential to that party's case, and on which that party will bear the burden

24   of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an
     essential element of the nonmoving party's case necessarily renders all other facts immaterial."

25   *Id.*  In such a circumstance, summary judgment should be granted, "so long as whatever is before
     the district court demonstrates that the standard for entry of summary judgment . . . is satisfied."

26   *Id.* at 323.  On the other hand, defendants' use of the word "conclusively" is not accurate.

27   Plaintiff need not "conclusively" establish any material fact at this stage, or even at trial for that
     matter since establishing the facts by a preponderance of the evidence will suffice.  *See Thomas v.*

28   *Cty. of Riverside*, 763 F.3d 1167, 1169 (9th Cir. 2014).

1    to defendants, plaintiff "relies only on his own speculation to establish this key element." (Doc.

2    Nos. 26-1 at 29; 27-1 at 28.) Defendants also assert that even if plaintiff had evidence of such

3    knowledge on the part of defendant Fladager, that would be insufficient because he has no direct

4    evidence by which to prove her motive and proving motive is part of his affirmative case. (Doc.

5    Nos. 26-1 at 30; 27-1 at 28–29.) Finally, defendants argue all plaintiff can muster on summary

6    judgment is circumstantial evidence of the temporal relationship between the adverse

7    employment actions taken against him and his speech at issue, and this is insufficient as a matter

8    of law. (Doc. Nos. 26-1 at 31–32; 27-1 at 29–30.)

9        Plaintiff's papers and his argument at hearing make clear he is relying primarily on

10   several sources of circumstantial evidence which, when considered collectively he contends,

11   demonstrate that a jury must determine whether defendant Fladager acted against him in

12   retaliation for his engagement in protected speech.[8] In this regard, plaintiff points to the

13   following:  1) evidence he sought to meet with Fladager after the election and she treated him

14   with distrust and did not reassure him she did not hold a grudge against him; 2) plaintiff's

15   removal from the gang prosecution unit shortly after Fladager took office, which Assistant

16   District Attorney Carol Shipley apparently told him was "punishment"; 3) the fact that, despite

17   having tried many cases prior to Fladager's election, he tried only one case thereafter; 4) the

18   disparate treatment he received compared to other Deputy District Attorneys who had allegedly

19   spoken critically of judges; 5) the disparate treatment he received after Fladager's election

20   compared to the treatment he received before the election; 6) the disparate treatment received by

21   alleged Cummins supporter Wallace McKenzie, who was supposedly passed over for promotion

22   despite his superior qualifications; 7) the disparate overall evaluation ratings plaintiff before and

23   after Fladager's election; and 8) the "paper trail" created about plaintiff, i.e. that complaints about

24   other attorneys were not commemorated in the same manner as those made against plaintiff.

25   Even taking the collective weight of this evidence into consideration, however, it is clear that no

26

27   _____

     [8] Of course, a mere laundry list of protected speech on the one hand and arguably retaliatory acts
     over time on the other is insufficient to establish a wrongful retaliation claim absent some
28   evidence showing that the retaliatory conduct was motivated by the protected speech.

1    reasonable factfinder could conclude the adverse actions taken against plaintiff were substantially

2    motivated by his protected First Amendment context.

3            First, concerning knowledge of plaintiff's support of Cummins, it is not seriously

4    disputed that plaintiff's support of Cummins was unknown.  Cummins acknowledged being

5    aware plaintiff supported his campaign and had donated money to it, though he could think of no

6    other members of the District Attorney's Office who supported his campaign, either publicly or

7    privately.  (Doc. No. 31 at 121–22.)  Cummins testified plaintiff was the only member of the

8    District Attorney's Office who told Cummins he was supporting him.  (Doc. No. 31 at 124.)

9    Begen—plaintiff's supervisor at various points in his tenure at the District Attorney's Office,

10   including from 2007 to 2012 (*see* Doc. No. 31 at 51–52)—also was aware plaintiff was

11   supporting Cummins in the election, though he believed Deputy District Attorneys McKenzie and

12   Mike Houston were also supporting Cummins.  (Doc. No. 31 at 85.)  Plaintiff testified at his

13   deposition that it was "public knowledge" he was supporting Cummins in the election, based on

14   his letter to the editor, his public donation to Cummins's campaign, his attendance at Cummins's

15   fundraisers, and his name being posted on Cummins's campaign website.  (Doc. No. 31 at 333–

16   34.)  According to plaintiff, during the race he had two lunches with an investigator who was

17   supporting Fladager's campaign, during which they discussed Fladager and plaintiff's support of

18   her opponent.  (Doc. No. 31 at 273–76.)  Plaintiff also testified Fladager talked to attorneys in the

19   office in an attempt to obtain their support, but did not talk to him.  (Doc. No. 31 at 280–81.)

20   According to plaintiff, Fladager arranged a campaign photograph for herself and her supporters

21   outside the office, and did not invite plaintiff (Doc. No. 31 at 276–78), suggesting her subjective

22   awareness of plaintiff's support of Cummins.  Even Fladager herself believes she became aware

23   of plaintiff's letter to the editor "at some point towards the end of the campaign" or around the

24   time of the election.  (Doc. No. 31 at 155–56.)  Therefore, defendants' assertion that plaintiff has

25   come forward with insufficient evidence of Fladager's knowledge of his support for Cummins

26   during the race is belied by the evidence presented on summary judgment.

27           Of course, mere knowledge that plaintiff supported her opponent is not, in and of itself,

28   sufficient to show Fladager held a retaliatory motive in taking the subsequent adverse

1    employment actions against plaintiff.  Because plaintiff lacks any direct evidence of retaliatory

2    motive, the court turns to the circumstantial evidence provided by plaintiff on summary judgment.

3         Plaintiff testified at deposition he had met with Fladager after the 2006 election to advise

4    her that, while he had supported Cummins, he wanted to "clear the air" between them and

5    reassure her that he would "do a good job" working for her.  (Doc. No. 31 at 264.)  Plaintiff noted

6    that he had to pursue this meeting with Fladager for several months before she agreed to meet and

7    when she did agree, she brought a witness to the meeting.  (*Id.* at 264–65.)  According to plaintiff,

8    Fladager was "very reserved" at the meeting, "didn't respond a lot," and just "listened."  (*Id.* at

9    269.)  Plaintiff testified Fladager did not provide him with any verbal reassurance at the meeting

10   that she bore no grudge against him.  (*Id.* at 269.)  Plaintiff acknowledged that he had "no

11   independent recollection" of what he said to Fladager during the meeting, and was attempting to

12   "reconstruct it . . . based on what I wanted to accomplish there."  (*Id.* at 267.)  Nevertheless,

13   plaintiff testified he believed "the tone was set" and he "had a hint that she might have a grudge."

14   (*Id.* at 269.)  In her declaration submitted in support of defendants' summary judgment motion,

15   Fladager states she does not recall meeting with plaintiff about his work on Cummins's campaign

16   during 2006 or at any point thereafter until he raised the retaliation allegations in his penultimate

17   *Skelly* conference.  (Doc. No. 27-5 at 51.)

18        There might be a multiplicity of reasons for not promptly meeting with a subordinate

19   immediately after becoming a newly-elected District Attorney.  Such evidence does not create a

20   reasonable inference of retaliation in response to plaintiff's engagement in activities protected by

21   the First Amendment.  Even if a jury construed Fladager's reserved approach to the meeting as

22   evidence that she was distrustful of plaintiff, this meeting did not involve or result in any alleged

23   adverse employment action.  Simply put, this evidence provides no support for plaintiff's

24   conclusion that the later adverse employment actions—the first of which being plaintiff's transfer

25   out of the gang unit eight months after Fladager took office—were retaliatory.

26        Turning to his transfer from the gang unit, plaintiff notes he was moved out of his

27   preferred position in that unit and into the issuance department shortly after Fladager took office.

28   (*See* Doc. No. 31 at 320–21, 325.)  Plaintiff's transfer occurred in March 2007, after complaints

1   were received by the District Attorney's Office in February 2007 regarding an inappropriate and

2   critical email plaintiff had sent to members of the gang intelligence task force.  (Doc. No. 30-2 at

3   24–25.)  Plaintiff argues that his transfer was punishment imposed by Fladager and Shipley,

4   insofar as it deprived him of the trial work he enjoyed.  (Doc. No. 30-2 at 25.)  The evidence

5   plaintiff cites in support of this contention includes Shipley's deposition testimony, in which she

6   stated she discussed the e-mail in question with Fladager, who found it inappropriate and believed

7   plaintiff should be removed from the gang unit to show him there would be negative

8   consequences for his inappropriate behavior.  (Doc. No. 31 at 527.)  This testimony, however,

9   does not support a conclusion that defendant Fladager retaliated against plaintiff by transferring

10  him out of the gang unit.  Rather, it supports the opposite conclusion:  defendant Fladager sought

11  to punish and reassign plaintiff for entirely appropriate and lawful reasons.

12      Plaintiff also argues that, when other employees of the District Attorney's Office "had

13  personality issues" with law enforcement, they "were never subject to formal discipline, such as a

14  written reprimand, suspension or termination."  (Doc. No. 30-2 at 25.)  Notably, plaintiff does not

15  assert that when other employees were inappropriate and rude to law enforcement officers, they

16  were not transferred out of work assignments in which they interacted with those officers.  Most

17  importantly for resolution of the pending summary judgment motion, he has come forward with

18  no evidence that this was the case.  Plaintiff also points to the deposition of McKenzie, who

19  testified that, though he had disagreements with law enforcement officers which were elevated

20  and involved his superiors, he was never disciplined in connection with those disagreements.

21  (Doc. No. 31 at 490–94.)  However, McKenzie also testified that he was never accused of being

22  rude in these disagreements, nor had he ever heard of complaints about other attorneys being rude

23  in their interactions with law enforcement.  (Doc. No. 31 at 491–95.)  Again, the evidence before

24  the court on summary judgment establishes that no one else acted as poorly in their professional

25  interpersonal relationships as plaintiff allegedly did, not that plaintiff was disproportionately

26  punished for the same conduct.

27      Plaintiff seeks to find retaliatory motive by comparing the administrative investigation

28  which started shortly after Fladager took office and the subsequent discipline he received as a

17

1    result with the disciplining of other attorneys in the District Attorney's Office.  Specifically,

2    plaintiff points to five other attorneys who received formal discipline while Fladager was District

3    Attorney.  According to plaintiff's evidence, of these five attorneys, two received suspensions:

4    (1) following a DUI, one attorney was given a ten day suspension, reduced from a proposed forty-

5    five day suspension; and (2) after a different DUI that involved a hit-and-run, an attorney was

6    given a twenty day suspension, reduced from a proposed forty-five day suspension.  The

7    remaining three attorneys received letters of reprimand:  (3) one attorney whose house had been

8    burglarized contacted a person selling items stolen from him on the internet and falsely

9    represented to this individual and later to the police that the district attorney's office was actively

10   investigating the matter; (4) one attorney made a comment about taking their clothes off to a

11   colleague; and (5) one attorney failed to document or communicate an agreed-upon plea deal to

12   the attorney taking over the case.  (Doc. No. 31 at 232–58.)  This evidence simply does not give

13   rise to any inference that plaintiff was the subject of retaliation.  Indeed, this evidence suggests

14   plaintiff's misconduct—which consisted of five separate instances of misconduct and for which

15   he ultimately received only one letter of reprimand—was punished in a proportionate manner

16   with other misconduct within the District Attorney's Office.  If anything, this evidence too

17   supports the conclusion that plaintiff was punished in an entirely reasonable, appropriate and

18   constitutional manner.

19         Retaliatory motive also lurks, according to plaintiff, in the shadows of the fact that no

20   other employee was "subjected to discipline for similar grounds."  (Doc. No. 45-3 at 39.)

21   However, plaintiff has not come forward with evidence establishing that any other employees

22   *engaged* in similar misconduct.  Plaintiff has presented no evidence suggesting other employees

23   in the office engaged in similar types of behaviors which could be taken (or mistaken) as rude or

24   inappropriate but were not disciplined for it.  Nor has he presented evidence that the discipline he

25   received was related to his political support for Cummins, rather than due to other appropriate

26   reasons, such as his own misconduct.  Regardless of whether it was fair for his colleagues and

27   others to find him rude, it is plaintiff's burden to present evidence that this discipline was

28   "substantially motivated" by his political speech.  Bias against him for other reasons neither

1    creates a cognizable First Amendment claim nor raises a material issue of fact with regard to such

2    a claim that must be resolved by a jury.

3          Plaintiff points again to the deposition testimony of Wallace McKenzie, who seemed to

4    feel plaintiff was being singled out for discipline.  McKenzie indicated he was surprised when

5    plaintiff told him about complaints received about him from a judge, because Deputy District

6    Attorneys were regularly told to support the office's cases and hold the judge's "feet to the fire."

7    (Doc. No. 45-3 at 40.)  McKenzie also said it was common for attorneys to receive verbal

8    reprimands following complaints from the clerical staff, but that he had never heard of other

9    attorneys who were formally disciplined because of such complaints.  (Doc. No. 45-3 at 41.)

10   Though McKenzie testified he believed plaintiff was singled out for disparate treatment, he could

11   not identify any particular reason why and did not indicate he believed it was because of

12   plaintiff's support of Cummins during the election.  (Doc. No. 31 at 442–51.)

13         Plaintiff also believes the failure of McKenzie to be promoted is indicative of retaliatory

14   animus on behalf of Fladager against plaintiff.  McKenzie was believed to be a Cummins

15   supporter, despite his efforts to stay neutral in the election.  (Doc. No. 31 at 468–69.)  According

16   to plaintiff, McKenzie was told by a member of management that others in management did not

17   like McKenzie and he should "watch his back" and "needed to be careful in the future," all of

18   which were statements to which McKenzie testified at his deposition.  (*Id.* at 446–51.)  McKenzie

19   was reportedly passed over for promotion, but believed it was due to his position within the local

20   union, not his presumed affiliation with Cummins.  (*Id.* at 454–55.)  McKenzie also testified he

21   was not promoted following the elections, but that Doug Raynaud, who McKenzie believed to be

22   a supporter of Fladager, was promoted instead.  (*Id.* at 477–82.)  Raynaud was promoted despite

23   having once been convicted of a DUI.  (*Id.* at 218, 391–92, 524–26.)

24         Plaintiff's evidence establishes that at least once following Fladager's election a supporter

25   of hers was promoted and McKenzie was not.  Such evidence does not create the inference that

26   McKenzie was retaliated against for his purported political beliefs, let alone provide evidence in

27   any way relevant to whether plaintiff was unlawfully retaliated against.  Even McKenzie testified

28   that he did not think he was retaliated against due to his perceived support of Cummins.  There is

1    simply no evidence before the court on summary judgment establishing that McKenzie should

2    have been promoted and was not.  Indeed, McKenzie himself testified only that he *thought* he had

3    more seniority than Raynaud, because Raynaud had started before him but left the office for a

4    period of time.  (Doc. No. 31 at 480–82.)  Moreover, McKenzie did not know whether Raynaud

5    or he had more experience trying cases.  (*Id.* at 481.)

6         Plaintiff also argues that, following his transfer from the gang unit to the calendar

7    department, he was "harassed" by his new supervisor, Dave Harris, who demanded he "engage in

8    work that other attorneys in the department were not required to perform."  (Doc. No. 45-3.)  In

9    actuality, the evidence plaintiff cites to support this contention is his own deposition testimony in

10   which he recalled a single instance when Harris asked him to do some extra work because the

11   regular work load that day was light, but did not ask plaintiff's deputy to do additional work as

12   well.  (Doc. No. 31 at 327–28.)  Plaintiff also testified at deposition that he felt singled out by

13   Harris because he once received an e-mail saying he should not jaywalk between the District

14   Attorney's Office and the courthouse across the street, which was a common practice.  (Doc. No.

15   31 at 328–30.)  Further, as far as plaintiff was concerned, Harris failed to defend him sufficiently

16   in his interactions with others, also leading plaintiff to conclude he was being targeted for

17   retaliation.  (*Id.* at 330–32.)  Plaintiff claims Harris once denied him the ability to take a vacation

18   at his chosen time, because Harris believed plaintiff had not accrued sufficient vacation time.  (*Id.*

19   at 305–08, 310–13.)  During this time, plaintiff also lost an unofficial position he held

20   representing the District Attorney's Office at lifer parole hearings for what plaintiff deemed to be

21   a "specious" reason.[9]  (*Id.* at 299–305.)  Again, none of these conclusory and insignificant

22   allegations support plaintiff's claim of a retaliatory motive on the part of defendants.  Rather, they

23   suggest only that plaintiff disliked and felt harassed by relatively benign aspects of regular

24   employment.

25   /////

26

27   ───────────────────────

     [9]  The "specious" reason referred to by plaintiff appears to be that the District Attorney's Office

28   phased out its attendance at these hearings except in extraordinary situations, due to staffing and
     budget cuts.  (Doc. No. 27-5 at 94.)

Next, plaintiff points to subsequent administrative investigations, his eventual transfer to a windowless office, and his transfer to other undesirable assignments, including the juvenile division and a newly created position in "collateral support," all as further evidence of defendants' retaliation.  (Doc. No. 45-3 at 51–65.)  However, all of these allegedly adverse employment actions happened *years* after the contested election between Fladager and Cummins.  Moreover these actions took place after an extended period of four years, from 2007 until 2011, in which very few or no complaints were leveled about plaintiff and during which he was, correspondingly, the subject of no investigations or discipline.  There is simply no thread of evidence drawing a connection between these latter employment actions and plaintiff's engagement in protected conduct.  Even the initial adverse action of which plaintiff complains— his transfer from the gang unit to issuance—occurred in March 2007, approximately eight months after Fladager took office.  The timing of the adverse actions of which plaintiff complains in actuality supports the conclusion that they were taken for legitimate reasons, not retaliatory ones.

The other evidence plaintiff identifies in attempting to create a triable issue of fact on this element is similarly unavailing.  Contrary to the suggestion that he was treated more harshly after the election, plaintiff had long been the subject of complaints, administrative investigations, and discipline in the District Attorney's Office prior to the election.  His behavior was complained about by clerical staff, witnesses, judges, law enforcement, and other attorneys.  In addition, his overall performance evaluations did not substantially change following Fladager's election: plaintiff was ranked either "exceptional" or "satisfactory" in almost all of his performance evaluations both before and after the election.  In fact, a fair reading of his annual performance reviews reflects that while managers had significant, ongoing concerns about plaintiff's behavior, they valued his contributions to the office, noted his successes, and praised his professional skills.

It bears reiterating that plaintiff has produced no evidence on summary judgment suggesting other attorneys in the District Attorney's Office engaged in the kinds of misconduct he engaged in, or were the subject of the same types of complaints that he was.  For example, plaintiff points to e-mails sent by Alan Cassidy, a Chief Deputy District Attorney, who he asserts "disparaged defense attorneys and judges."  (Doc. No. 30-2 at 52.)  The e-mails sent by Cassidy,

1    however, were clearly sent by one member of the office to other members of the District

2    Attorney's Office and, therefore, did not damage or jeopardize the relationship of the office with

3    local judges, law enforcement officers, and defense attorneys.  Notably, plaintiff has come

4    forward with no evidence suggesting Cassidy was ever the subject of a complaint by a judge for

5    how he spoke to her in her courtroom, as plaintiff was.  A reasonable factfinder would not

6    conclude, based on the evidence presented on summary judgment, that plaintiff was even treated

7    in a disparate fashion, let alone retaliated against for engaging in protected speech multiple years

8    prior to many of the adverse actions in question.

9           Finally, the court observes that, despite plaintiff's allegations of retaliation, many of the

10   complaints levied against him that resulted in serious discipline came from outside of the District

11   Attorney's Office, originating from law enforcement personnel, witnesses, court staff, and

12   members of the bench.  There can be no suggestion that these many individuals from outside the

13   office who leveled complaints about plaintiff were working in collusion with defendant Fladager

14   to malign plaintiff or to falsify complaints about him.   There is no evidence before the court on

15   summary judgment that these types of complaints were received against other members of the

16   District Attorney's Office, and certainly no evidence that any such complaints were received with

17   such frequency and vigor as the complaints which were made against plaintiff.

18          The logical fallacy of *post hoc, ergo propter hoc*—literally, "after this, therefore because

19   of this"—cannot sustain a First Amendment retaliation claim, contrary to the belief professed by

20   plaintiff's counsel at the hearing on this motion.  *See Huskey*, 204 F.3d at 899–900; *see also*

21   *Quiroz v. Horel*, 85 F. Supp.3d 1115, 1131-32 (N.D. Cal. 2015); Steshenko v. Gayrard, 70 F.

22   Supp.3d 979, 996 (N.D. Cal. 2014).  Here, both defendants and plaintiff have presented, and the

23   court has reviewed, a large amount of evidence susceptible of only one reasonable interpretation:

24   the adverse employment actions in this case were not substantially motivated by plaintiff's

25   engagement in speech protected by the First Amendment.  *See Matsushita Elec. Indus. Co., Ltd.*,

26   475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find

27   for the non-moving party, there is no genuine issue for trial.") (citations and quotations omitted).

28   Indeed, though it appears plaintiff was disciplined many times for things he said, and particularly

1   for his inability to articulate himself without offending those around him, there is no evidence

2   before the court on summary judgment from which a reasonable inference of retaliation could be

3   drawn.  *See Anthoine v. North Central Counties Consortium*, 605 F.3d 740, 753 (9th Cir. 2010)

4   (where plaintiff relies on circumstantial evidence to show retaliation, that evidence must be

5   specific to defeat the motion for summary judgment); *McGinest v. GTE Service Corp.,* 360 F.3d

6   1103, 1124 (9th Cir. 2004) (affirming grant of summary judgment for retaliation claim where

7   plaintiff had proffered no evidence of a causal link between the protected activity and denial of

8   promotion); *see also Roseboro v. Gillespie*, 791 F. Supp.2d 353, 370 (S.D.N.Y. 2011)

9   (circumstantial evidence of the temporal proximity of adverse employment action to plaintiff's

10  engagement in protected activity "is insufficient to survive summary judgment").

11          Accordingly, defendants are entitled to summary judgment in their favor as to plaintiff's

12  First Amendment claims.[10]

13          *2.      Due Process Claim*

14          Defendants also seek summary judgment in their favor with respect to plaintiff's

15  procedural due process claim on the grounds that the evidence establishes plaintiff was not

16  deprived of any protected interest because he voluntarily resigned his position.  (Doc. No. 27-1 at

17  31.)  Moreover, defendants argue that even if plaintiff could demonstrate some form of

18  constructive discharge, the evidence establishes that he was afforded all the process due to him,

19  and therefore this claim must fail.  (Doc. No. 27-1 at 32.)  In response, plaintiff maintains

20  Fladager's alleged bias prevented him from receiving adequate process, and therefore genuine

21  disputes of material fact remain for jury resolution.  (Doc. No. 40 at 35–36.)

22  /////

23  _____

24  [10]  Because summary judgment in favor of defendants will be granted on this ground, the court
    need not reach the defendants' other arguments directed at plaintiff's retaliation claim, including
    a lack of causation, qualified immunity, the statute of limitations defense, or the same decision

25  defense under the decision in *Mount Healthy* and *Karl*.  However, the court does note that had
    plaintiff made out an adequate prima facie case as to this claim, the same evidence discussed

26  above would have been sufficient to establish that the adverse employment action would have
    been taken absent the protected speech.  Finally, the court does not reach the various arguments

27  raised by defendants regarding the inapplicability of *Monell* liability's, since there can be no
    municipal liability for a constitutional violation that did not occur.

28

23

The parties agree plaintiff had a protected property interest in his job.  The only real question is whether Fladager's alleged bias deprived plaintiff of the requisite due process under the law.  While the above discussion indicates there is no evidence of retaliatory animus in response to plaintiff's First Amendment protected conduct, this does not necessarily establish that Fladager acted with impartiality toward plaintiff.  Nevertheless, for the reasons discussed below the granting of summary judgment in favor of defendants is also warranted with respect to this claim.

In at least some contexts, the Supreme Court has required a hearing of some sort prior to an employee's termination.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (due process "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 568–69 (1972)).  The hearing "need not be elaborate," and will generally be less than a full evidentiary hearing.  *Id.* at 545.  The purpose of such a hearing is to "be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action."  *Id.* at 545–46.  The essential requirements for such a hearing "are notice and an opportunity to respond."  *Id.* at 546.

"A biased proceeding is not a procedurally adequate one."  *Clements v. Airport Auth. of Washoe Cty.*, 69 F.3d 321, 333 (9th Cir. 1995).  This standard has been applied in the context of post-termination administrative proceedings, and even subsequent judicial review of the decision by an unbiased court does not redeem the tainted hearing.  *Id.*  However, the Ninth Circuit also noted that *pre-termination* hearings, which only require notice and an opportunity to respond, are not adjudications and therefore need not be conducted by an impartial decisionmaker, "so long as an impartial decisionmaker is provided at the post-termination hearing."  *Id.* at 333 n.15.  *See also Walker v. City of Berkeley,* 951 F.2d 182, 184 (9th Cir. 1991) ("[T]he failure to provide an impartial decisionmaker at the pretermination stage, of itself, does not create [due process] liability, so long as the decisionmaker at the post-termination hearing is impartial."); *Trevino v. Lassen Mun. Util. Dist.*, No. CIV. S-07-2106 LKK DAD, 2009 WL 385792, at *9 (E.D. Cal. Feb.

24

1   13, 2009) (noting the same, though holding that minimal process at a pre-termination hearing

2   combined with the announced appointment of an apparently biased decisionmaker at a post-

3   termination hearing which never occurred created a jury question about whether plaintiff received

4   sufficient procedural protections).

5          The court will assume *arguendo* that the same types of due process requirements apply

6   before any instance of formal discipline and therefore attached prior to plaintiff's thirty-day

7   suspension.  However, plaintiff received a pre-disciplinary proceeding prior to the thirty-day

8   suspension when a *Skelly* hearing was conducted by Sheriff Christianson.  (Doc. No. 26-4 at 3.)

9   As a result of that hearing plaintiff's intended termination was ultimately reduced to a thirty-day

10  suspension.  (*Id*.)  Plaintiff had filed an appeal of the suspension.  (*Id*.)  He served the suspension

11  from August 26, 2013 to October 4, 2013, and was slated to return to work on October 7, 2013.

12  (Doc. No. 26-4 at 3.)  Plaintiff voluntarily dropped his appeal of the thirty-day suspension on

13  September 26, 2013.  (Doc. No. 30-2 at 80.)  Instead of returning to work, however, plaintiff

14  submitted a letter of resignation on October 7, 2013.  (Doc. No. 26-4 at 3.)  Plaintiff does not

15  allege and presents no evidence that the adjudicator of his appeal, had he continued pursuing the

16  available appeal process, was or would have been biased.  Nor is there any evidence before the

17  court on summary judgment of bias on the part of Sheriff Christianson, who presided over the

18  *Skelly* hearing.  Therefore, the evidence on summary judgment establishes that plaintiff received

19  an adequate pre-disciplinary proceeding including all the process to which he was due and was

20  slated to receive a post-disciplinary proceeding but voluntarily forewent it and resigned.  There is

21  no constitutional requirement, under *Clements* or any other authority, that plaintiff receive an

22  unbiased hearing prior to being disciplined.  Moreover, there is no evidence of bias in the pre-

23  discipline hearing conducted by Sheriff Christianson.  Finally, plaintiff has come forward with no

24  evidence suggesting he would have received a biased hearing had he pursued his appeal of his

25  suspension.  Accordingly, defendants are entitled to summary judgment in their favor on

26  plaintiff's due process claim as well.

27  /////

28  /////

3.   *Plaintiff's State Law Claims Must Also Be Dismissed*

In his complaint, plaintiff alleged a fourth cause of action based on California Labor Code §§ 1101 and 1102. (Doc. No. 1 at 14–15.)   Defendants sought summary judgment in their favor as to these claims here, in part, because in California "[p]rovisions of the . . . Labor Code do not apply to private sector employees unless they are specifically and expressly made applicable to the public." (Doc. No. 26-1 at 36 & Doc. No. 27-1 at 35) (citing *Johnson v. Arvin-Edison Water Storage Dist.*, 174 Cal. App. 4th 729, 733 (2009)).   In his opposition to the pending motion, plaintiff concedes this issue. (Doc. No. 40 at 36.)   However, plaintiff also states in his opposition that he intended to proceed against defendants in this regard under California Government Code §§ 3201, *et seq.*, rather than the California Labor Code provisions cited above. (Doc. No. 40 at 36.)   In reply, defendants protest that plaintiff should not be allowed to announce a new theory of liability for the first time in an opposition to summary judgment. (Doc. No. 45 at 17; Doc. No. 46 at 16.)   Even if plaintiff were allowed to do so, defendants argue, they are entitled to summary judgment with respect to any such new claim on various state statutory immunity grounds. (*Id.*) Plaintiff argues California Government Code §§ 3201, *et seq.* override the immunity to which defendants claim to be entitled. (Doc. No. 40 at 36.)

A complaint may be amended, with leave of court, at virtually any point in the case, including during and after trial. *See* Fed. R. Civ. P. 15(b).   Indeed, the Federal Rules of Civil Procedure generally encourage district courts to freely allow amendments. *See* Fed. R. Civ. P. 15(a)(2), (b)(1).   The Ninth Circuit, however, has suggested that at least in some cases amendment should not be allowed at the summary judgment stage, particularly if there will be prejudice to the defendants resulting from the lack of discovery. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–94 (9th Cir. 2000).   In *Coleman*, plaintiff employees, who were laid off following reductions-in-force, had challenged an adverse employment action under the ADEA, claiming disparate treatment. *Id.* at 1291.   Plaintiffs' ADEA complaint alleged only a disparate impact theory. *Id.*   The Ninth Circuit did not indicate plaintiffs *must* raise both theories in their complaint, but held that where plaintiffs failed to indicate the alternate theory of liability either in the complaint or during discovery, and discovery had since closed and would therefore result in

26

1   prejudice to the defendant, plaintiffs were barred from raising the alternative theory for the first

2   time in opposition to defendant's summary judgment motion.  *Id.* at 1292–94; *see also Ultimax*

3   *Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1354 (9th Cir. 2009) ("Thus, the

4   district court was clearly within its discretion to deny the motion to amend based on undue delay

5   and a similarly burdensome need to reopen summary judgment motions."); *Pickern v. Pier 1*

6   *Imps. (U.S.), Inc*., 457 F.3d 963, 968–69 (9th Cir.2006) (refusing to allow the plaintiff to assert

7   new specific factual allegations in support of a claim when they were "presented for the first time

8   in [the plaintiff's] opposition to summary judgment"); *Maples v. SolarWinds, Inc*., 50 F. Supp. 2d

9   1221, 1232 (N.D. Cal. 2014) ("On a motion for summary judgment, the plaintiff's allegations and

10  theories of liability are confined to those found in the operative complaint.  [citation omitted.]

11  Since this particular claim is not alleged in the pleadings, it not properly before the Court.").[11]

12      In any event, plaintiff has failed to articulate a cognizable claim under California

13  Government Code §§ 3201, *et seq.*  Plaintiff's complaint specifically quotes California Labor

14  Code §§ 1101 and 1102.  (Doc. No. 1 at 14–15.)  The only factual allegations set forth in the

15  complaint in relation to that cause of action are that plaintiff "exercised his right to engage in

16  political activities," was retaliated against for these activities by being subjected to adverse

17  employment actions, and suffered damages as a result.  (Doc. No. 1 at 15.)  While he now asserts

18  he intends to proceed under Government Code §§ 3201, *et seq.* with respect to these factual

19  allegations, it is unclear how particularly he intends to do this since no single statutory provision

20  is cited by plaintiff.  Rather, he merely invokes the subsection in its entirety.  There are ten

21  separate statutory provisions under this subsection of the California Government Code.  Among

22  them, they bar any "restriction . . . placed on the political activities of any officer or employee of

23  a state or local agency," California Government Code § 3203, as well as the use of any elected

24  office to attempt to influence how an individual will vote, California Government Code § 3204,

25

26  [11]  It has been noted that the failure to plead the correct statutory basis for liability is not a basis to refuse amendment, since Rule 8 requires only a "short and plain statement of the case showing

27  that the pleader is entitled to relief" and that "a defendant is not entitled to summary judgment on a claim simply because the plaintiff's lawyer misconceived the proper legal theory."  *Finical v.*

28  *Collections Unlimited, Inc.*, 65 F. Supp. 2d 1032, 1047-48 (D. Ariz. 1999).

or to solicit certain political contributions, California Government Code § 3205.  None of the statutory subsections clearly provides a cause of action for retaliation for the exercise of one's First Amendment rights.  It is unclear what statutory theory of liability plaintiff is now suggesting he would allege.[12]

Accordingly, the court will grant defendants' motion for summary judgment on plaintiff's state law claims brought under California Labor Code §§ 1101 and 1102, as unopposed.  To the extent plaintiff's opposition seeks leave to amend the complaint, leave to amend will be denied as futile since plaintiff has failed to articulate how he may state a cognizable retaliation claim under the cited California Government Code provisions.  *See Saul v. United States*, 928 F. 2d 829, 843 (9th Cir. 1991); *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988) ("[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." ).  Finally, any amendment to attempt to state such a claim at this late stage of this litigation would be untimely.  *See Coleman*, 232 F.3d at 1292–94; *see also Cement Mfg. Corp.*, 587 F.3d at 1354.

**CONCLUSION**

For the reasons set forth above, defendants' motions seeking summary judgment in their favor as to all of plaintiff's claims (Doc. Nos. 26 and 27) are granted.  Accordingly, the Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **July 26, 2016**                                    _____

UNITED STATES DISTRICT JUDGE

---

[12]  Plaintiff's counsel did not elucidate the theory of liability under California Government Code §§ 3201, *et seq.* at the hearing on the pending motion.

28